**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BING GUAN, GO NAKAMURA, MARK ABRAMSON, KITRA CAHANA, ARIANA DREHSLER, <br><br>       Plaintiffs, <br><br>   v. <br><br> CHAD WOLF, Acting Secretary of the U.S. Department of Homeland Security, in his official capacity; MARK MORGAN, Acting Commissioner of U.S. Customs and Border Protection, in his official capacity; MATTHEW ALBENCE, Acting Director of U.S. Immigration and Customs Enforcement, in his official capacity, <br><br>       Defendants. | COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF (Violation of First Amendment) <br><br> No. 1:19-cv-6570 |

**PRELIMINARY STATEMENT**

1.     This lawsuit challenges U.S. border officers' questioning of journalists about their work documenting conditions at the U.S.-Mexico border. Plaintiffs were each impermissibly compelled to disclose information about their journalism work and activities when they sought to re-enter the United States. The border officers' questioning aimed at uncovering Plaintiffs' sources of information and their observations as journalists was unconstitutional. This questioning was unrelated to any valid immigration or customs purpose. Plaintiffs seek a declaratory judgment that such questioning and compelled disclosure of information violated the First Amendment. They also seek an injunction requiring Defendants to expunge any records they have retained regarding the

unlawful questioning and to inform Plaintiffs whether those records have been disclosed to other agencies, governments, or individuals.

2.      Plaintiffs are five U.S. citizens and professional photojournalists who have traveled outside the country for their work in the past and intend to continue doing so. Between November 2018 and January 2019, Plaintiffs traveled to Mexico to document people traveling north from Central America by caravan in an attempt to reach the U.S.-Mexico border. During this period, each of the Plaintiffs entered the United States via a port of entry. When they did so, border officers referred each of the Plaintiffs to secondary inspection and questioned them about their work as photojournalists, including their coverage of the caravan, their observations of conditions at the U.S.-Mexico border, and their knowledge of the identities of certain individuals. This questioning focused on what each Plaintiff had observed in Mexico in the course of working as a journalist, and did not relate to any permissible immigration or customs purpose. Plaintiffs Bing Guan and Go Nakamura were also forced to disclose their journalistic work product to border officers when they were required to show photographs each had taken of migrants and other people on the Mexican side of the U.S.-Mexico border.

3.      Plaintiffs Bing Guan, Go Nakamura, and Mark Abramson were each sent to secondary inspection and questioned about their work as journalists once between December 2018 and January 2019. Plaintiff Kitra Cahana was sent to secondary inspection on two separate occasions in January 2019, and border officers questioned her about her work as a journalist on each of those occasions. Plaintiff Ariana Drehsler was sent to secondary inspection and questioned about her work as a journalist on three separate occasions in December 2018 and January 2019.

4.    Plaintiffs were engaged in newsgathering activity in Mexico that has long been recognized as protected under the First Amendment, and the forced disclosure of information regarding that activity was not justified and did not meet the standard necessary to compel such disclosure.

5.    The border officers' questioning of Plaintiffs regarding their activities as journalists in Mexico substantially burdened Plaintiffs' First Amendment rights to freedom of speech, association, and the press. It required Plaintiffs to disclose confidential information about their observations, sources of information, and/or work product, including the identities of individuals with whom they may have interacted in the course of their work as journalists.

6.    The border officers' questioning of Plaintiffs regarding their journalism work and activities would reasonably chill Plaintiffs and other journalists from traveling to Mexico to report on U.S.-Mexico border issues, including about people traveling by caravan, asylum seekers, and other topics that may be of interest to the U.S. government.

7.    The border officers' questioning of Plaintiffs regarding their journalism work and activities would reasonably chill Plaintiffs and other journalists from publishing or speaking in a manner that is critical of, or embarrassing to, the U.S. government, out of a fear of being detained and questioned at the U.S. border about their journalism work in the future.

8.    Plaintiffs' right to engage in photojournalism on issues of widespread public interest lies at the heart of the First Amendment's protections. Plaintiffs seek to exercise that right without fear of unlawful questioning by the government.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

10.     This Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201–02, Rules 57 and 65 of the Federal Rules of Civil Procedure, and its inherent equitable powers.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e). Plaintiffs Bing Guan and Go Nakamura reside within this Court's judicial district, and Defendants are officers of the United States sued in their official capacities.

## PARTIES

### *Plaintiffs*

12.     Plaintiff Bing Guan is a U.S. citizen whose residence is in Brooklyn, New York. He is a freelance photojournalist.

13.     Plaintiff Go Nakamura is a U.S. citizen whose residence is in Queens, New York. He is a freelance photojournalist.

14.     Plaintiff Mark Abramson is a U.S. citizen whose residence is in New York, New York. He is a freelance photojournalist.

15.     Plaintiff Kitra Cahana is a U.S. citizen whose residence is in Austin, Texas. She is a freelance photojournalist.

16.     Plaintiff Ariana Drehsler is a U.S. citizen whose residence is in San Diego, California. She is a freelance photojournalist.

*Defendants*

17.     Defendants, who are responsible for the challenged detention, questioning, and retention of information, are the heads of the U.S. Department of Homeland Security ("DHS") and its agencies, U.S. Customs and Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE"), of which Homeland Security Investigations ("HSI") is a subcomponent. Defendants are sued in their official capacities.

18.     Defendant Chad Wolf is Acting Secretary of DHS. He has authority over all DHS policies and practices, including those challenged here. Plaintiffs sue him in his official capacity.

19.     Defendant Mark Morgan is Acting Commissioner of CBP, a component of DHS. He has authority over all CBP policies and practices, including those challenged here. Plaintiffs sue him in his official capacity.

20.     Defendant Matthew Albence is Acting Director of ICE, a component of DHS. He has authority over all ICE policies and practices, and all HSI policies and practices, including those challenged here. Plaintiffs sue him in his official capacity.

## FACTUAL BACKGROUND

### I.     Central American Caravans Attract Widespread Public Interest

21.     Beginning in the spring of 2018, one form of travel—so-called migrant caravans—began attracting significant attention in the United States.

22.     Traveling by caravan is one method among many used by people coming from Central America to the United States, including walking, hitchhiking, taking buses, or riding trains.

23.     On or about March 25, 2018, a caravan of people predominantly from Honduras embarked from Tapachula, Mexico, with the goal of reaching the U.S.-Mexico border. The caravan at one point comprised about 1,500 people, most of them women and children.

24.     This caravan attracted widespread public interest. International, national, and local media outlets reported on its progress, the experiences of people traveling in the caravan, and conditions at the U.S.-Mexico border.

25.     On or about October 12, 2018, another caravan of people set out from Honduras to the U.S.-Mexico border. At one point, this caravan included approximately 7,000 people, including at least 2,300 children.

26.     This caravan also drew widespread public interest and attracted press coverage in international, national, and local media outlets.

II.     **Intelligence Gathering Related to Plaintiffs and Others Covering the October 2018 Caravan and Conditions at the U.S.-Mexico Border**

27.     In March 2019, the media outlet NBC 7 San Diego revealed that DHS had engaged in wide-ranging intelligence collection targeting activists, lawyers, and journalists—including Plaintiffs—working on issues related to the October 2018 migrant caravan and conditions at the U.S.-Mexico border.[1]

---

[1] *See* Mari Payton, Paul Kreuger, Tom Jones & Bill Feather, *Leaked Email Reveals How Federal Agents Used Confidential Sources and Informants to Gather Information about Migrant Caravan*, NBC 7 SAN DIEGO, Mar. 8, 2019, https://www.nbcsandiego.com/news/local/Blumenthal-Grave-Concerns-Over-Border-Surveillance-Documents-506892591.html; Tom Jones, Mari Payton & Bill Feather, *Photos: Leaked Documents Show Government Tracking Journalists, Immigration Advocates*, NBC 7 SAN DIEGO, Mar. 7, 2019, https://www.nbcsandiego.com/multimedia/PHOTOS-Leaked-Documents-to-NBC-7-Investigates-506782041.html; Tom Jones, Mari Payton & Bill Feather, *Source: Leaked Documents Show the U.S. Government Tracking Journalists and Immigration Advocates*

28.     As part of its reporting, NBC 7 San Diego published a DHS internal email, dated December 1, 2018, from David C. Shaw, the HSI Special Agent in Charge in San Diego, describing DHS evidence collection efforts with respect to the migrant caravan. The subject header of the email reads: "Continued Requests for CI Information/Intel on Incoming Migrant Caravan." The email instructs "[a]ll agents…to question available sources of information to include Confidential Informants (C/Is) and Sources of Information (SOIs) regarding the migrants, the caravan and it's [sic] leaders, and any criminal or cartel related actions concerning migrants or the caravan." The email further instructs agents to "forward any information directly to CIO [Chief Intelligence Officer]" and notes that the information "is being collected locally through the Incident Command Center, our SIG agents and IRS, and being routed through Headquarters." This email is reproduced here (with redactions in the original).

_____

*through a Secret Database*, NBC 7 SAN DIEGO, Mar. 6, 2019,
https://www.nbcsandiego.com/investigations/Source-Leaked-Documents-Show-the-US-Government-Tracking-Journalists-and-Advocates-Through-a-Secret-Database-506783231.html.

**From:** SND-Comms, HSI███████████████████████
**Date:** Saturday, Dec 01, 2018, 7:32 PM
**To:** SND-SAC-SD████████████████, SND-SAC-SD-MGRS████████████
████████, SND-SAC-SY████████████████████
**Subject:** Continued Requests for CI Information/Intel on Incoming Migrant Caravan

Agents-

As the caravan issue continues to be front and center, we are increasing our intelligence
collection efforts. All agents are asked to question available sources of information to include
Confidential Informants (C/Is) and Sources of Information (SOIs) regarding the migrants, the
caravan and it's leaders, and any criminal or cartel related actions concerning migrants or the
caravan. All information and intelligence needs to be documented as per standard operating
procedures. However, in addition, please forward any information directly to CIO ████
████████, and Acting Group Supervisor ████████████, and CC your Group
Supervisor. Please provide this in as timely a fashion as possible. (Email is sufficient with
appropriate contact information for potential follow-up.) This information is being collected
locally through the Incident Command Center, our SIG agents and IRS, and being routed
through Headquarters.

Your continued attention to the importance of these joint operations is greatly appreciated by
all of our DHS entities.

Thank you,



David C. Shaw
*Special Agent in Charge, San Diego*
*Homeland Security Investigations*

29.     NBC 7 San Diego also revealed the existence of a secret DHS database or

documents containing information about journalists who had been documenting the

October 2018 migrant caravan, as well as information about lawyers and activists who

had been communicating with the people in the caravan. NBC 7 San Diego reported that

the purpose of the database or documents was to "list people who officials think should

be targeted for screening at the border."[2]

30.     Alongside its reporting of the secret DHS database or documents, NBC 7

San Diego published screenshots of the database or documents.

---

[2] Jones, Payton & Feather, *Source*, *supra*, at note 1.

31.     The screenshots capture a title page and eight additional pages profiling 59 individuals. The title page is dated January 9, 2019 and features the heading "San Diego Sector Foreign Operations Branch, Migrant Caravan FY-2019, Suspected Organizers, Coordinators, Instigators, and Media." Above this heading are the American and Mexican flags astride a logo with a banner reading "ILU-OASISS-OMEGA." On information and belief, "ILU" refers to the International Liaison Unit, which facilitates cooperation between CBP and the Government of Mexico, including through the sharing of intelligence. On information and belief, "OASISS" refers to "Operation Against Smugglers Initiative on Safety and Security," a partnership between the U.S. Border Patrol and the Government of Mexico to enable the prosecution of Mexican human smugglers, through Mexican courts, using information obtained via interviews conducted by Border Patrol agents while in U.S. custody.

32.     The profile of each individual revealed in the screenshots features a headshot (typically taken from a passport, but, in some cases, from a social media account). Beneath the headshot are the following categories of personal information: (1) "DOB" [date of birth], (2) "COC" [country of commencement], (3) the "Role" the individual purportedly played vis-à-vis the migrant caravan, (4) whether there was an "Alert Placed" on the individual's record, and (5) the "Disposition" associated with the individual. Some of the individuals have an "X" placed across their headshots, which indicates "whether they were arrested, interviewed, or had their visa or SENTRI [Secure Electronic Network for Travelers Rapid Inspection] pass revoked by officials."

33.     Of the 59 individuals profiled in the screenshots, 10 are described as "Media" or "Journalist."[3] Thirteen individuals are labeled as "Organizer," eight as "Instigator," three as "Administrator on Caravan Support Network Facebook Page," one as "Associate," and one as "Coordinator." These screenshots are reproduced here (with redactions in the originals).



---

[3] Jones, Payton & Feather, *Photos*, *supra*, at note 1.















34.     All five Plaintiffs are featured in these screenshots.

35.     Mr. Abramson's identity was redacted by NBC 7 San Diego prior to publication. Ms. Drehsler, Mr. Guan, and Mr. Nakamura each have a green "X" placed across their headshots. The information beneath the headshots of Ms. Cahana, Ms. Drehsler, Mr. Guan, and Mr. Nakamura indicates that each occupies the "Role" of "Media/Photographer" and each has had an "Alert Placed" on his or her record.

36. Next to "Disposition," Ms. Drehsler's profile indicates that she was "Interviewed on 12/30/2018." Similarly, Mr. Nakamura's profile provides: "Interview conducted on 12/29/2018." Mr. Guan's profile indicates that he was "Interviewed." Ms. Cahana's profile, by contrast, provides: "Pending Encounter." These profiles are reproduced here (with redactions in the originals).

 

 

37. NBC 7 San Diego also reported that in addition to maintaining a list of journalists, lawyers, and activists, DHS created dossiers on each person listed. A list of DHS dossier files was shared with NBC 7 San Diego, which reported that two such files

"were labeled with the names of journalists but no further details were available" and that "[t]hose journalists were also listed as targets for secondary screenings."[4]

38.     On information and belief, each of the Plaintiffs was selected for secondary inspection, detention, and questioning by border officers from December 2018 to January 2019 because of their journalism work and activities in Mexico.

### III.    Border Officers Detained and Questioned Each Plaintiff at a Port of Entry about their Journalism Work and Activities, Including Coverage of Border Conditions

#### *Bing Guan*

39.     Bing Guan's work as a freelance photojournalist requires him to travel frequently to cover stories worldwide, and his photographs have been featured in *The Sunday Times Magazine*, *The Intercept*, and *The Phnom Penh Post.*

40.     Mr. Guan was questioned about his journalism work and activities by border officers on one occasion on December 29, 2018, as described further below.

41.     During the week of Thanksgiving in 2018, Mr. Guan worked in Mexico to document the migrant caravan that had originated in Honduras. Although Mr. Guan did not initiate this trip on assignment with any particular news outlet, he ultimately sold photographs from this trip to *The Intercept*. Mr. Guan returned to the United States after this trip.

42.     On or about December 25, 2018, Mr. Guan returned by car to Tijuana to continue his coverage of migrants near the U.S.-Mexico border.

43.     On or about December 27, 2018, Mr. Guan was on the southern side of the border when Mexican authorities approached him and asked him the purpose of his visit.

---

[4] Jones, Payton & Feather, *Source*, *supra*, at note 1.

The Mexican authorities then asked him to produce photo identification. When Mr. Guan produced his passport, the Mexican authorities photographed it.

44.     Early on the morning of December 29, 2018, Mr. Guan, along with Mr. Nakamura, left his hotel in Mexico to drive to San Diego. Upon arrival at the San Ysidro port of entry, CBP officers scanned Mr. Guan's and Mr. Nakamura's passports and told the two photojournalists that they were required to undergo secondary inspection. Mr. Guan and Mr. Nakamura waited at the port of entry for approximately 60 to 90 minutes, after which two plainclothes officers led them to a nearby building.

45.     One of the plainclothes officers escorted Mr. Guan through the lobby of the building and a celled detention area into a windowless room. There, the officer questioned Mr. Guan for approximately one hour.

46.     The officer asked Mr. Guan about his current address and length of residency, his birth location, and his contact information.

47.     In addition to asking Mr. Guan this biographical information, the officer asked whether Mr. Guan knew smugglers, activists, or journalists who assisted migrants in crossing the border. The officer also told Mr. Guan: "I know you've been around the migrant caravan."

48.     The officer asked Mr. Guan how he supported himself as a photojournalist.

49.     The officer asked Mr. Guan whether he knew any "coyotes" or activists who were pro-migrant or anti-migrant.

50.     The officer then produced a book of photographs, each page of which featured color photographs of several individuals. These pictures appeared to be compiled

from a variety of sources, such as identification documents and social media pages. The officer asked Mr. Guan to identify any "instigators" he recognized in this book of photographs.

51.     The officer then asked to see the photographs that Mr. Guan had taken while covering the border. Mr. Guan, feeling he had no choice and was not at liberty to leave, said he would show the officer the photographs. The officer escorted Mr. Guan to the car to retrieve his cameras. As Mr. Guan scrolled though some of his pictures, the officer used a cell phone to take photographs of the pictures on the camera's digital display.

52.     Shortly thereafter, Mr. Guan was released from secondary inspection and allowed into the United States.

53.     Approximately eight months later, on or about August 26, 2019, Mr. Guan traveled to Tijuana, Mexico. Mexican authorities at passport control informed Mr. Guan that a migratory alert had been placed on his passport.

54.     Mr. Guan's journalism work requires communicating in confidence with sources, who may give him tips about where to take photographs of newsworthy events.

55.     Mr. Guan's photographs, and associated information such as the location of the photographs and any people pictured in them, constitute his journalistic work product. Mr. Guan exercises journalistic judgment about which photographs to publish.

56.     On information and belief, Defendants retain information regarding the responses Mr. Guan gave to the border officer's questions about his journalism work and activities, including records or notes describing the contents of Mr. Guan's responses.

57.     On information and belief, Defendants retain information about the fact that Mr. Guan was questioned about his journalism work and activities.

58.     On information and belief, Defendants retain information regarding Mr. Guan's referral to secondary inspection for questioning.

59.     On information and belief, Defendants retain records of the photographs the border officer took of the pictures on Mr. Guan's camera, which constitute Mr. Guan's journalistic work product.

60.     As a freelance photographer, Mr. Guan's ability to travel is important to sustaining his career. He intends to continue traveling internationally to document issues of national and global importance, but fears that he will be referred to secondary inspection and asked questions about his work as a journalist and his sources in the future.

61.     Mr. Guan additionally fears that his ability to travel freely and work as a freelance photojournalist has been and is imperiled because Defendants have obtained, retained, and disseminated information about his journalistic activities with other U.S. law enforcement agencies and/or foreign governments.

### Go Nakamura

62.     Go Nakamura's work as a freelance photojournalist requires him to travel frequently to cover stories worldwide, and his photographs have been featured in *The Guardian*, *The New York Times*, and *Reuters*.

63.     Mr. Nakamura was questioned about his journalism work and activities by border officers on one occasion on December 29, 2018, as described further below.

64.     In November 2018, Mr. Nakamura traveled to Mexico, where he followed and documented the northbound movement of the migrant caravan that originated in Honduras. For about the first seven days of this trip, he was on assignment with *Reuters*. Mr. Nakamura returned to the United States after this trip.

65.     On or about December 24, 2018, Mr. Nakamura traveled to Tijuana, Mexico, to cover conditions at the U.S.-Mexico border. For one day of this trip, Mr. Nakamura was on assignment for *Reuters*.

66.     On or about December 27, 2018, Mr. Nakamura was on the southern side of the U.S.-Mexico border when Mexican authorities approached him and asked him the purpose of his visit. The Mexican authorities then asked him to produce photo identification. When Mr. Nakamura produced his passport, the Mexican authorities photographed it.

67.     Early in the morning of December 29, 2018, Mr. Nakamura, together with Mr. Guan, left his hotel in Mexico to drive to San Diego. Upon their arrival at the San Ysidro port of entry, CBP officers scanned their passports and told the two photojournalists that they were required to undergo secondary inspection. Mr. Guan and Mr. Nakamura waited at the port of entry for approximately 60 to 90 minutes, after which two plainclothes officers led them to a nearby building.

68.     Once inside the building, one of the plainclothes officers led Mr. Guan to one room, and the other officer escorted Mr. Nakamura into a separate waiting room.

69.     The officer questioned Mr. Nakamura for approximately 40 to 45 minutes.

70.     The officer asked Mr. Nakamura the purpose of his trip, who he was working for, where he was from, and where he lived.

71.     The officer asked how Mr. Nakamura had become a photojournalist and whether he had interacted with caravan organizers or activists who may have assisted people in crossing the border.

72.     The officer then produced a photograph book, each page of which featured several color headshots of individuals. The officer asked Mr. Nakamura to identify anyone he recognized in this set of pictures.

73.     The officer then asked to see photographs that Mr. Nakamura took while covering the border. Mr. Nakamura, feeling he had no choice and was not at liberty to leave, showed the officer some of his photographs. Mr. Nakamura scrolled though some photographs on his public Instagram page showing people en route to the U.S.-Mexico border and near the border wall.

74.     After waiting for about an additional ten minutes, Mr. Nakamura was released from secondary inspection and allowed into the United States.

75.     Over six months later, in July 2019, Mr. Nakamura traveled through Mexico City on his return to New York City from Peru. At the airport in Mexico City, Mexican authorities stopped Mr. Nakamura at passport control and sent him to a separate room, where they asked him to sign a document. The document indicated that an "alerta migratoria," or "migratory alert," had been placed on Mr. Nakamura's passport.

76.     Mr. Nakamura's journalism work requires communicating in confidence with sources, who may give him tips about where to take photographs of newsworthy events.

77.     Mr. Nakamura's photographs, and associated information such as the location of the photographs and any people pictured in them, constitute his journalistic

work product. Mr. Nakamura exercises journalistic judgment about which photographs to publish.

78.     On information and belief, Defendants retain information regarding the responses Mr. Nakamura gave to the border officer's questions about his journalism work and activities, including records or notes describing the contents of Mr. Nakamura's responses.

79.     On information and belief, Defendants retain information about the fact that Mr. Nakamura was questioned about his journalism work and activities.

80.     On information and belief, Defendants retain information regarding Mr. Nakamura's referral to secondary inspection for questioning.

81.     On information and belief, Defendants retain information regarding the photographs Mr. Nakamura showed a border officer, which constitute Mr. Nakamura's journalistic work product.

82.     As a freelance photographer, Mr. Nakamura's ability to travel is important to sustaining his career. He intends to continue traveling internationally to document issues of national and global importance, but fears that he will be referred to secondary inspection and asked questions about his work as a journalist and his sources in the future.

83.     Mr. Nakamura additionally fears that his ability to travel freely and work as a freelance photojournalist has been and is imperiled because Defendants have obtained, retained, and disseminated information about his journalistic activities with other U.S. law enforcement agencies and/or foreign governments.

### *Mark Abramson*

84.     Mark Abramson is a freelance photojournalist. His photographs have been

featured in *The New York Times*, *The Washington Post*, *The Wall Street Journal*, and

*Time*, among other publications.

85.     Mr. Abramson was questioned about his journalism work and activities by

border officers on one occasion on January 5, 2019, as described further below.

86.     In November 2018, Mr. Abramson spent approximately three weeks in

Mexico covering the migrant caravan that had originated in Honduras. Mr. Abramson

returned to the United States after this trip.

87.     On or about December 24, 2018 to January 5, 2019, Mr. Abramson was

covering conditions near the border in the vicinity of Tijuana, Mexico, both on a

freelance basis and, for a period, on assignment for *The New York Times*.

88.     On or about December 27, 2018, Mr. Abramson was on the southern side

of the U.S.-Mexico border when Mexican authorities approached him and asked him the

purpose of his visit. The Mexican authorities then asked him to produce photo

identification. When Mr. Abramson produced his passport, the Mexican authorities

photographed it.

89.     At approximately 2:00 AM on or about January 5, 2019, Mr. Abramson

sought to enter the United States at the San Ysidro port of entry. A CBP officer scanned

Mr. Abramson's passport, following which Mr. Abramson was sent to secondary

inspection.

90.     In secondary inspection, two uniformed officers searched Mr. Abramson's

person by patting him down and emptying his pockets. The officers also searched Mr.

Abramson's bag, which contained notebooks that included confidential source material; the names and contact information of people he encountered while working; personal reflections; and receipts to be submitted to his editor for reimbursement.

91.     During the search, the officers asked Mr. Abramson questions about the contents of his belongings, such as "What is in the book?" They also asked him what kinds of pictures he takes.

92.     Approximately 20 to 30 minutes after the search, Mr. Abramson was led into another room, where he was patted down again. This room was small with fluorescent lighting. An officer introduced himself as "Agent Castro" but did not identify the agency for which he worked.

93.     The officer questioned Mr. Abramson about the purpose of his work and also about his employers. Mr. Abramson responded that he was a photojournalist covering migrant camp conditions for *The New York Times*.

94.     The officer asked Mr. Abramson what he saw while following the caravan, who was leading the group of migrants, and whether these leaders were for or against the U.S. government. He also asked Mr. Abramson whether he knew of any groups assisting the migrant caravan.

95.     After approximately 30 to 40 minutes of questioning, Mr. Abramson was released from secondary inspection and allowed into the United States.

96.     Mr. Abramson's journalism work requires communicating in confidence with sources, who may give him tips about where to take photographs of newsworthy events.

97.     Mr. Abramson's photographs, and associated information such as the location of the photographs and any people pictured in them, constitute his journalistic work product. Mr. Abramson exercises journalistic judgment about which photographs to publish.

98.     On information and belief, Defendants retain information regarding the responses Mr. Abramson gave to the border officers' questions about his journalism work and activities, including records or notes describing the contents of Mr. Abramson's responses.

99.     On information and belief, Defendants retain information about the fact that Mr. Abramson was questioned about his journalism work and activities.

100.    On information and belief, Defendants retain information regarding Mr. Abramson's referral to secondary inspection for questioning.

101.    On information and belief, Defendants retain records regarding the source information contained in Mr. Abramson's notebooks.

102.    As a freelance photographer, Mr. Abramson's ability to travel is important to sustaining his career. He intends to continue traveling internationally to document issues of national and global importance, but fears that he will be referred to secondary inspection and asked questions about his work as a journalist and his sources in the future.

103.    Mr. Abramson additionally fears that his ability to travel freely and work as a freelance photojournalist has been and remains imperiled because Defendants have obtained, retained, and disseminated information about his journalistic activities with other U.S. law enforcement agencies and/or foreign governments.

*Kitra Cahana*

104.    Kitra Cahana's work as a freelance photojournalist requires her to travel frequently to cover stories worldwide, and her photographs have been featured in *National Geographic* and *The New York Times*.

105.    Ms. Cahana was questioned about her journalism work and activities by border officers on two occasions in January 2019, as described further below.

106.    Between November 2018 and January 2019, Ms. Cahana spent several weeks covering migrant issues in Tijuana, Mexico, both on a freelance basis and at times on assignment for *The Huffington Post*, *The New York Times*, and *Die Zeit*.

107.    On or about December 27, 2018, Ms. Cahana was on the southern side of the U.S.-Mexico border when Mexican authorities approached her and asked her the purpose of her visit. The Mexican authorities then asked her to produce photo identification. When she produced her passport, the Mexican authorities photographed it.

108.    In early January 2019, Ms. Cahana took a flight from Tijuana, Mexico, to Montreal, Canada. She did not travel through any U.S. ports of entry on this journey.

109.    On or about January 17, 2019, Ms. Cahana attempted to travel to Tapachula, Mexico—near the border with Guatemala—via Detroit and Mexico City to continue covering the migrant caravans and conditions at the U.S.-Mexico border. Ms. Cahana intended to take photographs on a freelance basis, but she had informed several publications, including *The New York Times* and *The Intercept*, about her trip and they had expressed interest in her planned coverage. Because she had a stopover in Detroit, Ms. Cahana was required to go through U.S. customs preclearance in Montreal. When she scanned her passport at the preclearance area, the machine printed out a ticket with a

picture of Ms. Cahana's face with a large "X" on it. This had never happened to Ms. Cahana previously.

110.    Ms. Cahana was sent to a booth where a CBP officer questioned her about her purpose for travel to Mexico and what she planned to photograph. This CBP officer then referred Ms. Cahana to secondary inspection.

111.    In secondary inspection, another CBP officer questioned Ms. Cahana for about ten minutes. The officer asked her whether she had an assignment in Mexico, about her plans to photograph the migrant caravan, how she obtained assignments and which press outlets she had worked for in the past, and about the financial compensation and tax implications of freelancing.

112.    The CBP officer then permitted Ms. Cahana to travel to Detroit, and from there she flew to Mexico City.

113.    Ms. Cahana arrived at passport control in Mexico City after 8:00 PM that day. Ms. Cahana scanned her passport at and provided her fingerprints to a machine, which also took her photograph. She then provided the machine printout, passport, and migration card to a Mexican officer at a customs booth. The Mexican officer asked Ms. Cahana where she was headed. When Ms. Cahana responded that her final destination was Tapachula, the officer immediately escorted her to a waiting area.

114.    There, Mexican officers confiscated Ms. Cahana's cell phone. She was also asked to complete forms written in English, which included questions relating to her occupation and her plans in Mexico. Ms. Cahana speaks beginner Spanish and repeatedly asked the Mexican officers in Spanish why she was being held and, at one point, asked them if it was because she was a journalist. A Mexican officer responded in Spanish,

saying, to the best of Ms. Cahana's knowledge, "No, it's not us, it's Interpol." Ms. Cahana then asked whether it was the Americans, to which the Mexican officer responded, to the best of Ms. Cahana's knowledge, "yes."

115.    At approximately 1:30 AM, a Mexican officer called Ms. Cahana's name and asked her to sign a form written in Spanish, which she did not understand. Ms. Cahana refused to sign the form. Another Mexican officer then took her to another area and tried to pressure her to sign the form. Ms. Cahana again refused to sign the form.

116.    Ms. Cahana was then taken to a different area. A representative from AeroMexico informed Ms. Cahana that she would be placed on a plane to Detroit in the morning. Ms. Cahana again asked a Mexican officer in Spanish whether she was being held because she was a journalist. The officer responded in Spanish, saying, to the best of Ms. Cahana's knowledge, that it was because of the Americans, not the Mexicans.

117.    At approximately 8:00 AM at or around January 18, 2019, Mexican officers escorted Ms. Cahana to the terminal, where they returned her cell phone to her and placed her on a flight to Detroit, which departed at approximately 9:10 AM.

118.    Upon arrival at the Detroit airport, Ms. Cahana scanned her passport at the customs area. Once again, the machine printed out a ticket with a picture of Ms. Cahana's face with a large "X" on it, and Ms. Cahana was again sent to secondary inspection.

119.    Two plainclothes officers questioned Ms. Cahana in a private room. The officers had access to a computer, which they appeared to consult as they questioned Ms. Cahana. The officers asked Ms. Cahana why she had been denied entry to Mexico and what happened there. They also asked Ms. Cahana if she had had prior encounters with Mexican authorities. Ms. Cahana informed the officers that she had previously been

working in Tijuana when she was approached by Mexican police who asked to see her identification and photographed her passport. One of the officers asked her to confirm whether the incident had taken place on the U.S.-Mexico border and around "the day after Christmas." This suggested to Ms. Cahana that the officers knew more about her and her journalism work in Mexico in December 2018 than Ms. Cahana had revealed during questioning by them.

120.   Ms. Cahana was then released from secondary inspection and allowed into the United States.

121.   Later that month, on or about January 26, 2019, Ms. Cahana attempted to enter Mexico by land from Guatemala. Ms. Cahana intended to take photographs on a freelance basis on this trip. The Mexican officer who scanned her passport told her that an alert was associated with her passport. The officer denied her entry to Mexico.

122.   Ms. Cahana's journalism work requires communicating in confidence with sources, who may give her tips about where to take photographs of newsworthy events.

123.   Ms. Cahana's photographs, and associated information such as the location of the photographs and any people pictured in them, constitute her journalistic work product. Ms. Cahana exercises journalistic judgment about which photographs to publish.

124.   On information and belief, Defendants retain information regarding the responses Ms. Cahana gave to the border officers' questions about her journalism work and activities, including records or notes describing the contents of Ms. Cahana's responses.

125.    On information and belief, Defendants retain information about the fact that Ms. Cahana was questioned about her journalism work and activities.

126.    On information and belief, Defendants retain information regarding Ms. Cahana's two referrals to secondary inspection and questioning.

127.    As a freelance photographer, Ms. Cahana's ability to travel is important to sustaining her career. Ms. Cahana intends to continue traveling internationally to document issues of national and global importance, but fears that she will be referred to secondary inspection and asked questions about her work as a journalist and her sources in the future.

128.    Ms. Cahana additionally fears that her ability to travel freely and work as a freelance photojournalist has been and remains imperiled because Defendants have obtained, retained, and disseminated information about her journalistic activities with other U.S. law enforcement agencies and/or foreign governments.

### Ariana Drehsler

129.    Ariana Drehsler is a freelance photojournalist who has covered the Arab Spring and the Syrian Civil War, and whose work has been published in *The Guardian*, *The New York Times*, *Associated Press*, *Agence France-Presse*, *The Wall Street Journal*, and *Bloomberg*.

130.    Ms. Drehsler was questioned about her journalism work and activities by border officers on three occasions from December 2018 to January 2019, as described further below.

131.    In April 2017, Ms. Drehsler worked on assignment for *Buzzfeed* covering migrant issues in Mexico.

132.    During November and December 2018, Ms. Drehsler worked on assignment for *United Press International* near the U.S.-Mexico border covering one of the migrant caravans.

133.    At approximately 12:15 AM on or about December 30, 2018, Ms. Drehsler sought to enter the United States at the San Ysidro port of entry. A CBP officer referred her to secondary inspection.

134.    Ms. Drehsler waited while border officers searched her belongings. An officer behind a desk questioned her for about 10 to 15 minutes. Two plainclothes officers then escorted her to a separate room.

135.    Ms. Drehsler asked the two officers why she had been referred to secondary inspection. The officers responded that her passport had been flagged.

136.    The officers told Ms. Drehsler to write down her home address and her editor's phone number. They also asked her about the nature of her work and her background in photography, including what training is required for freelance photography.

137.    One of the officers asked Ms. Drehsler to describe what she had seen in Tijuana, including at any migrant shelters, stating, "You're on the ground; you're there, we're not."

138.    The officers told Ms. Drehsler that if she had plans to cross at the same port of entry in the future, she should budget an additional hour to pass through secondary inspection.

139.    Ms. Drehsler was then released from secondary inspection and allowed into the United States.

140.     A few days later, at approximately 11:00 PM on or about January 2, 2019, Ms. Drehsler sought to enter the United States from Mexico at the San Ysidro port of entry. The CBP officer at primary inspection scanned her passport and again sent Ms. Drehsler to secondary inspection.

141.     Ms. Drehsler waited for approximately 15 minutes before the same two plainclothes officers who had previously questioned her escorted her into a room. A third officer entered the room and told Ms. Drehsler that she had looked at Ms. Drehsler's website. This officer complimented Ms. Drehsler's photography, saying she had done "great work."

142.     The officers asked Ms. Drehsler whether, if they were to show her photographs, she could identify any activists working near the U.S.-Mexico border in them. Despite asking this question, border officers did not show Ms. Drehsler any photographs.

143.     The officers then questioned Ms. Drehsler at length. Their questions focused on what she had seen in Mexico related to the migrant caravan and people around the caravan. They also asked about her opinion of the latest migrant caravan, whether she was familiar with its leadership to the extent it had leaders, and whether she thought it was difficult for people to cross the border. She was also asked if word had reached people who were thinking of traveling to the U.S.-Mexico border on how difficult it was to seek asylum. They also asked her whether she rented or owned her home in the United States.

144.     When Ms. Drehsler asked if she should expect to be stopped again, one of the officers responded that she should.

145.    After approximately 15 to 20 minutes of questioning, Ms. Drehsler was released from secondary inspection and allowed into the United States.

146.    A few days later, at approximately 9:00 PM on or about January 4, 2019, Ms. Drehsler sought to enter the United States from Mexico at the San Ysidro port of entry. She was again referred to secondary inspection. In the waiting area at the port of entry, a uniformed officer asked Ms. Drehsler whether she wanted to show the officers her photographs from that day. Ms. Drehsler did not show the officer any photographs.

147.    Ms. Drehsler waited approximately 45 minutes in the waiting area before two uniformed officers escorted her into a room. There, the officers inspected her belongings.

148.    One of the officers asked Ms. Drehsler questions about a Mexican migrant shelter she had been covering. Specifically, the officer asked Ms. Drehsler whether she had seen "anything suspicious" at the shelter, and what the general mood in the shelter had been. One of the officers again told Ms. Drehsler she was being asked these questions because she was "on the ground."

149.    The officer then asked Ms. Drehsler about her time in Syria, where she had worked previously as a journalist. Specifically, the officer asked Ms. Drehsler about the subjects of her photography, the people with whom she had associated, and whether she was affiliated with any organizations or groups.

150.    Shortly thereafter, Ms. Drehsler was released from secondary inspection and allowed into the United States.

151.    Ms. Drehsler's journalism work requires communicating in confidence with sources, who may give her tips about where to take photographs of newsworthy events.

152.    Ms. Drehsler's photographs, and associated information such as the location of the photographs and any people pictured in them, constitute her journalistic work product. Ms. Drehsler exercises journalistic judgment about which photographs to publish.

153.    On information and belief, Defendants retain information regarding the responses Ms. Drehsler gave to the border officers' questions about her journalism work and activities, including records or notes describing the contents of Ms. Drehsler's responses.

154.    On information and belief, Defendants retain information about the fact that Ms. Drehsler was questioned about her journalism work and activities.

155.    On information and belief, Defendants retain information regarding Ms. Drehsler's three referrals to secondary inspection and questioning.

156.    As a freelance photographer, Ms. Drehsler's ability to travel is important to sustaining her career. Ms. Drehsler intends to continue traveling internationally to document issues of national and global importance, but fears that she will be referred to secondary inspection and asked questions about her work as a journalist and her sources in the future.

157.    Ms. Drehsler additionally fears that her ability to travel freely and work as a freelance photojournalist has been and remains imperiled because Defendants have

obtained, retained, and disseminated information about her journalistic activities with other U.S. law enforcement agencies and/or foreign governments.

## CLAIM
### Violation of the First Amendment
### (Freedom of Speech, Freedom of the Press, Freedom of Association)
### (by all Plaintiffs against all Defendants)

158.    Plaintiffs herein incorporate by reference the allegations above.

159.    Defendants violated the First Amendment by asking Plaintiffs questions about their journalism work and activities, including their sources of information and their observations as journalists, without any valid immigration or customs purpose.

160.    Defendants violated the First Amendment by asking Plaintiffs questions about their journalism work and activities, including their sources of information and their observations as journalists, thereby compelling them to disclose information revealing constitutionally protected newsgathering and associational activities, without meeting the standard necessary to compel such disclosure.

161.    Defendants violated the First Amendment by asking Plaintiffs questions about their journalism work and activities, including their sources of information and their observations as journalists, thereby substantially burdening Plaintiffs' exercise of their constitutional rights to engage in newsgathering activity and to associate with their sources, and substantially burdening their freedom of speech—including their rights to publish their work as photojournalists.

162.    Defendants violated the First Amendment by referring Plaintiffs to secondary inspection, detaining them in secondary inspection, and asking them questions in secondary inspection because of their work and activities as journalists covering conditions at the U.S.-Mexico border.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court:

A.  *Declare* that Defendants' border officers' questioning of the Plaintiffs about their journalism work and activities violated the First Amendment;

B.  *Declare* that Defendants' border officers' compelled disclosure of information from the Plaintiffs about their journalism work and activities violated the First Amendment;

C.  *Declare* that Defendants' border officers' referral of Plaintiffs to secondary inspection, detention of Plaintiffs in secondary inspection, and questioning in secondary inspection because of their work and activities as journalists violated the First Amendment;

D.  *Enjoin* Defendants to expunge all records they have retained regarding the unlawful questioning of Plaintiffs, including records reflecting the substance of information the Plaintiffs were unlawfully compelled to disclose;

E.  *Enjoin* Defendants to inform the Plaintiffs whether the Defendants disseminated records regarding their unlawful questioning of Plaintiffs to other individuals, agencies, and/or governments, including foreign governments; and, if so, to identify the individuals, agencies, and/or governments, including foreign governments;

F.  *Award* Plaintiffs reasonable attorneys' fees and costs; and

G.  *Grant* such other and further relief as the Court deems proper.

DATED: November 20, 2019

Respectfully submitted:

|  | _s/ Esha Bhandari_ |
|---|---|
| Antony Gemmell | Esha Bhandari |
| Christopher Dunn | Scarlet Kim |
| NEW YORK CIVIL | AMERICAN CIVIL LIBERTIES UNION |
| LIBERTIES UNION | FOUNDATION |
| FOUNDATION | 125 Broad Street, |
| 125 Broad Street, | 18th Floor |
| 19th Floor | New York, NY 10004 |
| New York, NY 10004 | (212) 549-2500 (phone) |
| (212) 607-3300 (phone) | (212) 549-2583 (fax) |
| (212) 607-3318 (fax) | ebhandari@aclu.org |
| agemmell@nyclu.org | scarletk@aclu.org |
| cdunn@nyclu.org | |

Mitra Ebadolahi*
Sarah Thompson*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
(619) 232-2121 (phone)
(619) 232-0036 (fax)
mebadolahi@aclusandiego.org
sthompson@aclusandiego.org


*Application for admission _pro hac vice_ forthcoming

_Counsel for Plaintiffs_