**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
_____

Bing GUAN; Go NAKAMURA; Mark )
ABRAMSON; Kitra CAHANA; and Ariana )
DREHSLER, )
                                      )    **No. 19-CV-6570 (PKC/JO)**
                                       )
                  *Plaintiffs*,  )    **(Hon. Pamela K. Chen)**
*v.* )
                                       )
Chad WOLF, Acting Secretary of Homeland )
Security; Mark MORGAN, Acting Commissioner, )
U.S. Customs and Border Protection; and )
Matthew ALBENCE, Acting Director, U.S. )
Immigration and Customs Enforcement, )
                                       )
                  *Defendants*.  )
_____ )


## DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS COMPLAINT

RICHARD P. DONOGHUE
United States Attorney
Eastern District of New York

F. FRANKLIN AMANAT
Senior Counsel
EKTA R. DHARIA
Assistant United States Attorney
Eastern District of New York
271A Cadman Plaza East
Brooklyn, NY 11201-1820
(718) 254-6024/7520
franklin.amanat@usdoj.gov
ekta.dharia@usdoj.gov

*Attorneys for Defendants*

Served: May 21, 2020

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................... 1

BACKGROUND ............................................................................................................................ 3

    A.    CBP's Role at the Border ...................................................................................... 3

    B.    Plaintiffs' Border Crossings .................................................................................. 5

ARGUMENT .................................................................................................................................. 7

    I.    PLAINTIFFS' FIRST AMENDMENT CLAIM SHOULD BE DISMISSED FOR
        FAILURE TO STATE AN ACTIONABLE CLAIM FOR RELIEF ........................................ 7

    A.    Standard of Review ............................................................................................... 7

    B.    Plaintiffs' Attempt to Bootstrap a Fourth Amendment Claim Into a First
        Amendment Violation Fails in the Face of the Paramount Interest in
        Protecting the Border ............................................................................................ 8

        1.    Plaintiffs' Claim is Actually a Fourth Amendment Claim ...................... 8

        2.    Plaintiffs' Allegations at Best Demonstrate Merely Incidental
                Burdens of a Valid and Routine Border Search ..................................... 11

    C.    Plaintiffs Have Not Plausibly Alleged that They Were Targeted On Account
        of Their Professional Identities as Photojournalists ........................................... 13

    D.    Plaintiffs Have Not Plausibly Alleged that Defendants Compelled Disclosure
        in Violation of Plaintiffs' Free-Association or Free-Speech Rights .................... 14

        1.    Plaintiffs Have Not Alleged Any Compulsion That Could Amount to
                a First Amendment Violation .................................................................. 15

        2.    Defendants' Actions Were Narrowly Tailored to Serve Compelling
                Government Interests ............................................................................... 17

    E.    Any First Amendment Claim Premised on Alleged Violation of the
        Journalist's Qualified Privilege Must Be Dismissed for Failure to State a
        Claim. ................................................................................................................. 18

        1.    Plaintiffs Cannot Invoke the Qualified Privilege Because They Do
                Not Allege the Requisite Compulsion ..................................................... 18

        2.    Any Disclosure of Non-Confidential Information Was Valid and
                Overcomes Any Assertion of Journalist's Qualified Privilege ................. 20

    F.    Plaintiffs' First Amendment Claim Should Be Dismissed Because Plaintiffs
        Have Failed to Allege a Concrete "Chilling" Effect ........................................... 21

    II.    THE COMPLAINT MUST BE DISMISSED FOR LACK OF SUBJECT MATTER
        JURISDICTION BECAUSE PLAINTIFFS LACK STANDING. ........................................ 23

    A.    Applicable Standard ............................................................................................ 23

    B.    Plaintiffs Have Not Shown that They Have Suffered or Will Suffer Injury-in-
        Fact. ................................................................................................................... 26

CONCLUSION ............................................................................................................................ 29

# TABLE OF AUTHORITIES

## Federal Cases

*Abidor v. Napolitano*, 990 F. Supp. 2d 260 (E.D.N.Y. 2013) ............................................................ 11

*Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227 (1937) ..................................................................... 23

*Allen v. Wright*, 468 U.S. 737 (1984) .......................................................................................... 24

*Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015) ........................................................................... 24

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................................... 7, 8

*Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F. 2d 196 (2d Cir. 1992) ........................ 26

*Baker v. Carr*, 369 U.S. 186 (1962) ............................................................................................ 24

*Baker v. F&F Inv.*, 470 F.2d 778 (2d Cir. 1972) ............................................................................ 19

*Beecher v. Alabama*, 389 U.S. 35 (1967) ...................................................................................... 16

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ...................................................................... 7

*Bibicheff v. Holder*, 55 F. Supp. 3d  (E.D.N.Y. 2014) ................................................................... 11

*Branzburg v. Hayes*, 408 U.S. 665 (1972) ................................................................................... 18

*BroadStar Wind Sys. Grp. Ltd. Liab. Co. v. Stephens*, 459 Fed. Appx. 351 (5th Cir. 2012) ............... 24

*Burson v. Freeman*, 504 U.S. 191 (1992) ..................................................................................... 17

*Camara v. Municipal Court*, 387 U.S 523 (1967) .......................................................................... 21

*Citizens Union v. Attorney General*, 408 F. Supp. 3d 478 (S.D.N.Y. 2019) ...................................... 15

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) .......................................................................... 28

*Colombo v. O'Connell*, 310 F.3d 115 (2d Cir. 2002) ....................................................................... 22

*Cortlandt St. Recovery Corp. v. Hellas Telecomms. I, S.à.r.l*, 790 F.3d 411 (2d Cir. 2015) ............... 26

*Culombe v. Connecticut*, 367 U.S. 568 (1961) .............................................................................. 16

*Curley v. Village of Suffern*, 268 F.3d 65 (2d Cir. 2001) ................................................................ 22

*Davis v. North Carolina*, 384 U.S. 737 (1966) .............................................................................. 16

*Doyle v. Midland Credit Mgmt., Inc.*, 722 F.3d 78 (2d Cir. 2013) ................................................... 23

*Fair Hous. in Huntington Comm. Inc. v. Town of Huntington, N.Y.*, 316 F.3d 357 (2d Cir. 2003) ....... 25

*Fighting Finest, Inc. v. Bratton*, 95 F.3d 224 (2d Cir. 1996) .......................................................... 11

*Flast v. Cohen*, 392 U.S. 83 (1968) ............................................................................................. 25

*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990) ................................................................ 24, 26

*Gibson v. Fla. Leg. Inv. Comm.*, 372 U.S. 539 (1963) .................................................................... 15

*Golden v. Zwickler*, 394 U.S. 103 (1969) ..................................................................................... 24

*Gonzales v. NBC*, 194 F.3d 29 (2d Cir. 1999) ............................................................... 18, 19, 20, 21

*Greenwald v. Wisconsin*, 390 U.S. 519 (1968) .................................................................................... 16

*Haig v. Agee*, 453 U.S. 280 (1981).................................................................................................... 8, 17

*In re Grand Jury Subpoena Dtd. January 4, 1984*, 750 F.2d 223 (2d Cir. 1984)............................. 19

*Kramer v. Time Warner, Inc.*, 937 F.2d 767 (2d Cir. 1991) ................................................................ 8

*Krase v. Graco Children Prods., Inc.*, 79 F.3d 346 (2d Cir. 1996)...................................................... 21

*Laird v. Tatum*, 408 U.S. 1 (1972) ...................................................................................................... 22

*Lebowitz v. City of New York*, 948 F. Supp. 2d 392 (S.D.N.Y. 2013) ............................................... 21

*Local 1814, Int'l Longshoremen's Ass'n v. Waterfront Comm.*, 667 F.2d 267 (2d Cir. 1981) ............ 15

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .................................................... 24, 25, 26, 28, 29

*Lyng v. UAW*, 485 U.S. 360 (1988) ................................................................................................ 11, 12

*Makarova v. United States*, 201 F. 3d 110 (2d Cir. 2000) ................................................................... 26

*Mincey v. Arizona*, 437 U.S. 385 (1978) ............................................................................................. 16

*Muhammad v. Bonner*, 2008 WL 926574 (E.D.N.Y. Mar. 31, 2008).................................................. 5

*New York Times Co. v. Gonzales*, 459 F.3d 160 (2d Cir. 2006) ......................................................... 19

*Northeastern Fla. Chap. Ass'd Gen. Contractors of Am. v. City of Jacksonville, 508* U.S. 656 (1993) ..................... 24

*Oregon v. Elstad*, 105 S. Ct. 1285 (1984)........................................................................................... 15

*Papsan v. Allain*, 478 U.S. 265 (1986)................................................................................................. 8

*Presbyterian Church (USA) v. United States*, 870 F.2d 518 (9th Cir. 1989)...................................... 24, 29

*Raines v. Byrd*, 521 U.S. 811 (1997) ................................................................................................... 25

*Reck v. Pate*, 367 U.S. 433 (1961)....................................................................................................... 16

*Roberts v. United States Jaycees*, 468 U.S. 609 (1984)........................................................................ 17

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, ("FAIR"), 547 U.S. 47 (2006) .............. 11, 12

*Salmon v. Blesser*, 802 F.3d 249 (2d Cir. 2015).................................................................................. 15

*Sierra Club v. Morton*, 405 U.S. 727 (1972) ....................................................................................... 24

*Sierra Club v. U.S. Army Corps of Eng'rs*, 732 F.2d 253 (2d Cir. 1984) ........................................... 14

*Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26 (1976) .......................................................... 24

*Singer v. Fulton Cty. Sheriff*, 63 F.3d 110 (2d Cir. 1995) ................................................................... 23

*Sokolow v. PLO*, 2012 WL 3871380 (S.D.N.Y. Sep. 6, 2012)........................................................... 21

*Spear v. Town of W. Harford*, 954 F.2d 63 (2d Cir. 1992) ................................................................. 22

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) ............................................................................ 22, 24

*Stephens v. Trump Org. LLC*, 205 F. Supp. 3d 305 (E.D.N.Y. 2016) ............................................... 12

*Tabbaa v. Chertoff*, 509 F.3d 89 (2d Cir. 2007) ........................................... 8, 9, 10, 16, 17, 18, 20

*Teague v. Regional Comm'r of Customs*, 404 F.2d 441 (2d Cir. 1968) ............................................... 12

*Texas v. Travis Cty.*, 272 F. Supp. 3d 973 (W.D. Tex. 2017)........................................................................24, 25

*United States v. Albertini*, 472 U.S. 675 (1985) ........................................................................ 12

*United States v. Arnold*, 533 F.3d 1003 (9th Cir. 2008) ........................................................................ 11

*United States v. Flores-Montano*, 541 U.S. 149 (2004) ........................................................ 8, 9, 10, 21

*United States v. Ickes*, 393 F.3d 501 (4th Cir. 2005) ........................................................................ 11

*United States v. Irving*, 452 F.3d 110 (2d Cir. 2006) ........................................................................5, 20

*United States v. Montoya de Hernandez*, 473 U.S. 531 (1985) ................................... 3, 5, 8, 9, 10, 18, 20

*United States v. Ramsey*, 431 U.S. 606 (1977)........................................................................ 5, 9, 10, 21

*United States v. Sanders*, 211 F.3d 711 (2d Cir. 2000)........................................................................ 19

*United States v. Sanders*, 663 F.2d 1 (2d Cir. 1981)........................................................................5, 19

*United States v. Sanusi*, 813 F. Supp. 149 (E.D.N.Y. 1992) ........................................................................ 22

*United States v. Treacy*, 639 F.3d 32 (2d Cir. 2011)........................................................................18, 19

*Urbina v. City of New York*, 672 Fed. App'x 52 (2d Cir. 2016) ........................................................................ 19

*Valley Forge Christian Coll. v. Am. United for Sep. of Church and State, Inc.*, 454 U.S. 464 (1982)......................25

*von Bulow by Auersperg v. von Bulow*, 811 F.2d 136 (2d Cir. 1987)........................................................................ 19

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ........................................................................ 15

*Warth v. Seldin*, 422 U.S. 490 (1975) ........................................................................ 24

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ........................................................................ 28

*Zhang v. Lynch*, 2018 WL 1157756 (E.D.N.Y. Mar. 1, 2018) ........................................................................ 8

*Zherka v. DiFiore*, 412 Fed. Appx. 345 (2d Cir. 2011)........................................................................16, 23

## Federal Statutes

6 U.S.C. § 211 ........................................................................ 3

8 U.S.C. § 1225 ........................................................................ 4

8 U.S.C. §§ 1225, 1357 ........................................................................ 5

8 U.S.C. § 1324........................................................................ 14

19 U.S.C. §§ 482, 1455, 1559, 1461, 1467, 1499, 1581 ........................................................................ 5

19 U.S.C. §§ 1433, 1459 ........................................................................ 4

19 U.S.C. § 1496 ........................................................................ 5

19 U.S.C. § 1582 ........................................................................ 5

31 U.S.C. § 5317 ........................................................................ 3

## Federal Regulations

8 C.F.R. § 235.1 .................................................................................................................... 4

19 CFR Part 12 ...................................................................................................................... 3

19 CFR § 161.2 ...................................................................................................................... 3

19 C.F.R. §§ 162.5, 162.7 ..................................................................................................... 5

19 C.F.R. § 162.6 ............................................................................................................... 4, 5

## PRELIMINARY STATEMENT

Plaintiffs are freelance photojournalists who seek a declaration that officers of U.S. Customs and Border Protection ("CBP") violated their First Amendment rights by referring them to secondary inspection as they entered the United States in late 2018 and early 2019. Like all other international travelers entering the United States, Plaintiffs were required to present themselves and their belongings for inspection, and to supply information and respond to questions, at the port of entry. They were asked about the purpose of their travel, their occupation, where they lived, and where they had been. CBP also asked Plaintiffs questions relating to persons who may have been illegally assisting aliens to cross the border. Such routine questioning at ports of entry is a critical element of CBP's paramount mission to protect the Nation's borders by detecting and interdicting potential threats to national security. Plaintiffs answered CBP's questions voluntarily and without issue, and all were cleared to enter the United States. No Plaintiff alleges any real injury stemming from their border inspections, beyond the mild and common inconvenience of a short delay before receiving clearance to enter—delays which the Supreme Court has made clear are to be expected at our Nation's borders and not constitutionally significant.

Plaintiffs allege, however, that simply because they are journalists, they should be exempt from the type of inspection to which everyone crossing the border has to submit. They predicate this allegation on the unsupported notion that any law enforcement questioning implicating journalistic activities interferes with constitutionally protected expression and thus "reasonably chills" future reporting. Of course, the notion that there is a "journalist's exception" to the long-established border search doctrine is plainly preposterous. So Plaintiffs try to bolster their claims with inflammatory but ultimately implausible allegations that they were singled out for secondary inspection at the border *because* they were journalists (allegedly because each of them had been covering the migrant caravans then traveling through Mexico toward the U.S. border), suggesting that this alleged targeting somehow transmogrifies a routine border inspection into a First Amendment violation.

Plaintiffs' Complaint must be dismissed. The sole cause of action asserted, which seeks a declaration that CBP's actions amounted to "violation of the First Amendment," fails to state an actionable claim. Plaintiffs' attempt to bootstrap what is in reality a Fourth Amendment claim into a First Amendment violation fails in the face of the Government's overriding interest in protecting the Nation's borders. Plaintiffs have not plausibly alleged that (1) they were targeted on account of their professional identities as photojournalists, (2) CBP in any way compelled speech or disclosure of information in violation of Plaintiffs' free association or free speech rights, or (3) their interactions with CBP caused a concrete "chilling effect" on their expressive activities. To the extent any allegation of these sorts can be gleaned from the Complaint, it still would not state an actionable First Amendment claim because the Government's conduct was plainly justified in the border search context and narrowly tailored to advance legitimate governmental interests unrelated to suppression of protected expression.

Even more fundamentally, the Court should dismiss this case at the threshold, because Plaintiffs lack standing to bring it.[1] For all of the reasons articulated in the Rule 12(b)(6) motion, the Complaint fails to allege that Plaintiffs have suffered, or will suffer, an injury-in-fact sufficient to vest this Court with subject matter jurisdiction. Going outside the pleading and looking at the annexed exhibits (which the Court can do on a Rule 12(b)(1) motion), the CBP records memorializing what *actually* happened to Plaintiffs during their secondary inspections amplify the routine nature of these inspections and demonstrate beyond peradventure that Plaintiffs were not compelled to disclose, and did not disclose, any journalistic sources or otherwise putatively protected information. Moreover, the CBP encounter lists show that since the incidents complained of, each of these Plaintiffs has crossed the U.S. border one or more times without ever being referred for secondary inspection, belying any claim that these individuals are being targeted for special questioning on account of their journalistic activities, and likewise belying any supposed fear of future interaction with CBP on which Plaintiffs rely to invoke the Court's jurisdiction.

---

[1] As explained *infra* at 25, we have here reversed the typical organization of motions raising both standing arguments and merits arguments, to emphasize the complete absence of alleged or actual injury-in-fact.

## BACKGROUND

### A.    CBP's Role at the Border.

To achieve its multi-faceted law enforcement and border security missions, CBP takes various actions at the border, including identifying and mitigating threats to border security and interdicting inadmissible aliens and prohibited and restricted goods, while facilitating and expediting the flow of legitimate travelers and trade across the border. *See* Declaration of Michael B. Firing (annexed), ¶ 4; *see also* 6 U.S.C. § 211. In this role, CBP is responsible for enforcing hundreds of criminal and civil laws at the border and administering comprehensive regulatory schemes. Firing Decl. ¶ 4. CBP border enforcement efforts include those relating to immigration, customs, international trade, child pornography, drug smuggling, weapons trafficking, financial crimes, as well as national security and terrorism. *Id.* In addition, CBP enforces a host of other laws at the border on behalf of various federal agencies. *See, e.g.*, 31 U.S.C. § 5317; 19 CFR § 161.2(a); 19 CFR Part 12.[2]

CBP's Office of Field Operations ("OFO") is the component responsible for inspecting all individuals, baggage, and conveyances at ports of entry; it also makes admissibility determinations for both persons and merchandise. *See* 6 U.S.C. § 211(g); Firing Decl. ¶¶ 4-5. OFO's law enforcement officers are referred to as CBP Officers ("CBPOs").[3] Using tools including the TECS database, *see* Firing Decl. ¶ 6, as well as their extensive training and experience, CBPOs evaluate the totality of the circumstances for each encounter at the border and consider every piece of available relevant information to determine if the person and goods in question are admissible into the United States, if there is a violation of any of the laws CBP enforces or administers, or if there is a threat to border security. *Id.* ¶¶ 8, 11-12. CBP conducts regular risk assessments to identify travelers or merchandise that warrant additional scrutiny; as a result of such

---

[2] *See United States v. Montoya de Hernandez,* 473 U.S. 531, 544 (1985) ("At the border, customs officials have more than merely an investigative law enforcement role. They are also charged, along with immigration officials, with protecting this Nation from entrants who may bring *anything* harmful into this country, whether that be communicable diseases, narcotics, or explosives." (emphasis added)).

[3] CBPOs are customs officers within the meaning of Title 19 and immigration officers within the meaning of Title 8 of the United States Code.

crucial assessments, "lookouts" can be placed in TECS to advise CBPOs that a particular traveler warrants additional scrutiny. Relevant lookout information may be specific to an individual (*e.g.*, a prior conviction for possession of child pornography), or it may be an identified pattern of behavior that is associated with a threat to border security (*e.g.*, a travel pattern associated with drug smuggling). Firing Decl. ¶ 9.

All travelers seeking to enter the United States, including all U.S. citizens, are subject to inspection upon each arrival and must present themselves to CBP at a port of entry to report their arrival and submit to a unified customs and immigration inspection at a port of entry. *See* 19 U.S.C. §§ 1433(b), 1459(a); 19 C.F.R. § 162.6; 8 U.S.C. § 1225(a)(3); 8 C.F.R. § 235.1(f)(l). Individuals are generally required to present themselves at the port of entry's primary arrival location, often referred to as "primary" or "primary inspection." Firing Decl. ¶ 10. At primary, CBPOs inspect travelers' documentation (*e.g.*, passport or customs declaration), attempt to verify the travelers' identity and citizenship, and ask questions regarding their travel. CBPOs at primary may use the information provided by the traveler to conduct limited queries of information maintained in TECS, which would typically include biographical information; manifest or passenger information transmitted by the carrier;[4] lookouts (such as "wants and warrants"); vehicle information (if it is a land crossing); and information about a traveler's prior border crossings. *Id.*

If the CBPO at primary determines that additional scrutiny is appropriate (for example, to address concerns related to admissibility, customs, national security, and/or agricultural or other laws) or that an inspection cannot be completed expeditiously, the traveler may be referred for a continuation of the border inspection, often referred to as "secondary" or "secondary inspection." Firing Decl. ¶ 11. A CBPO may refer any traveler to secondary inspection with or without suspicion. *Id.* As during primary, the CBPO at secondary may question travelers regarding their admissibility; the purpose and intent of their travel; their occupation; the identity of any traveling companions; the identity of any persons and places to be visited in the United States; the contents of their baggage and vehicles; the expected length of their visit; the

---

[4] This may include information from APIS (Advance Passenger Information System), which contains data collected in advance of an air or sea passenger's departure from or arrival to the United States.

identity of all persons and places visited abroad; the value of any cash and other monetary instruments in a traveler's possession; and the identity of a traveler's next destination, among other things. *Id.* A CBPO may also run additional law enforcement queries through TECS and other CBP systems. *Id.*

During a border inspection, CBP has broad authority to search and detain persons entering the United States. *See* 19 U.S.C. § 1582 (all persons coming into the United States shall be liable to detention and search by authorized officers or agents). In addition, pursuant to 19 U.S.C. § 1496, "the appropriate customs officer may cause an examination of the baggage of any person arriving in the United States . . . ." Moreover, "all persons, baggage, and merchandise arriving in the Customs territory of the United States from places outside thereof are liable to inspection and search by a Customs officer." 19 C.F.R. § 162.6.[5]

The Supreme Court has made it clear that border searches are subject to standards different from those applicable to other searches. *See generally United States v. Ramsey*, 431 U.S. 606, 616 (1977). Border searches are presumed reasonable merely by virtue of the person's entry into the United States from a foreign country, and the entry in and of itself constitutes consent to border inspection. *Id.* at 619; *see also United States v. Sanders*, 663 F.2d 1, 2-3 (2d Cir. 1981); *Muhammad v. Bonner*, No. 05-CV-1851 (RJD/LB), 2008 WL 926574, at *3 (E.D.N.Y. Mar. 31, 2008) ("[I]ndividuals entering the country are deemed to consent to a routine search and their expectation of privacy under the Fourth Amendment is limited."). "Routine border searches" of persons and their belongings do not require reasonable suspicion, probable cause, or a warrant. *Montoya de Hernandez*, 473 U.S. at 538; *United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006) ("Routine searches include those searches of outer clothing, luggage, a purse, wallet, pockets, or shoes which, unlike strip searches, do not substantially infringe on a traveler's privacy rights.").

**B.  Plaintiffs' Border Crossings.**

According to the Complaint, the five Plaintiffs are freelance photojournalists, three of whom are based in New York and the other two in Austin and San Diego, respectively. Compl. ¶¶ 12-16. At various

---

[5] *See also* 19 U.S.C. §§ 482, 1455, 1559, 1461, 1467, 1499, 1581; 8 U.S.C. §§ 1225, 1357; 19 C.F.R. §§ 162.5, 162.7.

times in late December 2018 and January 2019, all of them were in Mexico covering (either independently or on behalf of various news organizations) one or more of the "migrant caravans" that were then making their way from Central America towards the U.S.-Mexico border. *Id.* ¶¶ 21-25, 41 (Guan), 64 (Nakamura), 86-87 (Abramson), 106 (Cahana), 131-32 (Drehsler). For four of them (all but Cahana), the narratives are similar. Each attempted to cross back into the United States one or more times at the San Ysidro port of entry near Tijuana, either on foot or in a vehicle; each was sent to the secondary inspection area; each was questioned for between ten and sixty minutes; and each was released from secondary inspection and allowed into the United States. *Id.* ¶¶ 44-45, 52 (Guan), 67-69, 74 (Nakamura), 89, 95 (Abramson), 133-34, 139-40, 145-47, 150 (Drehsler). Cahana's story is somewhat different. In January 2019, she attempted to fly from Montreal to Mexico City through Detroit and was inspected by CBP at preclearance at the Montreal airport. *Id.* ¶ 109. There, like the other Plaintiffs, she was sent to secondary inspection, where she was questioned for about ten minutes before being cleared to travel through Detroit on her way to Mexico. *Id.* ¶¶ 110, 112. On arriving in Detroit the next day on her return flight from Mexico City, she was again sent to secondary inspection, where she was briefly questioned before being released and allowed into the United States. *Id.* ¶ 120.

With some differences in detail, Plaintiffs' accounts of what they experienced during their border inspection are substantially the same. They were asked routine biographical questions such as where they lived and for how long; where they were born; what was their profession and by whom were they employed; what was the purpose of their travel; etc. Compl. ¶¶ 46, 48 (Guan), 70-71 (Nakamura), 93 (Abramson), 111 (Cahana), 136, 143, 149 (Drehsler). Four of them were asked whether they knew anyone, including smugglers or "instigators," who may have been illegally assisting aliens in the caravan to cross the border. *Id.* ¶¶ 47, 49-50 (Guan), 71-72 (Nakamura), 94 (Abramson), 137, 142-43, 148 (Drehsler). Guan and Nakamura were asked if they had any photographs of persons involved with the migrant caravans that might depict such illegal acts; they showed the CBPOs some of the pictures they had taken (Guan from his camera and Nakamura from his "public Instagram page"). *Id.* ¶¶ 51 (Guan), 73 (Nakamura). Drehsler

was asked on primary if "she wanted to show the officers her photographs from that day," but she declined and did not show anything. *Id.* ¶ 146. Abramson avers he was asked during primary what kind of pictures he takes and what was in a notebook found in his bag; he does not allege that he answered either question. *Id.* ¶¶ 90-91. Cahana avers that on her return trip through Detroit she was asked about her prior encounters with Mexican authorities. *Id.* ¶ 119. Drehsler states that one CBPO complimented her photography, "saying she had done 'great work.'" *Id.* ¶ 141; *see also generally* Firing Decl. Exhs. 2, 4, 6, 8, 10 (CBP incident logs and inspection reports documenting Plaintiffs' interactions).

Following the border crossings, each Plaintiff went about his or her business as a photojournalist without impediment. None alleges that he or she was in any meaningful way precluded from continuing to cover the migrant caravans (or other issues), from publishing or distributing photographs, or from associating with sources and other journalists. Critically, each Plaintiff has crossed the border back into the United States on one or more occasions since the events described in the Complaint, but never once has any of them again been referred to a secondary inspection. *See* Firing Decl. Exhs. 1, 3, 5, 7, 9 (CBP encounter lists documenting each Plaintiff's border crossings). Nor have any of them alleged that they were ever subsequently referred to secondary.

## ARGUMENT

## I. PLAINTIFFS' FIRST AMENDMENT CLAIM SHOULD BE DISMISSED FOR FAILURE TO STATE AN ACTIONABLE CLAIM FOR RELIEF.

### A. Standard of Review.

Rule 12(b)(6) requires courts to dismiss any case where the plaintiffs have failed to state a legal claim upon which relief can be granted. To survive a motion to dismiss for failure to state a claim, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *See Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). When deciding a motion to dismiss under Rule 12(b)(6), courts must construe the pleadings broadly and assume that the facts are as plaintiff alleges; however, "[t]hreadbare recitals of the elements of

a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678. Additionally, courts are not obligated to "accept as true a legal conclusion couched as a factual allegation." *Papsan v. Allain*, 478 U.S. 265, 286 (1986). Meanwhile, "in deciding a Rule 12(b)(6) motion, the court may consider, in addition to the factual allegations of the complaint, documents attached to the complaint as exhibits or incorporated in it by reference, matters of which the court may take judicial notice, and documents in the plaintiff's possession or of which she had knowledge and relied on in bringing suit." *Zhang v. Lynch*, No. 16-CV-4889 (WFK), 2018 WL 1157756, at *4 (E.D.N.Y. Mar. 1, 2018); *see also Kramer v. Time Warner, Inc.,* 937 F.2d 767, 773 (2d Cir. 1991) ("Of course, it may also consider matters of which judicial notice may be taken under Fed. R. Evid. 201.").

### B. Plaintiffs' Attempt to Bootstrap a Fourth Amendment Claim Into a First Amendment Violation Fails in the Face of the Paramount Interest in Protecting the Border.

#### 1. Plaintiffs' Claim is Actually a Fourth Amendment Claim.

As an initial matter, it is "axiomatic" that, at the border, "the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity." *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004). Indeed, "it is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981). Thus, the United States' "interest in preventing the entry of unwanted persons and effects is at its zenith" at the border, while "the expectation of privacy [is] less at the border than in the interior." *Montoya de Hernandez*, 473 U.S. at 538-39; *see also Tabbaa v. Chertoff*, 509 F.3d 89, 103 (2d Cir. 2007) ("It is undisputed that in this case, the government's interest in protecting the nation from terrorism constitutes a compelling state interest unrelated to the suppression of ideas.").

It is equally obvious and unarguable that the "[i]nterception and detection at international border crossings is likely the most effective way to protect the United States" from dangerous people and things, and to safeguard the United States from the illegal entry of persons. *See Tabbaa*, 509 F.3d at 103. CBPOs and other border personnel are thus given "more than merely an investigative law enforcement role" at

the border, and "must be allowed to graduate their response to the demands of any particular situation." *Montoya de Hernandez*, 473 U.S. at 542, 544; *see Flores-Montano*, 541 U.S. at 153 (the United States has particularly broad latitude at the border in light of its "inherent authority to protect" and "paramount interest in protecting[] its territorial integrity"). Indeed, "[t]ime and again, [the Supreme Court] ha[s] stated that 'searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border." *Id.* at 152-53 (quoting *Ramsey*, 431 U.S. at 619).

Plaintiffs' principal cavil here is that they were briefly referred for additional scrutiny when attempting to cross the border. *See, e.g.*, Compl. ¶¶ 3, 38, 162, Prayer for Relief C. But as discussed *supra*, at 3-5, secondary inspection, which is simply a continuation of the statutorily-required border inspection, is a process to which any international traveler may be referred at any border at any time. *See* Firing Decl. ¶ 11; *Tabbaa*, 509 F.3d at 103 ("[I]t is undisputed that all persons seeking entry into the United States are subject to search and detention by CBPOs, and that CBP, as a matter of standard operating procedure, may refer individuals for a secondary inspection that can include the collection of biometric information such as fingerprints or photographs.").

Plaintiffs have no occasion to complain before this Court about their referral to secondary inspection. As the Supreme Court has long held, courts are not to "indulge in unrealistic second-guessing" of discretionary decisions of CBP personnel at the border as they perform the critical function of protecting the United States' borders, including the decision to refer an individual to secondary inspection. *See Montoya de Hernandez*, 473 U.S. at 542. Such second-guessing is precisely the aim of Plaintiffs' Complaint, and it must not be countenanced.

Although Plaintiffs have raised only a First Amendment claim, constitutional claims concerning the lawfulness of searches at the border should be considered under, and in light of, Fourth Amendment jurisprudence. Under the border search doctrine discussed above, searches and seizures at the border "are reasonable simply by virtue of the fact that they occur at the border." *Flores-Montano*, 541 U.S. at 152-53;

*see also Ramsey*, 431 U.S. at 619 ("'[The] longstanding recognition that searches at our borders without probable cause and without a warrant are nonetheless 'reasonable' has a history as old as the Fourth Amendment itself.'").[6] At the border, the "balance between the interests of the Government and the privacy rights of the individual is . . . struck much more favorabl[y] to the Government." *Montoya de Hernandez*, 473 U.S. at 540; *see also Tabbaa*, 509 F.3d at 103. The Fourth Amendment does not "shield entrants from inconvenience or delay at the [i]nternational border," and the Supreme Court has "consistently rejected hard-and-fast time limits" for border searches. *Flores-Montano*, 541 U.S. at 155 n.3; *Montoya de Hernandez*, 473 U.S. at 543; *Tabbaa*, 509 F.3d at 100. Nor does the Fourth Amendment protect individuals from "[r]outine searches of the persons and effects of entrants." *Montoya de Hernandez*, 473 U.S. at 538; *Tabbaa*, 509 F.3d at 98 (searches of "outer clothing, luggage, a purse, wallet, pockets or shoes" at the border are "routine searches" that "do not substantially infringe on a traveler's privacy rights.").

Here, Plaintiffs' allegations demonstrate only "routine" border stops and searches that were plainly valid under longstanding Fourth Amendment jurisprudence. Plaintiffs were interviewed by CBPOs for between ten minutes and an hour. Compl. ¶¶ 45, 69, 95, 134, 145, 147; *see Flores-Montano*, 541 U.S. at 155 n.3 ("think[ing] it clear that delays of one to two hours at international borders are to be expected"); *Montoya de Hernandez*, 473 U.S. at 543. During those short interviews, Plaintiffs were asked about the "purpose of [their] visit," their "address and length of residency," their "birth location," their "contact information," the purpose of their travel, their profession and employer (two areas that were related to their purpose of their travel in this case), etc. *See* Compl. ¶¶ 45-48, 70-71, 93, 110-11, 136. 143, 149. Some Plaintiffs were asked questions about the migrant caravans, focusing on whether Plaintiffs knew anyone, including smugglers or "instigators," who may have been illegally assisting aliens to cross the border. *Id.*

[6] *See generally Ramsey*, 431 U.S. at 617 ("The Congress which proposed the Bill of Rights, including the Fourth Amendment, to the state legislatures on September 25, 1789, 1 Stat. 97, had, some two months prior to that proposal, enacted the first customs statute, Act of July 31, 1789, c. 5, 1 Stat. 29…. As this act was passed by the same Congress which proposed for adoption the original amendments to the Constitution, it is clear that the members of that body did not regard searches and seizures of this kind as 'unreasonable,' and they are not embraced within the prohibition of the amendment.").

¶¶ 47, 49-50, 71-72, 94, 137, 142-43, 148. These inspections were exactly the types of non-invasive, routine border searches protected under the Fourth Amendment. *See, e.g.*, *Bibicheff v. Holder*, 55 F. Supp. 3d 54 (E.D.N.Y. 2014) (border search and seizure valid where plaintiff referred multiple times for secondary inspection, questioned and detained by CBPOs, had his luggage searched, and was informed there was a "hit" against him in the "CBP system"). Plaintiffs' contentions that such basic questioning about and searching of Plaintiffs' travels and belongings amounted to a constitutional violation are entirely meritless.

The mere fact that Plaintiffs here are photojournalists claiming that their border inspections implicated their expressive activities does not alter the analysis. Indeed, numerous courts have explicitly refused to "carve out a First Amendment exception to the border search doctrine." *See Abidor v. Napolitano*, 990 F. Supp. 2d 260, 278 (E.D.N.Y. 2013) (Korman, J.) (dismissing plaintiff's claim regarding a border directive); *see also, e.g.*, *United States v. Arnold*, 533 F.3d 1003, 1010 (9th Cir. 2008); *United States v. Ickes*, 393 F.3d 501, 506 (4th Cir. 2005). The Fourth Circuit described as "quite staggering" the ramifications of carving out a First Amendment exception to the border search doctrine. *See Ickes*, 393 F.3d at 506. Recognizing such an exception, that court held, would not only "create a sanctuary at the border" for terrorist communities and dangerous groups of people whose actions "are inherently 'expressive,'" but it would also "undermine the compelling reasons that lie at the very heart of the border search doctrine." *Id.*

Boiled down, Plaintiffs allege that simply because they are journalists they should be exempt from the type of inspection to which every traveler crossing the border has to submit. But the notion that there is a "journalist's exception" to the long-established border search doctrine is plainly preposterous.

### 2. Plaintiffs' Allegations at Best Demonstrate Merely Incidental Burdens of a Valid and Routine Border Search.

The First Amendment does not protect against "incidental" burdens of government action on a plaintiff's free association or free speech rights. *See Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.* *("FAIR")*, 547 U.S. 47, 62 (2006); *Lyng v. UAW*, 485 U.S. 360, 366 (1988). An interference with First Amendment rights becomes cognizable only when it is "'direct and substantial' or 'significant.'" *Fighting*

*Finest, Inc. v. Bratton*, 95 F.3d 224, 228 (2d Cir. 1996) (quoting *Lyng*, 485 U.S. at 366); *see also FAIR*, 547 U.S. at 67 ("incidental burden" on free speech is "no greater than is essential" and is "permissible . . . so long as the neutral regulation promises a substantial government interest that would be achieved less effectively absent the regulation" (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985))). A free association violation is "direct and substantial" only when the government "order[s] [the individuals] not to associate together . . . [or] 'prevent[s]' them from associating together or burden[s] their ability to do so in any significant manner." *Lyng*, 485 U.S. at 367.

Here, Plaintiffs have not alleged that CBPOs ordered them to make specific statements they did not wish to make or to refrain from associating with other specific people or categories of people. *See Lyng*, 485 U.S. at 367. Any alleged interference with their ability to speak or to associate with others is at best incidental to the CBP's proper exercise of its duty to secure the border against infiltration and dangerous entrants. *See, e.g.*, *Teague v. Regional Comm'r of Customs*, 404 F.2d 441, 445 (2d Cir. 1968) (no First Amendment violation in the "burdensome and time-consuming administrative process" because the "restriction . . . is only incidental to the proper general purpose of the regulations"), *cert denied*, 394 U.S. 977 (1969). Nor have Plaintiffs plausibly alleged that they were or have been significantly affected in their ability to carry out their professions as photojournalists documenting the migrant caravan (or anything else). *See id.* Indeed, Plaintiffs indisputably remain free to continue their work as photojournalists and to publish their photographs, as they have apparently done without restriction since the incidents alleged in the Complaint.[7]

---

[7] *See* Bing Guan, Photographer Sin Refugio, *available at* https://bingguan.photos/sinrefugio (photographs of migrant caravan); Go Nakamura Photography, migrant caravan heading to the US, *available at* http://gonakamuraphotography.com/ (similar); Mark Abramson, Caravana, *available at* https://www.markabramsonphoto.com/caravana (similar); Kitra Cahana, MAPS, Caravana Migrante, Tijuana *available at* https://www.mapsimages.com/works/caravana-migrante-tijuana/ (similar); Ariana Drehsler, Asylum Seekers Reach US-Mexico Border, *available at* https://www.arianadrehsler.com/asylum-seekers-reach-us-mexico-border (similar). *See Stephens v. Trump Org. LLC*, 205 F. Supp. 3d 305, 310 n.7 (E.D.N.Y. 2016) (a "court may take judicial notice of information publicly announced on a party's website" where "authenticity is not in dispute").

**C. Plaintiffs Have Not Plausibly Alleged that They Were Targeted On Account of Their Professional Identities as Photojournalists.**

Plaintiffs' implication that Defendants targeted them for secondary inspection on account of their professional identities as journalists has no plausible factual basis. Although Plaintiffs allege the existence of a "database" or PowerPoint presentation in which they were allegedly named, *see* Compl. ¶¶ 29-38, and imply that their inclusion in this presentation means they were targeted as journalists, this implication falls of its own weight. As an initial matter, Plaintiffs do not specifically allege that their inclusion on this alleged presentation had anything to do with the fact that they were referred to secondary inspection when they crossed the border. To the contrary, they each acknowledge that their secondary inspections occurred shortly after *Mexican authorities* had questioned them about their activities in that country, and aver that *Mexican authorities* had placed some kind of alert on their passports. *See, e.g.,* Compl. ¶¶ 43, 53 (Guan), 66, 75 (Nakamura), 88 (Abramson), 107, 113-17, 119, 121 (Cahana), 135 (Drehsler). Moreover, the alleged list is not limited to "media" but includes numerous individuals from various sectors and backgrounds believed to have information about "suspected organizers, coordinators, or instigators" associated with the migrant caravans. *See* Compl. ¶ 33. It, in any event, includes only the types of information about each individual that CBPOs routinely ask about during inspections at the border—name, date of birth, and occupation—as well as non-invasive internal notes to assist CBP with its border-security measures. *See id.*

As Plaintiffs acknowledge, moreover, at the time relevant to the complaint, CBPOs had specific concerns about the rise of migrant entrants into the United States and the possibility that individuals with malign intent may have been assisting aliens to cross the border in violation of federal law. *See* Compl. ¶¶ 21-26, 28. Given those concerns, and the Government's paramount mission to secure the borders by detecting and mitigating potential threats to the Nation, it is not surprising that federal officials might have sought, as Plaintiffs allege, "to question available sources of information … regarding the migrants, the caravan and its leaders, and any criminal or cartel related actions concerning migrants or the caravan." *Id.*

¶ 28.[8] The Complaint at best claims that the alleged "database" listed individuals whom the Government at one point believed may have information about the migrant caravan or its participants—information that could potentially be helpful in detecting and preventing threats to national security. Even assuming Plaintiffs' alleged inclusion on such a list was a reason they were questioned at the border (again, implied but not actually alleged), such questioning—*e.g.,* into whether Plaintiffs knew anyone, including smugglers or "instigators," who may have been illegally assisting aliens in the caravan to cross the border, *see id.* ¶¶ 47, 49-50, 71-72, 94, 137, 142-43, 148—would plainly be unrelated to any putative suppression of Plaintiffs' First Amendment rights and instead would be entirely consistent with the agency's mandate to protect the Nation's borders. It would not amount to "targeting" of journalists for special treatment at the border.[9]

### D. Plaintiffs Have Not Plausibly Alleged that Defendants Compelled Disclosure in Violation of Plaintiffs' Free-Association or Free-Speech Rights.

The Complaint also intimates a First Amendment claim premised on the allegedly "compelled disclosure" of information about Plaintiffs' journalistic work and expressive activities. *See* Compl. ¶ 1. This claim should be dismissed because Plaintiffs have failed to plausibly allege compulsion. Alternatively, even if Plaintiffs could somehow show compulsion, the claim nevertheless fails because Defendants' actions were narrowly tailored to serve the compelling interest of protecting this Nation's borders.

---

[8] *See* Letter from Randy J. Howe, Executive Director, Office of Field Operations, U.S. Customs and Border Protection to Mana Azarmi, Center for Democracy & Technology (May 9, 2019) ("Howe Ltr.") ("In October of 2018, the threat level of the Central American migrant caravan in Mexico reached higher than normal levels, they demonstrated violent tendencies, and presented transportation, medical, and housing demands to the Government of Mexico. To address these developing threats, CBP partnered with the Government of Mexico and other law enforcement agencies. CBP was also investigating possible violations under 8 U.S. Code § 1324, which pertains to any person who encourages or induces an alien to enter the United States, knowing or in reckless disregard that they are doing so in violation of law. *A number of journalists and photographers were identified by Mexican Federal Police as possibly assisting migrants in crossing the border illegally and/or as having some level of participation in the violent incursion events*…. CBP utilized various sources of information in assessing the intentions of the caravan upon their arrival in Tijuana, Mexico. These varied sources of information helped identify a number of people involved in assisting migrants in crossing the border illegally or having witnessed the violent actions taken against law enforcement at the border. CBP followed through with appropriate investigatory queries and compiled caravan information from various sources to determine if subsequent investigation was warranted. Efforts to gather this type of information are a standard law enforcement practice." (emphasis added)); *see also Sierra Club v. U.S. Army Corps of Eng'rs*, 732 F.2d 253, 258 (2d Cir. 1984) (no abuse of discretion when district court took judicial notice of a letter by a "middle-level [Federal Highway Administration] administrator").

[9] *See* Howe Ltr., *supra* n.8 ("CBP does not target journalists for inspection based on their occupation or their reporting. CBP has policies in place that prohibit discrimination against arriving travelers and has specific provisions regarding encounters with journalists.").

### 1. Plaintiffs Have Not Alleged Any Compulsion That Could Amount to a First Amendment Violation.

The First Amendment can protect individuals from being compelled to disclose the identities of those with whom they associate, as well as individuals who would rather remain silent than be forced to speak. *See Gibson v. Fla. Leg. Inv. Comm.*, 372 U.S. 539, 544 (1963); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 641 (1943). Here, however, Plaintiffs' allegations concerning what they experienced as they crossed the border lack any indicia of compelled speech or disclosure.

The facts, as Plaintiffs allege them, nowhere indicate that Plaintiffs were forced, required, or in any way impelled to disclose the identities of those with whom they associate in response to the CBPOs' routine inquiries at the border. Plaintiffs do not allege, for instance, that they were subjected to any law or rule requiring Plaintiffs to disclose any protected information. *See, e.g.*, *Citizens Union v. Attorney General,* 408 F. Supp. 3d 478, 507 (S.D.N.Y. 2019) (statute requiring non-profit organizations to disclose identities of donors compelled disclosure under First Amendment). Nor do Plaintiffs allege that CBP issued a subpoena or court order requiring a response. *See, e.g.*, *Local 1814, Int'l Longshoremen's Ass'n v. Waterfront Comm.*, 667 F.2d 267 (2d Cir. 1981) (subpoena requiring disclosure of names amounted to "compelled disclosure" of free-association rights). Moreover, Plaintiffs nowhere allege that any CBPO used force or threats thereof to ensure responses to their questions. Plaintiffs have not alleged that any CBPO unholstered their weapons or used handcuffs, or the threat thereof, to force them to speak. Plaintiffs have not even alleged that any CBPO told them that responding to all questions was a condition to cross the border.

These potential indicia of compulsion, for which courts routinely look in this and other constitutional contexts to determine whether actions are compelled, are completely absent from Plaintiffs' allegations. *See, e.g.*, *Oregon v. Elstad*, 105 S. Ct. 1285, 1295 (1984) (recognizing, in the Fifth Amendment context, the "vast difference" between "a confession by physical violence or other deliberate means calculated to break the suspect's will" and a "'guilty secret' freely given in response to an unwarned but uncoercive question"); *Salmon v. Blesser*, 802 F.3d 249, 254 (2d Cir. 2015) (allegations that police officer

removed plaintiff by grabbing his collar, twisting his arm, and shoving him out the door amounted to seizure under Fourth Amendment).[10]

As discussed above, Plaintiffs' allegations show they participated in nothing more than routine, non-invasive, non-coercive interviews by CBPOs, typical of secondary inspections that are conducted all the time. *See Tabbaa,* 509 F.3d at 103. Although some Plaintiffs allegedly "fe[lt] [t]he[y] had no choice and w[ere] not at liberty to leave," that allegation is wholly subjective and too conclusory to show, objectively, that any Plaintiff was in any way coerced. *See* Compl. ¶¶ 51, 73; *cf. Zherka v. DiFiore,* 412 Fed. Appx. 345, 348 (2d Cir. 2011). Indeed, Plaintiffs' allegations evince the opposite—that they were objectively under so little pressure to cooperate that they could *refuse* to provide the CBPOs with responses to their questions without any sanction or consequence. The CBPOs allegedly asked Plaintiff Drehsler, for instance, "whether she wanted to show the officers her photographs from that day." Compl. ¶ 146. Drehsler *refused* and "did not show the officers any photographs." *Id.* She was released from secondary inspection "[s]hortly thereafter." *Id.* ¶¶ 147-50.

Simply put, voluntarily responding to routine, non-invasive questions during secondary inspection at the border does not constitute compelled disclosure. That Plaintiffs are photojournalists does not change the fact that they were asked the same types of questions as any other traveler may be asked when crossing the border, and plainly does not amount to a violation of their free speech or association rights. Indeed, if Plaintiffs' extreme position were accepted—that it is inherently compulsive for CBPOs to ask questions during inspection at ports of entry to persons seeking to enter the country—it would lead to the truly absurd conclusion that CBPOs could ask *no one* questions upon entering the country, as the right to

---

[10] The cases where the Supreme Court has found the disclosure of information to law enforcement officers to be unconstitutionally involuntary have involved egregious and coercive police misconduct unlike anything Plaintiffs allege here. *See, e.g., Mincey v. Arizona,* 437 U.S. 385 (1978) (defendant subjected to 4-hour interrogation while incapacitated and sedated in intensive-care unit); *Greenwald v. Wisconsin,* 390 U.S. 519 (1968) (defendant, on medication, interrogated for over 18 hours without food or sleep); *Beecher v. Alabama,* 389 U.S. 35 (1967) (police officers held gun to the head of wounded confessant to extract confession); *Davis v. North Carolina,* 384 U.S. 737 (1966) (16 days of incommunicado interrogation in closed cell without windows, limited food, and coercive tactics); *Reck v. Pate,* 367 U.S. 433 (1961) (defendant held for four days with inadequate food and medical attention until confession obtained); *Culombe v. Connecticut,* 367 U.S. 568 (1961) (defendant held for five days of repeated questioning during which police employed coercive tactics).

associate and be free from compelled speech, etc., is not unique to photojournalists.

## 2. Defendants' Actions Were Narrowly Tailored to Serve Compelling Government Interests.

Even if Plaintiffs had plausibly alleged compulsion, Defendants' alleged conduct still would not amount to a First Amendment violation. Allegations of First Amendment violations at the international border may be subject to qualitatively lower standards of scrutiny than might apply in other contexts. *See Tabbaa*, 509 F.3d at 102 n.5. But even assuming *arguendo* that strict scrutiny applies, CBP's actions here "easily pass muster." *Id.* Under strict scrutiny, an infringement on free association or free speech rights is allowable as long as it is narrowly tailored (*i.e.*, "cannot be achieved through means significantly less restrictive") to furthering "compelling state interests, unrelated to the suppression of ideas." *See Burson v. Freeman*, 504 U.S. 191, 198 (1992); *Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984).

Here, Defendants' alleged actions were lawful because they were as narrowly tailored as possible to advancing the compelling government interest of protecting the territorial integrity of the United States. As discussed *supra* at 3-5, CBP's primary mission is to secure the Nation's borders, and CBPOs are stationed at the borders to carry out that mission and to enforce numerous laws. Moreover, as explained *supra*, at 13-21, CBP had specific concerns, at the time of the incidents alleged in the Complaint, about the sharp rise of migrant entrants into the United States and the associated possible violence and violations of federal laws; it thus took appropriate measures to assess the intentions and knowledge of those believed to be involved with or have information about the migrant caravans, in an effort to detect and mitigate potential threats to the Nation. *See* Compl. ¶¶ 21-26, 28; Howe Ltr., *supra* n.8; *Haig*, 453 U.S. at 307.

That Plaintiffs were referred for "secondary inspection, detention, and questioning," Compl. ¶ 38,[11] as part of this lawful information-gathering effort amounts to nothing more than interactions to which any traveler entering the United States may be subject. *See Montoya de Hernandez*, 473 U.S. at 542; *Tabbaa*, 509 F.3d at 103. The routine, natural questions the CBPOs allegedly asked Plaintiffs were wholly

---

[11] The Complaint nowhere alleges that any Plaintiff was ever actually "detained."

unrelated to the suppression of any ideas or associations and were narrowly tailored to obtain information related to the travel of migrant caravans needed to ensure the protection of the Nation's borders.

### E. Any First Amendment Claim Premised on Alleged Violation of the Journalist's Qualified Privilege Must Be Dismissed for Failure to State a Claim.

Plaintiffs have also failed to state any First Amendment claim ostensibly arising under the journalist's qualified privilege. *See* Compl. ¶¶ 55, 77, 99, 123, 152.[12] They have not plausibly alleged that they were compelled to disclose privileged information about their photographs or the sources thereof. And even if Plaintiffs could show compulsion, any allegedly involuntary disclosure of photographs or of alleged confidential sources was sufficiently justified under the circumstances alleged to vitiate any actionable First Amendment claim.

#### 1. *Plaintiffs Cannot Invoke the Qualified Privilege Because They Do Not Allege the Requisite Compulsion.*

In its seminal case on the journalist's qualified privilege, the Supreme Court held that journalists do not have an absolute privilege under the First Amendment to refuse to appear before a grand jury and answer questions relevant to an investigation into the commission of a crime. *See Branzburg v. Hayes*, 408 U.S. 665, 681 (1972). Since *Branzburg*, the Second Circuit has repeatedly held that the qualified privilege at best protects journalists from the "*compelled* production of a reporter's resource materials" in circumstances other than a grand jury subpoena. *von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 143 (2d Cir. 1987); *see also United States v. Sanders*, 211 F.3d 711, 719 (2d Cir. 2000) ("qualified journalist's privilege against compelled disclosure of confidential news sources"); *Treacy*, 639 F.3d at 42 ("It is settled law in this Circuit, at least in the civil context, that a journalist possesses a qualified privilege protecting him or her from the

---

[12] We assume *arguendo* for purposes of this motion that the journalist's qualified privilege is a constitutional concept, but whether it actually is so is an open question in this Circuit. *See, e.g.*, *United States v. Treacy*, 639 F.3d 32, 43 (2d Cir. 2011) ("declin[ing] to resolve absent any Congressional retrenchment of the privilege" whether "the reporter's privilege is derived from the First Amendment rather than federal common law of privileges"); *Gonzales v. NBC*, 194 F.3d 29, 35 n.6 (2d Cir. 1999) (recognizing that "[p]revious decisions of [the Second Circuit] have expressed differing views on whether the journalists' privilege is constitutionally required, or rooted in federal common law" and deciding that the Court "need not decide whether the privilege is founded in the Constitution" "[u]ntil Congress legislates to modify the privilege or do away with it").

compelled disclosure of even nonconfidential materials.'"); *Baker v. F&F Inv.*, 470 F.2d 778, 779, 782 (2d Cir. 1972) (privilege applies to the "[c]ompelled disclosure of confidential sources" during a deposition).

The burden to demonstrate the requisite compulsion falls on the party claiming the qualified privilege. *von Bulow*, 811 F.2d at 144 (quoting *In re Grand Jury Subpoena Dtd. January 4, 1984*, 750 F.2d 223, 224 (2d Cir. 1984)). But as discussed *supra* at 15-17, Plaintiffs' Complaint is devoid of any factual allegations that the CBPOs ever compelled them to do anything, much less to disclose information regarding the sources of their reporting. For example, they do not claim that Defendants issued a subpoena compelling them to disclose information about their sources. *See, e.g.*, *New York Times Co. v. Gonzales*, 459 F.3d 160, 167-68 (2d Cir. 2006) (invoking journalist's privilege for compelled disclosure in response to subpoenas); *NBC*, 194 F.3d at 32-33 (applying journalist's privilege claim on a motion to compel compliance with "subpoenas" to disclose names of sources). Nor have Plaintiffs alleged that they were required to disclose such information in court or under oath. *See, e.g.*, *Treacy*, 639 F.3d at 44-45 (confronting privilege in the context of "compelling a reporter's direct testimony" in a trial court).

The Complaint, moreover, contains no indicia that any Plaintiff was forcibly compelled to disclose photographs or the sources thereof to CBPOs. *See supra* at 15-17; *see, e.g.*, Compl. ¶ 146 (Drehsler "*did not show* the officer any photographs," and was not forced to show them or reveal her sources). Although two Plaintiffs allegedly "fe[lt] [t]he[y] had no choice and [were] not at liberty to leave," that allegation, again, is entirely subjective and does not amount to the type of concrete, objective compulsion that courts have uniformly found is needed to state a journalist's privilege claim. *See* Compl ¶¶ 51, 73; *von Bulow*, 811 F.2d at 143; *cf. Urbina v. City of New York*, 672 Fed. App'x 52, 54 (2d Cir. 2016) (summary order) (plaintiff did not state Fourth Amendment claim, even though officers directed him to walk a certain way and get out of the neighborhood, because a reasonable person would have believed he was "free to leave"). Nor do Plaintiffs anywhere specify what exact information allegedly subject to the qualified privilege they supposedly disclosed to the CBPOs. Plaintiffs instead allege in general and conclusory terms that they provided information about their "journalistic work product." *See id.* ¶¶ 55, 77, 99, 123, 152. But without

corresponding factual allegations showing the precise nature and content of that disclosure, these allegations do not suffice at the pleading stage.

## 2. Any Disclosure of Non-Confidential Information Was Valid and Overcomes Any Assertion of Journalist's Qualified Privilege.

Even if Plaintiffs could invoke the journalist's privilege—and they cannot—any photographs Plaintiffs allegedly disclosed to CBPOs at most constitute "non-confidential" information which, under the circumstances alleged in the Complaint, was appropriately disclosed. *See NBC*, 194 F.3d at 33 (non-confidential refers to "[i]nformation that was not received by the publisher in confidence, as the 'source' of the information was the author of the article").[13] Here, the Complaint alleges that only two Plaintiffs actually disclosed their photographs to the CBPOs. *See* Compl. ¶ 51 (Guan), ¶ 73 (Nakamura). Again, these disclosures were voluntary rather than compelled, but regardless, the disclosed photographs are not confidential because Plaintiffs do not allege that they were taken in confidence or for private consumption.[14] *See* Compl. ¶ 43 (Guan eventually sold photographs to *The Intercept*); *id.* ¶ 73 (Nakamura showed CBPOs photographs from his "public Instagram page"). And even if Plaintiffs disclosed photographs to CBPOs that were not disclosed to the general public, those photographs remain non-confidential because they were taken in the open of individuals who were already public, or who could

---

[13] Giving Plaintiffs the benefit of every doubt, the Complaint alleges, at best, that, only Plaintiff Abramson revealed any confidential source materials to the CBPOs. *See* Compl. ¶ 90 (CBPOs allegedly "searched Abramson's bag, which contained notebooks that included confidential source material; the names and contact information of people he encountered while working; personal reflections; and receipts to be submitted to his editor for reimbursement."). According to Abramson, after searching his bag during primary inspection the officers asked routine follow-up questions, such was "What is in the book" and what types of pictures did he take. *Id.* ¶ 91. He does not allege that he answered such questions. Nor does he even allege that the CBPO ever opened, looked through, or read the notebook. As a threshold matter, such allegations do not state a First Amendment claim because the CBPOs are alleged to have done nothing more than a "routine search" of Abramson's belongings, which have repeatedly been found constitutionally valid. *See Montoya de Hernandez*, 473 U.S. at 538 ("[r]outine searches of the persons and effects of entrants" at the border are reasonable); *Tabbaa*, 509 F.3d at 98 (searches of "outer clothing, luggage, a purse, wallet, pockets, or shoes" at the border are routine searches that "do not substantially infringe on a traveler's privacy rights" (quoting *Irving*, 452 F.3d at 123). Abramson does not allege that any CBPOs specifically forced him to reveal any journalistic sources—and, indeed, he acknowledges that even after seeing the notebooks in his bag the CBPOs did not ask any follow-up questions that would intrude on or compel disclosure of those sources. *See* Compl. ¶¶ 90-91. Rather, Abramson's allegations indicate only that he was being subjected to a "routine border search," which happened to occur items in his bags that contained information about sources.

[14] *See* Bing Guan, Photographer, Sin Refugio, available at https://bingguan.photos/sinrefugio (photographs of migrant caravan); Go Nakamura Photography, migrant caravan heading to the US, available at http://gonakamuraphotography.com/ (same).

Defendants' Motion to Dismiss
*Guan v. Wolf*, No. 19-CV-6570 (PKC/JO) (EDNY)
Page 20

have been publicly revealed. *See, e.g., Krase v. Graco Children Prods., Inc.*, 79 F.3d 346, 353 (2d Cir. 1996) (TV outtakes, which had not previously been published to the public, were non-confidential material for journalist's privilege claim); *Lebowitz v. City of New York*, 948 F. Supp. 2d 392, 395 (S.D.N.Y. 2013) (reporter's observations about events he witnessed in public was non-confidential information); *see Sokolow v. PLO*, No. 04 Civ. 397 (GBD/RLE), 2012 WL 3871380, at *3 (S.D.N.Y. Sep. 6, 2012) (requiring disclosure of TV outtakes, which were non-confidential materials, where the TV producer, having chosen not to, had been "free to disseminate any portions" of outtakes).

Although "non-confidential" information may be covered by the journalist's privilege, a party seeking to justify the disclosure of non-confidential information can easily overcome the qualified privilege by showing that the materials: (a) "are of likely relevance to a significant issue in the case," and (b) "are not reasonably obtainable from other available sources." *NBC*, 194 F.3d at 36; *see also Sokolow*, 2012 WL 3871380, at *3 (standard for relevance is "low"). Defendants here readily meet these criteria. Plaintiffs were at a border stop, where the United States has a "paramount interest" in protecting its national security, around the time of increasing migrant travel by caravan. *See* Compl. ¶¶ 21-26; *Flores-Montano*, 541 U.S. at 152. As discussed, Plaintiffs were asked routine questions during the stop regarding the purpose of their travel and follow-up questions regarding the details of their work. *See Ramsey*, 431 U.S. at 619; *Camara v. Municipal Court*, 387 U.S 523, 537 (1967) (border searches "have a long history of judicial and public acceptance"). The Guan and Nakamura photographs, which were voluntarily provided during that border search, were thus highly relevant to the inquiry regarding the nature of their work and the purpose of their travel, especially insofar as it related to the migrant caravans. *See* Compl. ¶¶ 51, 73. Those photographs, moreover, were not reasonably obtainable elsewhere at that time. That alone is sufficient. *Cf. United States v. Sanusi*, 813 F. Supp. 149, 153-56 (E.D.N.Y. 1992) (requiring disclosure where relevant to a criminal case and not obtainable through other means).

**F. Plaintiffs' First Amendment Claim Should Be Dismissed Because Plaintiffs Have Failed to Allege a Concrete "Chilling" Effect.**

Plaintiffs' attempt to premise a First Amendment violation on the alleged "chilling" effect resulting from their interactions with Defendants also fails. *See, e.g.,* Compl. ¶¶ 6, 7. To prevail on a First Amendment "chill" claim, a plaintiff must make specific, non-speculative, and non-subjective allegations indicating a concrete deprivation of her First Amendment rights. *See Laird v. Tatum,* 408 U.S. 1, 13-14 (1972) (allegations of "subjective 'chill'" insufficient to establish harm for First Amendment claim); *Colombo v. O'Connell,* 310 F.3d 115, 117 (2d Cir. 2002) (plaintiff must show "actual, non-speculative chilling effect" from defendant's actions); *Spear v. Town of W. Harford*, 954 F.2d 63, 67-68 (2d Cir. 1992) (allegations of a "chilling effect" must be non-conclusory and non-speculative for First Amendment claim). Significantly, a plaintiff must establish that his or her rights "were 'actually chilled.'" *Curley v. Village of Suffern,* 268 F.3d 65, 73 (2d Cir. 2001) ("Where a party can show no change in his behavior, he has quite plainly shown no chilling of his First Amendment right to free speech.").

Plaintiffs' allegations fall far short of this requirement. Plaintiffs vaguely allege that the questions the CBPOs asked during secondary inspection would "reasonably chill" them and other journalists, *see* Compl. ¶¶ 6, 7, but this is at best a conclusory, non-factual end-run around the requirement for objective indicia of actual chilling. *See Spear*, 954 F.2d at 67 (dismissing claim on basis that plaintiff's allegations of a "chill" were "conclusory and speculative"). Plaintiffs offer no concrete factual allegations explaining how undergoing a border inspection and being briefly referred for additional scrutiny *actually* hindered their journalistic activity.

Plaintiffs also declaim a fear that they "will be referred to secondary inspection and asked questions about [their] work as a journalist and [their] sources," and express concern that their "ability to travel freely and work as a freelance photojournalist has been and remains imperiled." *See* Compl. ¶¶ 60-61, 82-83, 102-03, 127-28, 156-57. Those allegations, as well, are wholly subjective and do not provide "objective" indicia that Plaintiffs' actions are chilled. *See, e.g., Zherka,* 412 Fed. Appx. at 348 (dismissing First Amendment claim where plaintiffs' claim of a chilling effect "was purely subjective" and where plaintiffs "provided no objective evidence of a reasonable fear of prosecution," where plaintiffs continued to publish articles on

the same subject matter). To the contrary, Plaintiffs indisputably remain free to travel, continue their work as photojournalists, and publish their photographs.[15] *See Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 120 (2d Cir. 1995) (dismissing First Amendment claim where plaintiff made only "vague allegations in his complaint" and "continued to publish his newspaper"). Plaintiffs have thus failed to state a First Amendment claim premised on the alleged "chilling" effect of Defendants' actions, and their claim should be dismissed.

## II. THE COMPLAINT MUST BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION BECAUSE PLAINTIFFS LACK STANDING.

### A. Applicable Standard.

An action is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) "when the district court lacks the statutory or constitutional power to adjudicate" the case. *Doyle v. Midland Credit Mgmt., Inc.*, 722 F.3d 78, 80 (2d Cir. 2013). To invoke federal subject matter jurisdiction, a party must establish, *inter alia*, the existence of a "justiciable controversy" with the adverse party—one that is "definite and concrete, touching the legal relations of parties having adverse legal interests." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937). In other words, a plaintiff must demonstrate "'a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify the exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). For this reason, plaintiffs bringing suit in federal courts must demonstrate standing to seek the relief sought in the complaint. *See Allen v. Wright*, 468 U.S. 737, 751 (1984).

To meet "the irreducible constitutional minimum of standing," a plaintiff must satisfy three requirements: first, a plaintiff must have suffered an "injury-in-fact," meaning "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 & n.1 (1992); *see also Spokeo, Inc. v. Robins*, 136

---

[15] See Bing Guan, Photographer, available at https://bingguan.photos; Go Nakamura Photography, available at http://gonakamuraphotography.com/; Mark Abramson, available at https://www.markabramsonphoto.com/; Kitra Cahana, available at https://kitracahana.com/home/; Ariana Drehsler, available at https://www.arianadrehsler.com/.

S. Ct. 1540, 1547-48 (2016); *Warth,* 422 U.S. at 508; *Sierra Club v. Morton*, 405 U.S. 727, 740-41 n.16 (1972). If the injury has not already occurred, plaintiffs must demonstrate a "credible threat" of imminent future injury, *see, e.g., Presbyterian Church (USA) v. United States*, 870 F.2d 518, 528-29 (9th Cir. 1989), and that threat must be real and immediate. *See Golden v. Zwickler*, 394 U.S. 103, 109 (1969). Second, the plaintiff must demonstrate a "causal connection between the injury and the conduct complained of." *Defenders of Wildlife*, 504 U.S. at 560. The injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976). Third, the injury must be redressable by the specific relief sought by the complaint. This means that it "must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision'" granting the specific relief sought by the Complaint. *Defenders of Wildlife*, 504 U.S. at 561 (quoting *Simon*, 426 U.S. at 38); *see also Allen,* 468 U.S. at 750-51.[16]

The requirements of standing apply just as forcefully when a plaintiff seeks declaratory relief as they do when he seeks monetary or injunctive relief. *See BroadStar Wind Sys. Grp. Ltd. Liab. Co. v. Stephens,* 459 Fed. Appx. 351, 356 (5th Cir. 2012); *Texas v. Travis Cty.*, 272 F. Supp. 3d 973, 978-79 (W.D. Tex. 2017). If anything, the need for an actual case or controversy is even more pronounced when the principal relief Plaintiffs seek is a declaration that certain governmental acts violated the Constitution, since the very nature of the suit already trends in the direction of an advisory opinion. *See Travis Cty.*, 272 F. Supp. 3d at 980 ("The Court's decision today is driven in large part by the well-established constitutional ban on advisory opinions. This ban seeks to ensure that federal courts determine specific disputes between parties, rather than hypothetical legal questions, and in doing so, conserve judicial resources."); *see generally Raines v. Byrd*, 521 U.S. 811, 819-20 (1997) (standing inquiry must be "especially rigorous when reaching the merits of the dispute would force [a court] to decide whether an action taken by [another] branch [ ] of the Federal

---

[16] The party invoking federal subject matter jurisdiction bears the burden of pleading and proving the elements of standing. *See, e.g., Northeastern Fla. Chap. Ass'd Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 663 (1993); *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990). *See also Arpaio v. Obama,* 797 F.3d 11, 19 (D.C. Cir. 2015).

Government was unconstitutional."); *Valley Forge Christian Coll. v. Am. United for Sep. of Church and State, Inc.*, 454 U.S. 464, 471, 475 (1982) ("The judicial power of the United States . . . is not an unconditioned authority to determine the constitutionality of legislative or executive acts," but is limited by Article III of the Constitution "to the resolution of 'cases' and controversies."); *Flast v. Cohen*, 392 U.S. 83, 96-97 (1968).

Whether a court has subject matter jurisdiction to even hear a case is an issue that must be decided *before* the court considers the merits of a plaintiff's claim; indeed, "whether a claimant has standing is the threshold question in every federal case, determining the power of the court to entertain the suit." *See Fair Hous. in Huntington Comm. Inc. v. Town of Huntington, N.Y.*, 316 F.3d 357, 361 (2d Cir. 2003). For this reason, motions seeking to dismiss for lack of standing and also for failure to state a claim typically set forth the standing/jurisdictional arguments before analyzing the deficiencies of the Complaint as to the merits.

Here, we have reversed the typical organization to emphasize the complete absence of alleged or actual injury-in-fact sufficient to confer standing on Plaintiffs to sue. For all of the reasons discussed in Part I, nothing in the Complaint plausibly alleges that any Plaintiff suffered any injury to his or her First Amendment rights or other "invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Defenders of Wildlife*, 504 U.S. at 560 & n.1. The arguments in Part I therefore dispose of Plaintiffs' standing as equally as they do the merits.

For two critical reasons, however, the jurisdictional analysis under Rule 12(b)(1) is different from, and even more favorable to the Government than, the 12(b)(6) analysis. First, Plaintiffs' allegations do not get the benefit of the doubt on a 12(b)(1) motion; plausibility is not enough, and instead Plaintiffs have to demonstrate that they *actually* have standing to sue. *See Defenders of Wildlife*, 504 U.S. at 561 ("Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each [standing] element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."); *FW/PBS*, 493 U.S. at 231 (standing cannot be "inferred argumentatively from averments in the pleading," but, rather, plaintiffs "must allege facts essential to show jurisdiction"); *Atlantic Mut. Ins. Co. v. Balfour*

*Maclaine Int'l Ltd.*, 968 F. 2d 196, 198 (2d Cir. 1992) (in reviewing a Rule 12(b)(1) motion, the court must not draw inferences favorable to the plaintiff). Second, unlike on a 12(b)(6) motion, the court is not confined to the pleadings when assessing jurisdiction under Rule 12(b)(1) but "may also rely on evidence outside the complaint," including competent affidavits. *Cortlandt St. Recovery Corp. v. Hellas Telecomms. I, S.à.r.l*, 790 F.3d 411, 417 (2d Cir. 2015) (citing *Makarova v. United States*, 201 F. 3d 110, 113 (2d Cir. 2000)).

In the following section, we supplement Part I's discussion of the Complaint and its manifold deficiencies with external evidence, to wit, the "competent affidavit" from Acting Assistant Director Firing and the exhibits it annexes, which shed light on what Plaintiffs *actually* experienced when CBP inspected them during their border crossings. This material also illuminates what has (or has not) happened to Plaintiffs since the encounters alleged in the Complaint. As will be evident from this discussion, Plaintiffs have utterly failed to show either that they experienced an injury-in-fact in the past or that they have a reasonable, nonspeculative basis to fear such injury in the future. Accordingly, Plaintiffs lack standing, and this Court lacks jurisdiction.

### B. Plaintiffs Have Not Shown that They Have Suffered or Will Suffer Injury-in-Fact.

In the incident logs and secondary inspection reports that CBPOs completed after questioning Plaintiffs, they documented in detail the conversations the officers had with Plaintiffs in connection with their border searches. *See* Firing Decl. Exhs. 2 (Guan), 4 (Nakamura), 6 (Abramson), 8 (Cahana), 10 (Drehsler). What emerges from all of these reports is that (a) Plaintiffs voluntarily complied with their questioning, freely providing the requested information without any indication of compulsion, distress, or coercion, (b) Plaintiffs were mainly asked about the nature of their work and their travels, their activities while in Mexico, and their plans in the United States, (c) to the extent Plaintiffs were questioned about the migrant caravans, the questions were focused on Plaintiffs' observations as to the condition of the migrants and their shelters, and as to individuals who were potentially assisting the migrants to cross the border illegally, and (d) Plaintiffs were not asked about their journalistic sources, and did not reveal them.

For example, the report of Guan's secondary inspection records that Guan █████████
████████████████████████████████████████████████████████████████████████████████
████. Exh. 2. The CBPO noted that ████████████████████████████████████████████
██████. Guan told the officer that █████████████████████████████████████████████
█████████████████████████████████████████. *Id.* Similarly, Nakamura advised the
CBPO that ████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████. He described █████████████████████████████████████████████████████████
████████████████████████████████████. He informed his questioning officer that █
███████████████████████████████████████████████████████████. Exh. 4.

Abramson told the CBPOs questioning him that ███████████████████████████████
████████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████. Exh. 6. He averred that ██████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████; he expressed █████████████████████████████████████
████████████████████████████████████████. He did not show any photographs to the officer
and was not asked to; nor was he asked about the notebook in his bag. *Id.* Cahana's report is even more
innocuous, insofar as the CBPOs in Montreal and then Detroit had brief conversations with her about her
plans to cover the migrant caravans in Mexico, and her difficulties getting admitted into that country, with
no specifics of her journalistic work discussed. Exh. 8.

Drehsler, who lives in San Diego and had three different secondary inspections within the span of
a week, commented that ██████████████████████████████████████████████████████████
█████████████████████████████████████. Exh. 10. She lamented █████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████. She said she

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████ ). She said ██████████████████████████████

████████████████████████████████████████████████ . *Id.*

Nothing in any of these detailed interaction reports even remotely suggests or supports a First Amendment violation, or the invasion of any other legally protected interest. As discussed above, Plaintiffs also seem to predicate standing on what happened to them after their secondary inspections, alleging that their experiences at the inspections "reasonably chill" their journalistic activities, claiming fear that they "will be referred to secondary inspection and asked questions about [their] work as a journalist and [their] sources," and expressing concern that their "ability to travel freely and work as a freelance photojournalist has been and remains imperiled." *See* Compl. ¶¶ 6-7, 60-61, 82-83, 102-03, 127-28, 156-57.[17] But the CBP person encounter lists annexed to the Firing Declaration, which itemize each Plaintiff's border crossing history, belie any claim that these individuals are being targeted for special questioning on account of their journalistic activities, and likewise belie any supposed fear of future interaction with CBP on which Plaintiffs rely to invoke the Court's jurisdiction. Guan, for example, has crossed back into the United States from abroad at least five times since the events described in the complaint, and he has never once been referred to secondary inspection. Exh. 1. For Nakamura, that number is eight, again with no secondary inspections. Exh. 3. Abramson has had one such crossing and was not referred to secondary inspection. Exh. 5. For Cahana, the number is six, again with no secondary inspections. Exh. 7. And Drehsler has crossed the border into the United States from abroad at least *31* times since the events alleged in the Complaint, without ever being referred for secondary inspection. Exh. 9.

---

[17] Speculation and conjecture about possible future injury do not suffice for standing. *See Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990). In particular, a plaintiff cannot base standing simply on allegations of "[p]ast exposure to illegal conduct," because "past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102-03 (1983). Rather, a plaintiff must show a "real and immediate threat" that he will suffer the same injury in the future, *id.* at 105-06, to ensure that the court does not entertain a suit based on speculative or hypothetical harms. *Defenders of Wildlife*, 504 U.S. at 563-65 n.2.

Given that all of these individuals have freely continued their work as photojournalists without restriction since the incidents alleged in the Complaint, publishing photographs without evident restraint, *see supra* n.7, the fact that Plaintiffs have crossed the border back into the United States multiple times without ever being referred for secondary inspection renders any notion of "chilling effect" or fear of future injury entirely spurious. Far from demonstrating injury-in-fact that is "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical," *Defenders of Wildlife*, 504 U.S. at 560 & n.1, or a "credible threat" of imminent future injury, *Presbyterian Church (USA)*, 870 F.2d at 528-29, Plaintiffs have failed to show any injury at all that could vest them with standing, or this Court with jurisdiction.

## CONCLUSION

For the foregoing reasons, the Complaint must be dismissed in its entirety and with prejudice for lack of subject matter jurisdiction and for failure to state an actionable claim.

Dated: Brooklyn, New York
      May 21, 2020

RICHARD P. DONOGHUE
United States Attorney
Eastern District of New York
271A Cadman Plaza East
Brooklyn, NY 11201-1820

By:    /s/ {SERVED ELECTRONICALLY }
       F. FRANKLIN AMANAT, Senior Counsel
       EKTA R. DHARIA, Assistant U.S. Attorney
       Eastern District of New York
       (718) 254-6024/7520
       franklin.amanat@usdoj.gov
       ekta.dharia@usdoj.gov