UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
BING GUAN, et al.,

                        Plaintiffs,

      -against-

CHAD WOLF, et al.,

                        Defendants.
---------------------------------------------------------X

Civil Action

No. 1:19-cv-6570

## **DECLARATION OF MICHAEL B. FIRING**

I, Michael B. Firing, declare pursuant to 28 U.S.C. § 1746 as follows:

(1) I am the Acting Assistant Director of Field Operations, Border Security, New York, Office of Field Operations (OFO), U.S. Customs and Border Protection (CBP), Department of Homeland Security (DHS). I have been employed with CBP for eighteen years and I have held this position since December of 2019. I began my career in 2002 with legacy United States Customs Service. During my eighteen years of federal service, I have held various leadership positions, including Supervisory CBP Officer, Deputy Chief Officer, Branch Chief, Acting Assistant Port Director and Acting Assistant Director, Border Security. Immediately prior to assuming my current role, I served as the Branch Chief, Enforcement Operations, for the Port of New York/Newark.

(2) In my role as the Acting Assistant Director of Field Operations, Border Security, I am responsible for executing the missions of CBP and, in particular, OFO. In my current position, I oversee the overall planning, directing, and timely execution of Border Security programs. The CBP mission includes the enforcement of the customs, immigration, and agriculture laws of the United States and hundreds of other laws at the border on behalf of numerous federal

agencies. OFO is the primary law enforcement entity responsible for securing the U.S. border at ports of entry (POEs) and Preclearance locations outside of the U.S., while facilitating lawful international trade and travel.

(3) This declaration is based on my personal knowledge and other information obtained in the course of my official duties and responsibilities. I make this declaration in support of Defendants' motion to dismiss in the above-captioned case.

(4) To achieve its law enforcement interdiction mission, CBP takes various actions at the border, including identifying and mitigating threats to border security and stopping prohibited and restricted goods and inadmissible aliens from crossing the border, while facilitating and expediting the flow of legitimate travelers and trade. *See* 6 U.S.C. § 211. In this role, CBP is responsible for enforcing criminal and civil laws at the border and administering comprehensive regulatory schemes. CBP border enforcement efforts include those relating to immigration, customs, international trade, child pornography, drug smuggling, weapons trafficking, financial crimes, as well as national security and terrorism. In addition, CBP enforces a host of other laws at the border on behalf of various federal agencies. *See, e.g.*, 31 U.S.C. § 5317; 19 CFR 161.2(a); 19 CFR Part 12. CBP accomplishes this mission by conducting border inspections of all persons and goods at ports of entry.

(5) Border inspections are unique and unlike any other law enforcement activity. CBP's mission to inspect all people and things that cross the border must be balanced with its mission to facilitate the flow of legitimate travelers and trade. Over one million travelers per day go through U.S. ports of entry, and CBP has limited to no advanced information about these travelers. The sheer volume of people and merchandise passing through the border each day means CBP has a limited amount of time to determine the specific law enforcement actions appropriate for each encounter.

(6) TECS[1] is CBP's principal law enforcement and anti-terrorism database system used at the border to assist with inspections and determinations regarding admissibility of arriving persons and merchandise. TECS includes law enforcement "lookouts" and other records entered by CBP and other law enforcement agencies regarding persons of interest. These "lookouts" can include, for example, information pertaining to known or suspected criminals, wanted persons, and persons of interest for law enforcement and counterterrorism purposes. In addition, TECS includes law enforcement records documenting certain inspections conducted by CBP at the border, including border searches of electronic devices. Inspections are official government records made by the agency to document the decisions made and activities undertaken by CBP during the course of encounters at the border.

(7) Based on my responsibilities and duties and information made available to me by my staff and other knowledgeable CBP personnel in the course of performing my duties and responsibilities, I have knowledge about TECS, its use by CBP, and the relevant record-keeping practices of CBP as they relate to TECS. My position affords me with the ability to access data recorded and maintained in TECS.

(8) CBP Officers evaluate the totality of the circumstances for each encounter at the border and consider every piece of relevant information available to determine if the person and goods are admissible into the United States, if there is a violation of any of the laws CBP enforces or administers, or if there is a threat to border security.

(9) CBP conducts risk assessments to identify travelers or merchandise that warrant additional scrutiny. A "lookout" can then be placed in the TECS system to advise CBP Officers that a particular traveler warrants additional scrutiny. Relevant information may be specific to an

---

[1] TECS is not an acronym.

individual (e.g., a prior conviction for possession of child pornography), or it may be an identified pattern of behavior that is associated with a threat to border security (e.g., a travel pattern associated with drug smuggling). This risk assessment is crucial given the volume of travelers and goods that CBP inspects.

(10) Upon arrival in the United States, individuals are generally required to present themselves to CBP at the port of entry's primary arrival location, often referred to as "primary" or "primary inspection." At primary inspection, CBP Officers inspect travelers' documentation (e.g., passport or customs declaration), attempt to verify travelers' identity and citizenship, and ask questions regarding their travel. The CBP Officer at primary may use the information provided by the traveler to conduct limited queries of information maintained in TECS. The information available to the CBP Officer at primary includes biographical information; manifest information transmitted by the carrier and/or APIS (Advance Passenger Information System), which includes information collected in advance of an air or sea passenger's departure from or arrival to the United States, where available; queries against lookouts (such as "wants and warrants"); vehicle information (in the land environment); and information about a traveler's prior border crossings.

(11) CBP Officers use the available information and their extensive training and experience to identify situations that warrant additional scrutiny. If the CBP Officer at primary determines that such additional scrutiny is appropriate (for example, to address concerns related to admissibility, customs, national security, and/or agricultural laws or other laws enforced or administered by CBP) or that an inspection cannot be completed expeditiously, the traveler may be referred for a continuation of the inspection, often referred to as "secondary" or "secondary inspection." A secondary inspection is a continuation of the border inspection and a CBP Officer may refer any traveler to secondary inspection with or without suspicion. As

during primary, at secondary, the CBP Officer may question all travelers regarding their admissibility; the purpose and intent of their travel; their occupation; the identity of any traveling companions; the identity of any persons and places to be visited in the United States; the contents of their baggage and vehicles; the expected length of their visit; the identity of all persons and places visited abroad; the nature of any affiliations with educational or professional institutions; the value of any cash and other monetary instruments in a traveler's possession; and the identity of a traveler's next destination, among other things. A CBP Officer may also run law enforcement queries through TECS and other CBP systems.

(12) CBP's unified border mission responsibilities are varied and complex. CBP Officers take a holistic approach that accounts for the totality of the circumstances in order to properly evaluate and assess the people and goods that seek to cross the border. During an inspection, every piece of information is evaluated in light of all of the other information. The inspection will continue until the CBP Officer is able to assess and evaluate the situation and resolve any concerns about border security or violations of law that CBP is authorized to enforce or administer.

(13) In order to respond to allegations made in the instant litigation, searches for secondary inspection records and border crossing histories collected by CBP and maintained in TECS for Plaintiffs Bing Guan, Go Nakamura, Mark Abramson, Kitra Cahana, and Ariana Drehsler were performed. The results of the enumerated queries are reflected in the attached documents. These documents have been redacted to protect law enforcement-sensitive information, as well as personally identifiable information.

(14) The following types of records were identified and retrieved as part of the aforementioned queries: 1) Incident Log Report; 2) Secondary Inspection Report; 3) Person Query; 4) Person Query – Sec Insp Hit List; and 5) Person Encounter List. Records entitled "Incident Log Report" and "Secondary Inspection Report" provide details regarding secondary inspections

performed of the individual listed. Records entitled "Person Query" provide personal information, document information, and other data accessible in TECS pertaining to the individual listed. Records entitled "Person Encounter List" provide the entire border crossing history for the individual listed contained in TECS. Records entitled "Person Query – Sec Insp Hit List" provide a list of secondary inspections conducted of the individual listed.

(15) CBP systems were queried for the border crossing history pertaining to Bing Guan from November 1, 2017, through February 3, 2020, and all secondary inspections conducted for Bing Guan. A comprehensive list of all secondary inspections was obtained and is attached as Exhibit 1. Records relating to (or documenting) the secondary inspection for Bing Guan on December 29, 2018, were retrieved and are attached to this declaration as Exhibit 2.

(16) CBP systems were queried for the border crossing history pertaining to Go Nakamura from November 1, 2017, through February 3, 2020, and all secondary inspections conducted for Go Nakamura. A comprehensive list of all secondary inspections was obtained and is attached as Exhibit 3. Records relating to (or documenting) the secondary inspection for Go Nakamura on December 29, 2018, were retrieved and are attached to this declaration as Exhibit 4.

(17) CBP systems were queried for the border crossing history pertaining to Mark Abramson from November 1, 2017, through February 3, 2020, and all secondary inspections conducted for Mark Abramson. A comprehensive list of all secondary inspections was obtained and is attached as Exhibit 5. Records relating to (or documenting) the secondary inspection for Mark Abramson on January 5, 2019, were retrieved and are attached to this declaration as Exhibit 6.

(18) CBP systems were queried for the border crossing history pertaining to Kitra Cahana from November 1, 2017, through February 3, 2020, and all secondary inspections conducted for Kitra Cahana. A comprehensive list of all secondary inspections was obtained and is attached as Exhibit 7. Records relating to (or documenting) the secondary inspections for Kitra Cahana

(18 continued) on January 17, 2019, and January 18, 2019, were retrieved and are attached to this declaration as Exhibit 8.

(19) CBP systems were queried for the border crossing history pertaining to Ariana Drehsler from November 1, 2017, through February 3, 2020, and all secondary inspections conducted for Ariana Drehsler. A comprehensive list of all secondary inspections was obtained and is attached as Exhibit 9. Records relating to (or documenting) the secondary inspections for Ariana Drehsler on December 30, 2018, January 2, 2019, and January 4, 2019, were retrieved and are attached to this declaration as Exhibit 10.

(20) I hereby certify that the attached documents listed and described above are true and correct data extracts of secondary inspection records and border crossing history records, as maintained in TECS in the ordinary course of CBP business.

(21) Pursuant to 28 U.S.C. § 1746, I declare, under penalty of perjury, that the foregoing is true and correct to the best of my information, knowledge and belief.

Executed on the 19th day of May, 2020.

*M. Firing*
MICHAEL FIRING
Acting Assistant Director of Field Operations
Border Security
New York Office of Field Operations
U.S. Customs and Border Protection
Department of Homeland Security

[EXHIBITS ATTACHED TO DECLARATION HAVE BEEN FILED UNDER SEAL]