# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

BING GUAN, GO NAKAMURA, MARK
ABRAMSON, KITRA CAHANA, and ARIANA
DREHSLER,

        Plaintiffs,

    v.

CHAD WOLF, Acting Secretary of the U.S.
Department of Homeland Security, in his official
capacity; MARK MORGAN, Acting Commissioner of
U.S. Customs and Border Protection, in his official
capacity; MATTHEW ALBENCE, Acting Director of
U.S. Immigration and Customs Enforcement, in his
official capacity,

        Defendants.

No. 1:19-CV-6570 (PKC/JO)

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT

Antony Gemmell
Christopher Dunn
NEW YORK CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street,
19th Floor
New York, NY 10004
(212) 607-3300 (phone)
(212) 607-3318 (fax)

Mitra Ebadolahi
Sarah Thompson
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION OF SAN DIEGO &
    IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138
(619) 232-2121 (phone)
(619) 232-0036 (fax)

Esha Bhandari
Scarlet Kim
Arianna Demas
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street,
18th Floor
New York, NY 10004
(212) 549-2500 (phone)
(212) 549-2583 (fax)

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................................... ii

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ....................................................................................................................... 2

ARGUMENT ............................................................................................................................ 5

I.      Plaintiffs have properly pleaded a First Amendment, rather than a
        Fourth Amendment, claim. ........................................................................................... 6

II.     Plaintiffs have adequately stated a claim that Defendants violated the
        First Amendment. ......................................................................................................... 9

        A.      Defendants' questioning of Plaintiffs was not routine because it was
                not related to any valid immigration or customs purpose. ................................ 10

        B.      Plaintiffs sufficiently allege that they were targeted because of their
                identities as journalists in violation of the First Amendment. .......................... 13

        C.      Defendants violated the First Amendment when they compelled Plaintiffs
                to disclose information revealing constitutionally-protected newsgathering
                and associational activities. ............................................................................... 19

        D.      Border officers' actions can infringe on First Amendment rights
                regardless of any chilling effect, although Plaintiffs have adequately
                pleaded that Defendants' actions will chill their exercise of
                constitutionally-protected rights. ....................................................................... 25

III.    Plaintiffs have standing to seek declaratory and injunctive relief. ............................... 27

CONCLUSION ......................................................................................................................... 30

# TABLE OF AUTHORITIES

## Cases

*Abidor v. Napolitano,*
  990 F. Supp. 2d 260 (E.D.N.Y. 2013) .................................................................................. 8

*Alasaad v. Nielsen,*
  419 F. Supp. 3d 142 (D. Mass. 2019), *appeal filed, Alasaad v. Wolf,*
  No. 1:17-CV-11730-DJC (1st Cir. Jan. 10, 2020) ................................................................ 28

*All. for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.,*
  436 F.3d 82 (2d Cir. 2006) .................................................................................................... 28

*Bradley v. Coughlin,*
  671 F.2d 686 (2d Cir.1982) ................................................................................................... 28

*Branzburg v. Hayes,*
  408 U.S. 665 (1972) .................................................................................................... 19, 20, 21

*Bursey v. United States,*
  466 F.2d 1059 (9th Cir. 1972) ............................................................................................... 19

*Carroll v. United States,*
  267 U.S. 132 (1925) ............................................................................................................... 11

*Carter v. HealthPort Technologies., LLC,*
  822 F.3d 47 (2d Cir. 2016) ...................................................................................................... 5

*Chastain v. Kelley,*
  510 F.2d 1232 (D.C. Cir. 1975) ............................................................................................ 30

*Eastman Kodak Co. v. Henry Bath LLC,*
  936 F.3d 86 (2d Cir. 2019) ...................................................................................................... 5

*Fazaga v. FBI,*
  916 F.3d 1202 (9th Cir. 2019) .......................................................................................... 6, 30

*Fox v. District of Columbia,*
  851 F. Supp. 2d 20 (D.D.C. 2012) ....................................................................................... 28

*Gibson v. Fla. Legislative Investigation Comm.,*
  372 U.S. 539 (1963) ........................................................................................................ 19, 20

*Goel v. Bunge, Ltd.,*
  820 F.3d 554 (2d Cir. 2016) .............................................................................................. 5, 13

*Gonzales v. Nat'l Broad. Co.,*
  194 F.3d 29 (2d Cir. 1999) .................................................................................................... 20

*Gonzales v. NBC,*
  194 F.3d 29 (2d Cir. 1999) .................................................................................................... 24

*Hedgepeth v. WMATA,*
  386 F.3d 1148 (D.C. Cir. 2004) ............................................................................................ 28

*Heidy v. U.S. Customs Service,*
   681 F. Supp. 1445 (C.D. Cal. 1988) ................................................................. 7, 27

*House v. Napolitano,*
   No. 11-10852-DJC, 2012 WL 1038816 (D. Mass. Mar. 28, 2012) ................................... 14, 16

*In re Petroleum Products Antitrust Litig.,*
   680 F.2d 5 (2d Cir. 1982) ......................................................................... 19, 21

*Janfeshan v. CBP,*
   No. 16-CV-6915, 2017 WL 3972461 (E.D.N.Y. Aug. 21, 2017) ........................................... 28

*Laird v. Tatum,*
   408 U.S. 1 (1972) ................................................................................... 26

*Livingston v. DOJ,*
   759 F.2d 74 (D.C. Cir. 1985) ....................................................................... 30

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ................................................................................. 27

*Nieves v. Bartlett,*
   139 S. Ct. 1715 (2019) .............................................................................. 6

*Norman-Bloodsaw v. Lawrence Berkeley Lab.,*
   135 F.3d 1260 (9th Cir. 1998) ....................................................................... 30

*Paton v. La Prade,*
   524 F.2d 862 (3rd Cir. 1975) ........................................................................ 28

*Perry v. Sindermann,*
   408 U.S. 593 (1972) ............................................................................. 6, 16

*Ragbir v. Homan,*
   923 F.3d 53 (2d Cir. 2019), *cert. petition filed*, No. 19-1046 (Feb. 21, 2020) ........................ 7

*Spear v. Town of West Hartford,*
   954 F.2d 63 (2d Cir. 1992) .......................................................................... 26

*Sullivan v. Murphy,*
   478 F.2d 938 (D.C. Cir. 1973) ....................................................................... 30

*Tabbaa v. Chertoff,*
   509 F.3d 89 (2d Cir. 2007) ..................................................................... passim

*United States v. Aigbekaen,*
   943 F.3d 713 (4th Cir. 2019) .................................................................. 8, 11, 20

*United States v. Arnold,*
   533 F.3d 1003 (9th Cir. 2008) ........................................................................ 8

*United States v. Burke,*
   700 F.2d 70 (2d Cir. 1983) .......................................................................... 20

*United States v. Cano,*
   934 F.3d 1002 (9th Cir. 2019) ................................................................... 11, 12

*United States v. Cotterman*,
   709 F.3d 952 (9th Cir. 2013) (en banc) .................................................................... 8

*United States v. Cutler*,
   6 F.3d 67 (2d Cir. 1993) .......................................................................................... 20

*United States v. Ickes*,
   393 F.3d 501 (4th Cir. 2005) .................................................................................... 8

*United States v. Kolsuz*,
   890 F.3d 133 (4th Cir. 2018) .................................................................................... 8

*United States v. Molina-Gomez*,
   781 F.3d 13 (1st Cir. 2015) ............................................................................... 11, 20

*United States v. Montoya de Hernandez*,
   473 U.S. 531 (1985) ......................................................................................... 11, 13

*United States v. Ramsey*,
   431 U.S. 606 (1977) ............................................................................................ 7, 8

*United States v. Rumely*,
   345 U.S. 41 (1953) ................................................................................................. 19

*United States v. Sanusi*,
   813 F. Supp. 149 (E.D.N.Y. 1992) ......................................................................... 23

*Zerilli v. Smith*,
   656 F.2d 705 (D.C. Cir. 1981) ............................................................................... 20

**Statutes and Regulations**

31 U.S.C. § 5317 ........................................................................................................ 12

19 CFR § 161.2(a) ...................................................................................................... 12

19 CFR Part 12 ........................................................................................................... 12

**Rules**

Fed. R. Civ. P. 12(b)(6).................................................................................. 4, 5, 13, 30

Fed. R. Civ. P. 12(b)(1).................................................................................. 4, 5, 28, 30

Fed. R. Civ. P. 56 ....................................................................................................... 28

## INTRODUCTION

This case is about whether the government may treat the U.S. border as a dragnet for investigative or intelligence-gathering operations. The government asserts the extraordinary authority to compel all international travelers, including the U.S. citizen Plaintiffs in this case, to answer questions unrelated to immigration or customs enforcement simply because they happen to be at the U.S. border. To accept the government's contentions would be to conclude that border officers face no limits on what they can require travelers to reveal, including information about their associations, religious and political beliefs, or professional activities. The First Amendment does not permit such a conclusion.

The government's arguments are particularly concerning in the context of this case. Plaintiffs are five photojournalists whom Defendants targeted for border questioning as part of an operation aimed at lawyers, activists, and journalists working in Mexico on issues involving migrants traveling to the United States. Defendants used border screening as a pretext to target people for additional scrutiny and invasive questioning because of their reporting on issues that were potentially embarrassing to the U.S. government, or because of their political viewpoints and advocacy regarding migrants.

By way of this action, Plaintiffs challenge the government's unconstitutional questioning of them at the U.S. border. Each Plaintiff alleges that Defendants singled them out for questioning because of their work as journalists, which violates the First Amendment. *See* Compl. ¶¶ 27–35, 38, 162 (ECF No. 1). Each of the Plaintiffs appeared in a Department of Homeland Security ("DHS") database, which identified them as members of the media. Public reporting has exposed that database as one part of an intelligence-gathering operation by Defendants to opportunistically use the U.S. border to detain and question individuals— including journalists, lawyers, and activists—because of their perceived connection to people

1

traveling by caravan to reach the U.S.-Mexico border in late 2018. *See id.* ¶¶ 27–37. In addition to singling out Plaintiffs for questioning because they are journalists, Defendants also violated the First Amendment by compelling each Plaintiff to disclose information about their journalism work and activities, including their sources of information and journalistic observations. *Id.* ¶¶ 1, 159–62 This questioning was unrelated to any valid immigration or customs purpose. By questioning them about their journalistic work, Defendants substantially burdened Plaintiffs' exercise of their First Amendment rights to engage in newsgathering activity, to associate with their sources, and to publish their work as photojournalists. *Id.* ¶ 161.

Notably, the government does not contend that any of the Plaintiffs were themselves a target of investigation regarding their admissibility to the country. Nor could it: Plaintiffs are all U.S. citizens entitled to enter the country, and the government admits that it questioned Plaintiffs for intelligence-gathering purposes because they were sources of information about *others*. Yet the caselaw is clear that the government's authority to detain and question people and search items at the international border is not unlimited, and that the First Amendment in particular imposes limits on what border officers can do.

Because Plaintiffs each have stated a claim that Defendants' actions violated the First Amendment, and because they have standing for the relief sought, the government's motion to dismiss should be denied.

## BACKGROUND

Plaintiffs Bing Guan, Mark Abramson, Kitra Cahana, Ariana Drehsler, and Go Nakamura are U.S. citizens and professional photojournalists who traveled to Mexico between November 2018 and January 2019 to document conditions at the U.S.-Mexico border. *See* Compl. ¶ 2. Defendants are the heads of DHS and its agencies, U.S. Customs and Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE"), of which Homeland Security

Investigations ("HSI") is a subcomponent. *Id.* ¶ 17. During this period, each of the Plaintiffs

sought entry to the United States via a port of entry. When they did so, officers referred each

Plaintiff to secondary inspection and questioned them about their work as photojournalists,

including their coverage of the "migrant caravan," their observations of conditions at the U.S.-

Mexico border, and their knowledge of the identities of certain individuals. This questioning

focused on what each Plaintiff had observed in Mexico in the course of working as a journalist,

and did not relate to any permissible immigration or customs purpose. *Id.* ¶ 2. Three of the

Plaintiffs were sent to secondary inspection and questioned about their journalism work once

during this time period. *Id.* ¶ 3. Kitra Cahana was sent to secondary inspection on two separate

occasions, and Ariana Drehsler was sent to secondary inspection on three separate occasions. *Id.*

¶ 3. Kitra Cahana was also denied entry to Mexico to continue her reporting work during this

time period, *id.* ¶¶ 112–17, and was told by Mexican authorities at the time that her denial was at

the behest of American government officials, *id.* ¶¶ 114, 116.

  In March 2019, the media outlet NBC 7 San Diego revealed that each of the Plaintiffs

was listed in a DHS database containing information about 59 people, including lawyers,

activists, and journalists, working on issues related to migrants traveling to the U.S.-Mexico

border. *See id.* ¶¶ 27, 29–35. Plaintiffs were identified in the database as members of the media.

*Id.* ¶ 35. NBC 7 San Diego also reported that DHS created dossiers on each of the people listed

in the database. *Id.* ¶ 37.

  Plaintiffs filed the instant lawsuit on November 20, 2019. In their Complaint, Plaintiffs

contend that Defendants violated their First Amendment rights by (1) questioning them about

their journalism work and activities without any valid immigration or customs purpose;

(2) compelling them to disclose information revealing constitutionally protected newsgathering

and associational activities, without meeting the standard necessary to compel such disclosure;
(3) substantially burdening the exercise of their constitutional rights to engage in newsgathering
activity and to associate with their sources, as well as substantially burdening their freedom of
speech—including their right to publish their work as photojournalists; and (4) referring them to
secondary inspection, detaining them in secondary inspection, and forcing them to answer
questions in secondary inspection because of their work and activities as journalists covering
conditions at the U.S.-Mexico border. *Id.* ¶¶ 159–62. Plaintiffs seek a declaratory judgment that
such questioning and compelled disclosure of information violated the First Amendment. They
also seek an injunction requiring Defendants to expunge any records they have retained
regarding and as a result of their unlawful questioning, and to inform Plaintiffs whether those
records have been disclosed to other agencies, governments, or individuals. *Id.* at 35.

All Plaintiffs fear that their ability to work as journalists, including their ability to travel
freely as part of that work, is imperiled because the government obtained, retained, and
disseminated information about their journalistic activities to other U.S. law enforcement
agencies and/or foreign governments. *Id.* ¶¶ 2, 61, 83, 103, 128, 157. Indeed, the government has
produced records in connection with its motion to dismiss that demonstrate it retained
information about Plaintiffs that does not relate to any valid immigration or customs purpose.
*See* Defs.' Mem. in Supp. of Mot. to Dismiss ("Def. Mem.") Ex. 2, at 6–7; Ex. 4, at 16–19; Ex.
6, at 28; Ex. 8, at 39, 43; Ex. 10, at 51–54, 56, 59.

Defendants served Plaintiffs with a motion to dismiss their claims pursuant to Fed. R.
Civ. P. 12(b)(1) and 12(b)(6), and accompanying Memorandum, on May 21, 2020. Plaintiffs
hereby oppose Defendants' motion.

**ARGUMENT**

Defendants' motion to dismiss should be denied. Plaintiffs properly pleaded a First Amendment claim rather than a Fourth Amendment claim. They also adequately stated a claim that Defendants violated the First Amendment when they singled them out for questioning at the U.S. border about their journalism work and activities and compelled them to disclose information. Lastly, Plaintiffs have standing to seek declaratory and injunctive relief.

To survive a motion to dismiss pursuant to Fed R. Civ. P. 12(b)(6), a complaint need only "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Eastman Kodak Co. v. Henry Bath LLC*, 936 F.3d 86, 93 (2d Cir. 2019) (internal quotation marks and citation omitted). "In assessing . . . motions to dismiss complaints for failure to state a claim, it is a court's obligation to view the evidence and interpret the allegations in the light most favorable to the Plaintiffs, drawing reasonable inferences in their favor." *Id.*

To survive a motion to dismiss for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), a plaintiff must—for a facially-based 12(b)(1) motion—"allege[] facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue" or—for a fact-based motion—"come forward with evidence of their own to controvert that presented by the defendant 'if the affidavits submitted on a 12(b)(1) motion . . . reveal the existence of factual problems' in the assertion of jurisdiction." *Carter v. HealthPort Technologies., LLC*, 822 F.3d 47, 56–57 (2d Cir. 2016) (citations omitted) (alterations and omissions in original). In this case, the government has produced external evidence outside the pleadings to support its Rule 12(b)(1) motion. This evidence cannot be relied on for purposes of Defendants' Rule 12(b)(6) motion. *See Goel v. Bunge, Ltd*., 820 F.3d 554, 559 (2d Cir. 2016). To the extent this Court relies on these materials for Defendants' Rule 12(b)(1) motion, they do not present any facts that obviate or contradict Plaintiffs' allegations in their Complaint, which are sufficient to support their standing.

## I.   Plaintiffs have properly pleaded a First Amendment, rather than a Fourth Amendment, claim.

Defendants mischaracterize Plaintiffs' properly pleaded First Amendment claim as a Fourth Amendment claim, arguing that Plaintiffs' "principal cavil here is that they were *briefly referred* for additional scrutiny when attempting to cross the border." Def. Mem. at 9 (emphasis added). Defendants' focus on the length of Plaintiffs' detention misapprehends the gravamen of Plaintiffs' complaint: that Defendants violated the First Amendment when they interrogated Plaintiffs about their journalism work and compelled them to disclose information about constitutionally-protected activities. *See* Compl. ¶¶ 159–62. Such claims properly sound in the First Amendment, including because Defendants' improper questioning of Plaintiffs substantially burdened their exercise of First Amendment rights. In addition to the improper questioning, and consequent compelled disclosure, Plaintiffs allege that they were singled out for secondary inspection and questioning *because* they are journalists, a separate First Amendment violation. *See id.* ¶¶ 38, 162.

It is well-established that the First Amendment provides an independent constitutional check on governmental action, regardless of whether that action also violates the Fourth Amendment. *See Tabbaa v. Chertoff*, 509 F.3d 89, 102 n.4 (2d Cir. 2007) (the First and Fourth Amendments apply "different legal standards" to border searches); *see also Nieves v. Bartlett*, 139 S. Ct. 1715, 1731 (2019) (Gorsuch, J., concurring in part and dissenting in part) ("[T]he *First* Amendment operates independently of the Fourth and provides different protections.") (emphasis in original); *Fazaga v. FBI*, 916 F.3d 1202, 1219–20 (9th Cir. 2019) (explaining independent First Amendment good faith limitation on otherwise lawful investigations). Even if the government could lawfully take action for other reasons, it may not take action against an individual "because of [their] constitutionally protected speech," *Perry v. Sindermann*, 408 U.S.

593, 597 (1972); *see also Ragbir v. Homan*, 923 F.3d 53, 69–70, 79 (2d Cir. 2019) (staying deportation of a noncitizen with a final order of removal who had raised a cognizable claim that ICE impermissibly singled him out for enforcement because of his First Amendment-protected advocacy for immigration reform), *cert. petition filed*, No. 19-1046 (Feb. 21, 2020).

This principle holds no less true at the border, where the Supreme Court has made clear that First Amendment protections can be implicated separate from any Fourth Amendment ones. In *United States v. Ramsey*, the Court recognized that First Amendment-protected speech might be chilled by customs searches of incoming international mail. While the Court upheld the statutory mail search regime, it emphasized that regulations "flatly prohibit[ed], under all circumstances, the reading of correspondence" without a warrant. 431 U.S. 606, 617, 623 (1977). The Court explicitly left open whether, absent this safeguard, it would require "the full panoply of Fourth Amendment requirements"—*i.e.*, a warrant—in order to protect *First* Amendment rights. *Id.* at 624 n.18.

In *Heidy v. U.S. Customs Service*, the district court applied the principle of *Ramsey* in considering a policy whereby customs officials retained information about the contents of materials that had been seized at the border. The retained materials did *not* violate a statute prohibiting importation of certain subversive material. The court held that "the chilling effect of this risk [of having lawful materials retained] upon the exercise of [F]irst [A]mendment rights of law-abiding citizens cannot be defended on the basis of any legitimate statutory purpose, and therefore . . . is constitutionally impermissible." 681 F. Supp. 1445, 1453 (C.D. Cal. 1988). And the Second Circuit, in *Tabbaa*, 509 F.3d at 102, held that border officers' actions constituted a "burden on plaintiffs' associational rights [that] was sufficiently 'significant' to implicate the

protections of the First Amendment" *even though* "the searches were routine under the Fourth Amendment." *Id.* at 102 n.4.

Plaintiffs do not argue that they are entitled to an "exception" from permissible border questioning to determine admissibility because they are journalists. *See* Def. Mem. at 11. The government's citations to *United States v. Ickes* and *United States v. Arnold* are therefore inapt. *See id.* Both cases concerned border officers' authority to conduct warrantless, suspicionless searches of laptops and rested on factual assumptions that are not applicable here. The *Ickes* court deemed it "far-fetched" that any traveler could be subjected to a laptop search given limited time and resources, 393 F.3d 501, 507 (4th Cir. 2005), assuming that any such search would occur only after the discovery of physical contraband or because of a traveler's conduct, *id*. Given this assumption, it dismissed concerns about the chill on travelers' First Amendment rights, and declined to consider a First Amendment problem with what it deemed an otherwise permissible border search for *contraband*. The *Arnold* court explicitly relied on the analysis in *Ickes*, *see Arnold*, 533 F.3d 1003, 1010 (9th Cir. 2008), as did the court in *Abidor v. Napolitano*, *see* 990 F. Supp. 2d 260, 271 (E.D.N.Y. 2013). Those cases at most stand for the proposition that the particular searches at issue did not implicate First Amendment rights, and not that First Amendment claims are categorically unavailable when there is no Fourth Amendment violation, a holding that would be contrary to *Ramsey*.[1] By contrast, in this case, Plaintiffs allege that they

---

[1] Both the Fourth and Ninth Circuits have subsequently imposed a reasonable suspicion requirement under the Fourth Amendment for certain types of electronic device searches deemed "forensic." *See United States v. Kolsuz*, 890 F.3d 133 (4th Cir. 2018); *United States v. Cotterman*, 709 F.3d 952 (9th Cir. 2013) (en banc). The Fourth Circuit has in fact required a warrant for an electronic device search at the border that went beyond the bounds of permissible warrantless border searches because it was for a domestic law enforcement investigation. *See United States v. Aigbekaen*, 943 F.3d 713 (4th Cir. 2019). Thus, the reasoning in *Arnold* and *Ickes* should be considered in the light of these subsequent cases.

were questioned specifically *because* they are journalists, about subject matter pertaining to their journalism work, which was unrelated to any valid immigration or customs purpose.

In this case, the length of Plaintiffs' secondary inspections is not at issue, but rather the impermissible reason for their referral to secondary inspection, as well as the impermissible scope of Defendants' interrogations of them. These claims properly sound in the First Amendment.

## II.   **Plaintiffs have adequately stated a claim that Defendants violated the First Amendment.**

Border officers' actions can substantially burden First Amendment rights, including when they single people out for additional questioning or searches on the basis of their First Amendment-protected activity. "[W]hen government action substantially penalizes members of a group for exercising their First Amendment rights, that penalty in itself can constitute a substantial burden, even if the government did not prevent the group from associating and regardless of any future chilling effect." *Tabbaa*, 509 F.3d at 101.

To begin with, Defendants' actions fell outside the scope of routine border activity because they were unrelated to any valid immigration or customs purpose. Defendants substantially burdened Plaintiffs' First Amendment rights by targeting Plaintiffs for secondary screening because they are journalists and because of their reporting in Mexico, and by compelling Plaintiffs to disclose information about their journalism work and activities. Defendants cannot justify their infringement on Plaintiffs' First Amendment rights because they lacked a compelling interest in the information sought from Plaintiffs, and because they cannot show there were no alternative means to get the information.

**A.** **Defendants' questioning of Plaintiffs was not routine because it was not related to any valid immigration or customs purpose.**

Despite the government's protestations to the contrary, the border questioning of the Plaintiffs was not routine. *See* Def. Mem. at 10–12. Routine border stops and searches are those which relate to a valid immigration or customs purpose, but in this case, the purpose for questioning the Plaintiffs was that they are journalists who had information about activities of interest to the government. More specifically, the government used border questioning of the Plaintiffs as a pretext to advance an intelligence-gathering operation about migrants and others traveling via caravan in Mexico. *See* Compl. ¶¶ 28–31; Def. Mem. at 13, 14 n.8. A CBP official's public statement after the leak of the database listing Plaintiffs as media members targeted for questioning admitted that it was an intelligence-gathering operation. He stated that government officials "utilized various sources of information in assessing the intentions of the caravan upon their arrival in Tijuana, Mexico," and in identifying "people involved in assisting migrants in crossing the border illegally or *having witnessed the violent actions taken against law enforcement at the border*." *See* Def. Mem. at 14 n.8 (emphasis added). He further noted that "CBP followed through with appropriate investigatory queries and compiled caravan information from various sources to determine if subsequent investigation was warranted." *Id.* But such investigatory actions, no matter how useful to the government, are not valid immigration and customs purposes for which officers can use their border authority to detain and question people. Defendants' questioning of Plaintiffs had nothing to do with determining whether Plaintiffs and their effects were entitled to enter the country.

The Supreme Court has consistently emphasized that warrantless and suspicionless border stops and searches are justified by narrow underlying rationales. "Since the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches

10

and seizures at the border … in order to regulate the collection of duties and to prevent the introduction of contraband into this country." *United States v. Montoya de Hernandez*, 473 U.S. 531, 537, 538 n.1 (1985). "Travelers may be so stopped in crossing an international boundary because of national self-protection reasonably requiring one entering the country to *identify himself as entitled to come in*, and his *belongings as effects which may be lawfully brought in*." *Carroll v. United States*, 267 U.S. 132, 154 (1925) (emphases added). The earliest customs statutes gave officials the power "to stop, search, and examine any vehicle, beast, or person on which or whom they should suspect there was merchandise which was subject to duty or had been introduced into the United States in any manner contrary to law." *Id.* at 149–51.

Accordingly, courts have not allowed the government carte blanche to conduct wide-ranging interrogations or searches at the border, and have recognized constitutional violations when officers have overstepped the bounds of permissible border activity. In the context of border questioning, the First Circuit held that questions about drug activity that "had nothing to do with whether or not to admit [the traveler] into the country" were not "routine" and therefore required Miranda warnings. *United States v. Molina-Gomez*, 781 F.3d 13, 24 (1st Cir. 2015). With respect to border searches of electronic devices, the Fourth Circuit required a warrant for a search that was done to advance a pre-existing domestic investigation into sex trafficking, as opposed to for a permissible border-related purpose. *See United States v. Aigbekaen*, 943 F.3d 713, 721 (4th Cir. 2019). And the Ninth Circuit recently held that border officers "may not search [an electronic device] in a manner untethered to the search for contraband" itself—*i.e.*, that officers could not search for the purpose of uncovering *evidence* of unlawful activity. *See United States v. Cano*, 934 F.3d 1002, 1019 (9th Cir. 2019).

Therefore, while Defendants might enforce "hundreds of criminal and civil laws" in addition to a "host of other laws at the border on behalf of various federal agencies," *see* Def. Mem. at 3, their statutory or regulatory role does not mean that they have broad *constitutional* authority to conduct suspicionless interrogations at the border on any subject of interest.[2] When border officers are conducting investigations to enforce domestic laws rather than determine the admissibility of people and goods, they must follow the constitutional rules applicable to any law enforcement agency. They get no special exemptions simply because their investigations take place at the border. *See Aiegbaeken*, 943 F.3d at 723–24 (requiring a warrant for a device search at the border to advance a domestic law enforcement investigation); *Cano*, 934 F.3d at 1007, 1019–21 (limiting permissible warrantless device searches at the border to a search for digital contraband); *see also United States v. Molina-Isidoro*, 884 F.3d 287, 296–97 (5th Cir. 2018) (Costa, J., specially concurring) (noting that, even for criminal investigations with a nexus to the border, "[n]o … tradition exists for unlimited authority to search and seize items that might help to prove border crimes but are not themselves instrumentalities of the crime").

Defendants' questioning of Plaintiffs about their journalism work and activities was not routine because it aimed at uncovering information unrelated to their admissibility (they are all U.S. citizens) or any goods they were themselves bringing into the country. Indeed, the primary subjects of interest were not Plaintiffs themselves, but rather other people about whom border officers believed Plaintiffs had information. *See* Compl. ¶¶ 28–31; Def. Mem. at 13, 14 n.8 (discussing the operation as identifying "sources of information" about the migrant caravan); *see*

---

[2] Notably, all of the examples of laws that the government cites in support of its claim of broadly sweeping enforcement authority are those which regulate the flow of goods across the border, a topic that falls within the realm of customs enforcement. *See*, *e.g.*, 31 U.S.C. § 5317 (monetary instruments at the border); 19 CFR § 161.2(a) (import and export of various controlled goods); 19 CFR Part 12 (special classes of merchandise).

*also* Def. Mem. at 26–28. The notes that border officers themselves took about the substance of the questions and answers plainly reveal this intelligence-gathering purpose: Plaintiffs were asked questions about *other* people and their activities. *See* Def. Mem. at 26–28.[3] The fact that border officers made notes about Plaintiffs' answers and retained them in their records demonstrates what their interest in questioning the Plaintiffs was—intelligence-gathering and investigations about other people, as well as Plaintiffs' observations in Mexico in the course of their journalism work. This is further borne out by how Plaintiffs were identified in the leaked database listing those who were to be questioned—as members of the "Media." Compl. ¶¶ 33, 35. Thus, unlike in *Tabbaa*, where the plaintiffs' own admissibility into the country was in question, *see* 509 F.3d at 93–94, the questioning of Plaintiffs here had nothing to do with any valid immigration or customs purpose because it was not about *their* admissibility or that of their effects. *Cf. Montoya de Hernandez*, 473 U.S. at 538 n.1.

## B. **Plaintiffs sufficiently allege that they were targeted because of their identities as journalists in violation of the First Amendment.**

Plaintiffs sufficiently allege that Defendants violated the First Amendment by referring them to secondary inspection, detaining them in secondary inspection, and interrogating them in secondary inspection because of their work and activities as journalists covering conditions at the U.S.-Mexico border. Contrary to Defendants' assertions, Plaintiffs are not seeking special exemption from routine border screening because of their identities as photojournalists. *See* Def. Mem. at 11. Rather, Plaintiffs allege that Defendants specifically *targeted* them for referral to secondary inspection because of their work as photojournalists. Defendants' specific targeting of Plaintiffs on this basis is evidenced by the DHS database identifying Plaintiffs as members of the

---

[3] While the court should consider only the allegations in the Complaint for purposes of a Rule 12(b)(6) motion to dismiss, *see Goel*, 820 F.3d at 559, Defendants' records confirm the plausibility of Plaintiffs' allegations.

media, and the absence of any government assertion that CBP officers questioned Plaintiffs because they themselves were the subjects of an investigation. The fact that Defendants targeted Plaintiffs as part of a coordinated operation is also evident given the similarities in each Plaintiff's interrogations—even though they presented at border ports of entry on different dates, *see* Compl. ¶¶ 43–44, 47–51, 66–67, 70–73, 88–91, 93–94, 107, 135–37, 140, 142–43, 146–49, and even when they presented at a different port of entry not on the U.S.-Mexico land border, as shown by Kitra Cahana's experience being questioned at customs preclearance in Canada and at the Detroit airport. *See id.* ¶¶ 109–11, 114, 118.

*Tabbaa* recognized that First Amendment rights are implicated when members of a group are targeted at the border because of their association with that group. As the court noted, a border stop "can constitute a direct and substantial interference" with First Amendment rights. 509 F.3d at 101. Specifically, "when government action substantially penalizes members of a group for exercising their First Amendment rights, that penalty in itself can constitute a substantial burden, even if the government did not prevent the group from associating and regardless of any future chilling effect." *Id.*; *see also House v. Napolitano*, No. 11-10852-DJC, 2012 WL 1038816, at *12 (D. Mass. Mar. 28, 2012) (recognizing a First Amendment claim where person had been selected for a border search based on association with a group).

It is particularly concerning when the government targets members of the media for additional scrutiny, because such targeting directly implicates freedom of the press in addition to freedom of association. Plaintiffs allege that Defendants targeted them because of their First-Amendment protected association, as members of the media, and because of their association with their sources. Compl. ¶¶ 38, 161–62. Additionally, Plaintiffs allege they were targeted

specifically for their journalism work in Mexico, thereby burdening their rights to engage in newsgathering and to publish their work. *Id.*

1. *Plaintiffs' allegations of targeting are plausible because of their inclusion in Defendants' database as members of the media and because Defendants' questions related to their journalism work.*

Despite Defendants' assertion to the contrary, *see* Def. Mem. at 13–14, Plaintiffs do specifically allege that they were "selected for secondary inspection, detention, and questioning by border officers from December 2018 to January 2019 *because of* their journalism work and activities in Mexico." Compl. ¶ 38 (emphasis added).

Moreover, this allegation is plausible in light of the fact that Defendants labeled the Plaintiffs as "Media" in their database. *See id.* ¶¶ 33–35. Defendants' argument—that there is *no* connection between Plaintiffs' inclusion in that database, specifically identifying them as members of the media, and their subsequent detention and questioning at the border—defies common sense. Plaintiffs' inclusion in the database represents objective evidence that they were targeted, confirmed by Defendants' placement of large X's across Plaintiffs' faces in the database once their questioning was complete. *See id.* ¶¶ 32, 35. Furthermore, Defendants asked Plaintiffs questions about their journalism work in Mexico, *id.* ¶¶ 47, 49, 51, 70–71, 73, 93–94, 110–11, 114, 119, 136–37, 143, 146, 148, adding to the plausibility of Plaintiffs' allegations that they were targeted for questioning *because* of that work, rather than for any routine border screening. The claim that Defendants were interested in questioning Plaintiffs only because they are photojournalists is further confirmed by the records Defendants continue to maintain about Plaintiffs' interrogations. *See* Def. Mem. Ex. 2, at 6–7; Ex. 4, at 16–19; Ex. 6, at 28; Ex. 8, at 39, 43; Ex. 10, at 51–54, 56, 59.

15

Defendants' suggestion that Plaintiffs' referral to secondary inspection was caused by an alert placed on their passports by Mexican authorities is a red herring, and does nothing to obviate Plaintiffs' First Amendment claims. *See* Def. Mem. at 13. Plaintiffs' claim that they were targeted by the U.S. government is supported by the existence of a *U.S. government* database containing Plaintiffs' photos and personally identifying information. *See* Compl. ¶¶ 31, 37. Defendants even placed an X over each Plaintiffs' face in the database once they had been questioned by *U.S. border officers*, indicating that the database was the basis for such officers' decision to question Plaintiffs, and showing that officers were aware that Plaintiffs were members of the media. *Id.* ¶¶ 32, 36–38. U.S. government officers specifically identified Plaintiffs as media targets for questioning and ultimately chose to effectuate such questioning, and they cannot escape constitutional scrutiny of their actions simply because the Mexican government may have also placed an alert on Plaintiffs' passports as part of a joint operation.

Plaintiffs are not seeking special treatment or exemption from ordinary rules because they are journalists—rather, they plausibly allege that the reason for their referral to secondary inspection in the first place was because they are journalists and because of their reporting work in Mexico, in violation of the First Amendment. *See House*, 2012 WL 1038816, at *10, 13 ("That the initial search and seizure occurred at the border does not strip House of his First Amendment rights, particularly given the allegations in the complaint that he was targeted specifically because of his association with the [Chelsea Manning] Support Network"); *see also Perry*, 408 U.S. at 595–96.

   2.   *Plaintiffs plausibly allege that they were impermissibly targeted because they were not being investigated for their own admissibility.*

Notably, Defendants nowhere state that they questioned Plaintiffs in secondary inspection because they themselves were the subjects of an investigation. Rather, Defendants tellingly

describe Plaintiffs as "sources of information," Def. Mem. at 13; Compl. ¶ 28. Indeed, journalists

are often useful sources of information, but that does not mean the government can permissibly

target them for border questioning on that basis. By offering this explanation, Defendants have

bolstered Plaintiffs' allegations that border officials were interested in questioning them because,

as journalists, they might have information on other people the government was interested in

investigating. But such targeting substantially burdens freedom of the press as guaranteed by the

First Amendment. Journalists will be chilled from doing their work if there are no limits on the

government's ability to single them out for questioning at the U.S. border, including to

investigate other people or to glean their sources of information. *Compare Tabbaa*, 509 F.3d at

101–02 (finding a substantial burden on travelers' First Amendment rights of association when

they were singled out for extensive border scrutiny because of attendance at a religious

conference).

3. *Plaintiff Kitra Cahana's experience at the Canadian-U.S. border and in Detroit further supports Plaintiffs' claim that they were targeted for their journalism work in Mexico.*

Each Plaintiff was stopped for secondary inspection on different dates and at different

ports of entry and asked about their experiences covering migrant issues in Mexico. What all

Plaintiffs have in common is that they are journalists who were featured, and identified as such,

in the government's own database, and were reporting on migrants in Mexico during the same

time period. *See* Compl. ¶¶ 33–38. To suggest that the database identifying them as journalists

was not the reason for their referral, detention, and questioning in secondary inspection is to turn

the standard of plausibility on its head.

Kitra Cahana's experience further supports Plaintiffs' claims that they were targeted for

being journalists, and for their work in Mexico specifically. The government argues that its

purpose in questioning Plaintiffs was to detect potential threats by questioning individuals returning to the United States from Mexico. *See* Def. Mem. at 1, 3–4, 13–14, 17. Leaving aside the fact that it is not permissible to use the border as a dragnet for investigative work, including when the traveler is not the subject of interest, *see supra* Part II.A, this argument is undermined by Cahana's experience. U.S. border officials initially referred Cahana for secondary inspection at U.S. customs preclearance in the Montreal airport on her way *to* Mexico via a stopover in Detroit. Compl. ¶ 109. If the true purpose of Defendants' questioning was to detect potential threats to the United States based on the experiences of those returning from Mexico, there would have been no reason for Cahana to be stopped and questioned when entering the United States from Canada. Rather, logic dictates that Cahana was stopped at preclearance in Montreal because of an alert placed on her passport in connection with the database identifying her as a journalist. *See id.* ¶¶ 109–11.

Further, during Cahana's secondary inspection in Montreal, a CBP officer questioned her about her *future* journalistic plans in Mexico. *Id.* ¶ 111. Specifically, the officer asked her whether she had an assignment in Mexico, about her plans to photograph the migrant caravan, how she obtained assignments and which press outlets she had worked for in the past, and about the financial compensation and tax implications of freelancing. *Id.* This was not routine questioning about her recent trip outside the United States in Canada—it was investigative, and bore no connection to her then-current admissibility into the United States. It further indicates that Cahana was sent to secondary inspection because of her status as a journalist and her reporting in Mexico, and that the border officer was aware of her status as a journalist focusing on migrant issues.

**C.** **Defendants violated the First Amendment when they compelled Plaintiffs to disclose information revealing constitutionally-protected newsgathering and associational activities.**

Plaintiffs sufficiently allege that U.S. border officials improperly forced them to disclose information about their journalism work and activities. This compelled disclosure of information violated the First Amendment. Courts long have recognized that government demands for information revealing expressive activities burden First Amendment rights and must satisfy heightened constitutional scrutiny. *See*, *e.g.*, *Gibson v. Fla. Legislative Investigation Comm.*, 372 U.S. 539, 544 (1963). The government must have a compelling interest in the information sought and use narrowly tailored means that do not capture more information than is necessary. *See*, *e.g.*, *id.* at 546 (prohibiting a subpoena to the NAACP from a legislative committee); *United States v. Rumely*, 345 U.S. 41, 46 (1953) (holding that the First Amendment limited a congressional committee's power to issue a subpoena to a bookseller seeking names of those who had purchased political publications); *Bursey v. United States*, 466 F.2d 1059, 1083 (9th Cir. 1972) (requiring substantial and immediate government interests in the information sought by a grand jury about a newspaper, and a means of obtaining it that was "not more drastic than necessary").

In addition, courts recognize that the government must meet a heightened standard before compelling a reporter to provide information to a grand jury or via subpoena. *See Branzburg v. Hayes*, 408 U.S. 665 (1972) (applying the standard of *Gibson* in requiring a "compelling" government interest before a reporter could be forced to testify). Since *Branzburg*, lower courts have recognized that a "reporter's privilege" is necessary in certain circumstances to preserve the freedom of the press. *See*, *e.g.*, *In re Petroleum Products Antitrust Litig.*, 680 F.2d 5, 7 (2d Cir. 1982) (noting "disclosure [of confidential information] may be ordered only upon a clear and

specific showing that the information is: highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources" (citation omitted)); *Zerilli v. Smith*, 656 F.2d 705, 714 (D.C. Cir. 1981) (citing Justice Powell's concurring opinion in *Branzburg* in finding that the qualified reporter's privilege applies especially where a reporter is not a party); *see also Gonzales v. Nat'l Broad. Co*., 194 F.3d 29, 36 (2d Cir. 1999); *United States v. Cutler*, 6 F.3d 67 (2d Cir. 1993); *United States v. Burke*, 700 F.2d 70, 77 (2d Cir. 1983).

There is no "border exception" to this heightened standard for compelling information from journalists. "Routine" border stops and searches are those that relate to a valid immigration or customs purpose. *See supra* Part II.A. When border officers' activities stray outside those bounds, as they did here, they must satisfy the same constitutional standards for search or questioning that would apply outside the border context. *See Molina-Gomez*, 781 F.3d at 19 (requiring Miranda warning for a border interrogation); *Aigbekaen*, 943 F.3d at 720 (requiring a warrant for a border search of an electronic device that was not for immigration or customs purposes).

In this case, Defendants' actions were not narrowly tailored to serve any compelling interest and cannot satisfy the standards laid out in *Gibson*, *Branzburg*, and subsequent lower court decisions. For the reasons discussed above, Defendants did not have a valid immigration or customs purpose in questioning Plaintiffs because Plaintiffs' own admissibility to the United States was not at issue. *Supra* Part II.A. While the government asserts its interest in "ensur[ing] the protection of the Nation's borders," Def. Mem. at 18, such a vague statement cannot satisfy the requirement of a compelling interest that would justify the wide-ranging interrogation of Plaintiffs. But even assuming they had a legitimate law enforcement investigatory purpose, Defendants cannot demonstrate that there were *no* alternative sources for the information

20

Plaintiffs were forced to disclose about other people and conditions at the border, *cf. In re Petroleum Products Antitrust Litig.*, 680 F.2d at 7, such that the burden on Plaintiffs' First Amendment rights was justified. Nor can Defendants provide *any* compelling justification for their inquiries into Plaintiffs' own reporting plans, professional assignments, financial situation, and opinions on the migrant caravan and the difficulties for migrants crossing the border. *See* Compl. ¶¶ 48, 111, 136, 143.

Critically, Defendants' use of the border to force journalists to disclose information is even more troubling because of the lack of the usual safeguards that exist with law enforcement investigations. For example, the Supreme Court in *Branzburg* noted that "[g]rand juries are subject to judicial control and subpoenas to motions to quash," such that courts can ensure that grand juries "operate within the limits of the First Amendment as well as the Fifth." 408 U.S. at 708. Defendants cannot justify using the *border* to compel Plaintiffs to disclose information rather than following the procedures that would apply to any domestic law enforcement investigation seeking to compel testimony from someone. The only reason to do so would be to take advantage of the fact that Plaintiffs were compelled to answer questions at the border, as opposed to being in a position to contest any compulsory legal process in a domestic context.

   1. *Defendants forced Plaintiffs to disclose confidential information.*

Defendants erroneously argue that the information Plaintiffs disclosed was "non-confidential" by focusing only on the photographs that Bing Guan and Go Nakamura were forced to show border officers.[4] But Plaintiffs allege that they were forced to disclose

---

[4] Only Go Nakamura alleges that the photographs he showed border officers were publicly available. *See* Compl. ¶ 73. Bing Guan alleges that he "ultimately" sold photographs from his trip to Mexico to a publication, *id.* ¶ 41, *i.e.* after he was forced to show them to a border officer. At the very least, at the time Guan showed his photographs, they were his journalistic work product. *Id.* at ¶ 59.

confidential *information*—including information about their observations and sources, such as

the identities of individuals with whom they may have interacted in the course of their work as

journalists.[5] Although plausible allegations must be accepted as true at the motion to dismiss

stage, the government does not even contest that the information Plaintiffs had to disclose about

their work was non-confidential. *See* Def. Mem. at 20–21. As discussed further below, *see infra*

Part III, border officers' notes about Plaintiffs' responses to questioning show the astonishing

---

[5] *See, e.g.*, Compl. ¶ 47 (Guan was asked whether he "knew smugglers, activists, or journalists who assisted migrants in crossing the border."); ¶ 49 (Guan was asked "whether he knew any 'coyotes' or activists who were pro-migrant or anti-migrant."); ¶ 50 (Guan was asked "to identify any 'instigators' he recognized in th[e] book of photographs."); ¶ 71 (Nakamura was asked how he "had become a photojournalist and whether he had interacted with caravan organizers or activists who may have assisted people in crossing the border."); ¶ 72 (Nakamura was asked "to identify anyone he recognized in th[e] set of pictures."); ¶ 91 ("[O]fficers asked Mr. Abramson questions about the contents of his belongings . . . [and] what kinds of pictures he takes."); ¶ 93 (Abramson was asked "about the purpose of his work and also about his employers."); ¶ 94 (Abramson was asked "what he saw while following the caravan, who was leading the group of migrants, and whether these leaders were for or against the U.S. government. [The officer] also asked Mr. Abramson whether he knew of any groups assisting the migrant caravan."); ¶ 110 (Cahana was questioned "about her purpose for travel to Mexico and what she planned to photograph."); ¶ 111 (Cahana was asked "whether she had an assignment in Mexico, about her plans to photograph the migrant caravan, how she obtained assignments and which press outlets she had worked for in the past, and about the financial compensation and tax implications of freelancing."); ¶ 114 (Cahana was asked to complete a written questionnaire, "which included questions relating to her occupation and her plans in Mexico."); ¶ 136 (Drehsler was asked to provide "her editor's phone number . . . [and] about the nature of her work and her background in photography, including what training is required for freelance photography."); ¶ 137 (Drehsler was asked "to describe what she had seen in Tijuana, including at any migrant shelters . . . ."); ¶ 142 (Drehsler was asked whether she could "identify any activists working near the U.S.-Mexico border" if shown photographs); ¶ 143 (Drehsler was asked "what she had seen in Mexico related to the migrant caravan and people around the caravan." Drehsler was asked "whether she was familiar with [the caravan's] leadership to the extent it had leaders" and if those "who were thinking of traveling to the U.S.-Mexico border . . . [understood] how difficult it was to seek asylum"); ¶ 148 (Drehsler was asked "questions about a Mexican migrant shelter she had been covering. Specifically, [Drehsler was asked] whether she had seen 'anything suspicious' at the shelter, and what the general mood in the shelter had been."); ¶ 149 (Drehsler was asked "about her time in Syria, where she had worked previously as a journalist. Specifically, . . . [she was asked] about the subjects of her photography, the people with whom she had associated, and whether she was affiliated with any organizations or groups.").

breadth of information they retained unrelated to any permissible immigration or customs purpose, including information that goes to the heart of Plaintiffs' work as journalists. The officers retained information about Plaintiffs' observations while reporting in Mexico (including what Plaintiffs were told by other people during the course of their work—*i.e.* sources), previous and current places of employment, future reporting plans, personal backgrounds, information about friends and families, schooling, and race and nationality. *See* Def. Mem. Ex. 2, at 6–7; Ex. 4, at 16–19; Ex. 6, at 28; Ex. 8, at 39, 43; Ex. 10, at 51–54, 56, 59.

Although Plaintiffs plausibly allege that they were forced to disclose confidential information about their journalistic work, even if this court were to consider the disclosed information as non-confidential, the government could not satisfy the requirements to compel disclosure. The information demanded from Plaintiffs was not relevant to a criminal case and unobtainable through other means. *Compare United States v. Sanusi*, 813 F. Supp. 149, 153–56 (E.D.N.Y. 1992) (requiring disclosure where relevant to a criminal case and not obtainable through other means). For example, it is hard to understand how some of the questions border officers asked Ariana Drehsler could ever satisfy that standard: she was asked about her opinion of the latest migrant caravan, whether she was familiar with its leadership to the extent it had leaders, and whether she thought it was difficult for people to cross the border. She was also asked if word had reached people who were thinking of traveling to the U.S.-Mexico border on how difficult it was to seek asylum. Compl. ¶ 143. These are some illustrative examples of the types of questions Plaintiffs were asked that, even if deemed non-confidential, could not satisfy the standard for compelled disclosure from a journalist. While these questions aimed to elicit information Plaintiffs would have learned during the course of their reporting, they could not be

"of likely relevance to a significant issue" in a criminal case, which the government has not even identified. *See* Def. Mem. at 21 (citing *Gonzales v. NBC*, 194 F.3d 29, 36 (2d Cir. 1999)).

> 2. *Plaintiffs were compelled to answer border officers' questions.*

Defendants implausibly suggest that Plaintiffs were voluntary, willing participants in their own detention and questioning to avoid the full implications of the position that travelers at the border have no protection from suspicionless interrogation on all manner of subjects, including about First Amendment-protected activities and associations. Defendants argue that the absence of any show of force, threats, or drawn weapons means that Plaintiffs were not compelled to turn over information. Def. Mem. at 16. But Defendants' position does not reflect the reality of the experiences of Plaintiffs' interrogations: Plaintiffs were in secondary inspection at the U.S. border; some of them were questioned in windowless rooms, separated from all other travelers, interrogated by plainclothes officers rather than uniformed CBP officers (indicating a special operation), had their belongings taken from them, and did not feel free to leave. *See* Compl. ¶¶ 51, 67–73, 90–94, 119, 134, 141. Simply using such words as "voluntary" to describe any compelled disclosures by Plaintiffs does not make them so. *See* Def. Mem. at 20.

For example, border officers questioned Mark Abramson in a windowless room about his work, what he saw in Mexico, and whether he knew who was assisting the migrant caravan. Compl. ¶¶ 92–94. They rifled through his notes containing confidential source material. *Id.* ¶¶ 90–91. It was reasonable for him to believe he had no choice but to answer border officers' questions. When border officers asked Bing Guan to show them his photographs, he scrolled through the digital display on his camera because he felt "he had no choice and was not at liberty to leave." *Id.* ¶ 51. Go Nakamura showed the officers his photographs for the same reasons—he was being held in a room alone, had already been questioned for approximately an hour, and felt

24

that he had no other choice but to abide by the officers' demand to see his photographs. *Id.* ¶ 67–73.

Border officers sent two of the Plaintiffs to secondary inspection for questioning multiple times in a short period. *See* Compl. ¶¶ 109–19, 133, 140–50. Border officers held Kitra Cahana in a room alone and questioned her in secondary inspection twice, each time after a scan of her passport returned a printout of her face with a large "X" on it. *Id.* ¶¶ 109–21. Border officers similarly held Ariana Drehsler multiple times in a room alone and questioned her about what she had seen in Tijuana, her knowledge of leadership of the migrant caravan, and specifically about a Mexican migrant shelter she had been covering. *Id.* ¶¶ 134–49. Border officers also told her that she should expect to be stopped again. *Id.* ¶¶ 138, 144. These allegations demonstrate that Plaintiffs were not free to bypass secondary inspection at will, and that border officers compelled them to disclose information.

**D. Border officers' actions can infringe on First Amendment rights regardless of any chilling effect, although Plaintiffs have adequately pleaded that Defendants' actions chill their exercise of constitutionally-protected rights.**

The Second Circuit has made it clear that "[g]overnment action can constitute a direct and substantial interference with associational rights even if there is no prior restraint and no clear chilling of future expressive activity." *Tabbaa*, 509 F.3d at 101. In this case, however, while Plaintiffs are not required to do so, they allege that border officers' questioning of them would reasonably chill them and other journalists from traveling to Mexico to report on U.S.-Mexico border issues. *See* Compl. ¶ 6. They also allege that Defendants' actions would reasonably chill them and other journalists from publishing or speaking in a manner that is critical of, or embarrassing to, the U.S. government, out of a fear of being detained and questioned at the U.S. border about their journalism work in the future. *Id.* ¶ 7. These allegations

25

are bolstered by the fact that Defendants specifically identified Plaintiffs as members of the media in a wide-ranging intelligence-gathering operation naming 59 individuals connected to migrants in Mexico as targets for border interrogations. *Id.* ¶¶ 27, 29–35. A reasonable journalist might reconsider engaging in such newsgathering activity in the future— including cross-border reporting on pressing current events such as U.S. immigration policies and practices —for fear of being stopped and questioned by border officers about their work.

Plaintiffs' allegations are distinguishable from those in *Laird v. Tatum*, 408 U.S. 1 (1972), or *Spear v. Town of West Hartford*, 954 F.2d 63 (2d Cir. 1992). *See* Def. Br. at 22. In *Laird*, the Court found no chilling effect for purposes of a standing inquiry where the plaintiffs merely alleged the "existence" of a data-gathering policy, such that there was no justiciable case or controversy. *See* 408 U.S. at 10, 15. And in *Spear*, the court held that there could be no chilling effect from a temporary restraining order that expressly excluded infringement on First Amendment-protected activity. *See* 954 F.2d at 67–68. In this case, Plaintiffs do not merely allege the existence of an intelligence-gathering operation (akin to the data-gathering policy in *Laird*). Rather, Plaintiffs here allege that Defendants specifically targeted *them* in that operation, Compl. ¶¶ 27, 29, 34–38, *as members of the media—i.e.*, that their First Amendment-protected activity was the impetus for their targeting, *id.* ¶¶ 31, 33, 35. Defendants specifically forced Plaintiffs to disclose information about First Amendment-protected activity, *id.* ¶¶ 47, 49–51, 71–73, 91, 93–94, 110–11, 114, 136–37, 142–43, 146, 148–49, unlike the exclusion in *Spear*. Plaintiffs also allege Defendants retained information Plaintiffs were compelled to disclose, *id.* ¶¶ 1, 56–59, 61, 78–81, 83, 98–101, 103, 124–26, 128, 153–55, 157, which leads them to fear this information being used in the future by Defendants or any other governments or law enforcement agencies with whom it was shared. *See id.* ¶¶ 61, 83, 103, 128, 157. This fear is

reasonable given that Kitra Cahana was denied entry to Mexico to continue her reporting work during this period—and was told that this exclusion was because of American officials. Compl. ¶¶ 114, 116.

Nor does it matter that Plaintiffs have subsequently been permitted to enter the United States without being subject to secondary inspection and questioning about their work. *See* Def. Mem. at 8. The fact remains that Defendants consider it legally permissible to single out members of the media, question them at the border about their work, and retain information about those interrogations, as they did here. *See* Def. Mem. at 26–28 (describing notes of the Plaintiffs' interrogations). Plaintiffs and other journalists accordingly have reason to fear that, should Defendants once again become interested in or offended by their lawful professional activities, they will be subjected to invasive interrogations by government officials at the U.S. border. *See Heidy*, 681 F. Supp. at 1448–49, 1453 (considering the chilling effect on First Amendment rights where the government had a practice of seizing lawful materials at the border). Thus, while alleging a chilling effect is not necessary to state a claim that border officers violated Plaintiffs' First Amendment rights, Plaintiffs plausibly allege that they and other journalists will be chilled from engaging in constitutionally-protected newsgathering and association with sources because of Defendants' actions. Compl. ¶¶ 6–7.

### III.   Plaintiffs have standing to seek declaratory and injunctive relief.

Plaintiffs have standing for the declaratory and injunctive relief they seek. They satisfy the three basic elements of Article III standing: (1) an "injury in fact" that is "concrete and particularized" and "actual or imminent," not "conjectural" or "hypothetical"; (2) a "causal connection" between the injury and the defendant's conduct; and (3) a likelihood that a favorable decision will "redress[]" the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

When law enforcement improperly collects information about a person, the continued retention of that information is an ongoing injury, and a demand to expunge it supports standing. *See Tabbaa*, 509 F.3d at 96 n.2 ("[P]laintiffs possess Article III standing based on their demand for expungement."); *Hedgepeth v. WMATA*, 386 F.3d 1148, 1152 (D.C. Cir. 2004); *Paton v. La Prade*, 524 F.2d 862, 868 (3d Cir. 1975); *Janfeshan v. CBP*, No. 16-CV-6915, 2017 WL 3972461, at \*\*4–7 (E.D.N.Y. Aug. 21, 2017); *Fox v. District of Columbia*, 851 F. Supp. 2d 20, 29 (D.D.C. 2012). *Alasaad v. Nielsen*, 419 F. Supp. 3d 142, 153–54 (D. Mass. 2019), *appeal filed*, *Alasaad v. Wolf*, No. 1:17-CV-11730-DJC (1st Cir. Jan. 10, 2020); *see also Bradley v. Coughlin*, 671 F.2d 686, 690 n.9 (2d Cir.1982) (recognizing expungement of records as a valid equitable demand).

Here, Plaintiffs seek an injunction requiring Defendants to expunge any records they have retained regarding the unlawful questioning of Plaintiffs, and to inform Plaintiffs whether those records have been disclosed to other agencies, governments, or individuals. Compl. at 35. The ongoing retention of this information constitutes the injury that entitles Plaintiffs to injunctive and declaratory relief. For purposes of their standing to seek expungement, it is irrelevant whether Plaintiffs have been able to travel back into the United States without being referred to secondary inspection since the events described in the Complaint. *See* Def. Mem. at 28–29.

To the extent the court relies on the materials external to the Complaint produced by Defendants in support of their Rule 12(b)(1) motion, those materials do not present any facts that obviate or contradict Plaintiffs' allegations in their Complaint.[6] Those allegations are sufficient

---

[6] When a court considers material extrinsic to the pleadings on a Rule 12(b)(1) motion, doing so does not convert the motion into one for summary judgment under Fed. R. Civ. P. 56. *See All. for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 n.8 (2d Cir. 2006) ("The

to establish Plaintiffs' standing. In fact, the external materials produced by Defendants support Plaintiffs' standing to seek expungement of information unlawfully retained.

Defendants have submitted a declaration that identifies the nature of the CBP "TECS" records that have been produced regarding each of the Plaintiffs. Decl. of Michael B. Firing ("Firing Declaration") ¶¶ 6, 7, 13–20. These records include notes made by officers regarding their border inspections of Plaintiffs. *Id.* While the government characterizes these records as "shed[ding] light on what Plaintiffs *actually* experienced when CBP inspected them during their border crossings," Def. Mem. at 26, they do no such thing. Common sense dictates that these records, at most, memorialize the individual border officers' impressions of their inspections of Plaintiffs, and only reflect the information they chose to record in TECS. The Firing Declaration does not claim that these records are a comprehensive account of everything Plaintiffs were asked, or every response they gave. It does not even claim that these records are an accurate account of Plaintiffs' border inspections. The Firing Declaration does not have anything to say about Plaintiffs' experiences of their interrogations, nor could it.

In any event, it is enough for this Court's purposes that nothing in the Firing Declaration or the TECS records contradicts Plaintiffs' allegations on which they rely for standing. In fact, both the Firing Declaration and the TECS records confirm those allegations: namely, that border officers improperly collected and retained information from Plaintiffs that pertains to their First Amendment protected-newsgathering activities and associations and has nothing to do with a valid immigration or customs purpose. *See* Def. Mem. Ex. 2, at 6–7; Ex. 4, at 16–19; Ex. 6, at 28; Ex. 8, at 39, 43; Ex. 10, at 51–54, 56, 59.

---

presentation of affidavits on a motion under Rule 12(b)(1) . . . does not convert the motion into a motion for summary judgment under Rule 56.").

Lastly, expungement is a recognized remedy for a constitutional violation. Courts are "empowered to order the expungement of Government records where necessary to vindicate rights secured by the Constitution." *Chastain v. Kelley*, 510 F.2d 1232, 1235 (D.C. Cir. 1975); *see also Fazaga*, 916 F.3d at 1239 ("We have repeatedly and consistently recognized that federal courts can order expungement of records, criminal and otherwise, to vindicate constitutional rights."); *Livingston v. DOJ*, 759 F.2d 74, 78 (D.C. Cir. 1985) ("[E]xpungement can and should be ordered 'when that remedy is necessary and appropriate in order to preserve basic legal rights.'" (quoting *Sullivan v. Murphy*, 478 F.2d 938, 968 (D.C. Cir. 1973)). This is true even when "the continued storage, against plaintiffs' wishes, of [sensitive] information that was . . . taken from them by unconstitutional means does not *itself* constitute a violation of law"; because retention of the information "is clearly an ongoing 'effect' of the . . . unconstitutional [conduct,] . . . expungement of the [information] would be an appropriate remedy for the . . . violation." *Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1275 (9th Cir. 1998).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that Defendants' Motion to Dismiss under Rule 12(b)(1) and Rule 12(b)(6) be denied.

Dated: July 17, 2020                              Respectfully submitted,

Antony Gemmell                                    */s/ Esha Bhandari*
Christopher Dunn                                  Esha Bhandari
NEW YORK CIVIL LIBERTIES UNION                    Scarlet Kim
    FOUNDATION                 Arianna Demas
125 Broad Street,                                 AMERICAN CIVIL LIBERTIES UNION
19th Floor                                            FOUNDATION
New York, NY 10004                                125 Broad Street,
(212) 607-3300 (phone)                            18th Floor
(212) 607-3318 (fax)                              New York, NY 10004
agemmell@nyclu.org                                (212) 549-2500 (phone)
cdunn@nyclu.org                                   (212) 549-2583 (fax)
                                                  ebhandari@aclu.org
                                                  scarletk@aclu.org

30

Mitra Ebadolahi                                    ademas@aclu.org
Sarah Thompson
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION OF SAN DIEGO &
    IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
(619) 232-2121 (phone)
(619) 232-0036 (fax)
mebadolahi@aclusandiego.org
sthompson@aclusandiego.org

*Counsel for Plaintiffs*


## CERTIFICATE OF SERVICE

The foregoing document was served on counsel for Defendants via email on July 17,

2020, pursuant to this Court's orders. *See* Minute Order of May 29, 2020; Minute Order of

March 6, 2020.


*/s/Esha Bhandari*

Esha Bhandari


*Counsel for Plaintiffs*