UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
BING GUAN, GO NAKAMURA, MARK
ABRAMSON, KITRA CAHANA, ARIANA
DREHSLER,

                     Plaintiffs,

          - against -

ALEJANDRO MAYORKAS, Secretary of the
U.S. Department of Homeland Security, in his
official capacity; TROY MILLER, Acting
Commissioner of U.S. Customs and Border
Protection, in his official capacity; TAE
JOHNSON, Acting Director of U.S.
Immigration and Customs Enforcement, in his
official capacity,[1]

                  Defendants.
--------------------------------------------------------x

**MEMORANDUM & ORDER**
19-CV-6570 (PKC) (RER)

PAMELA K. CHEN, United States District Judge:

       Plaintiffs are five photojournalists who bring this action against the heads of the United

States Department of Homeland Security ("DHS"), United States Customs and Border Protection

("CBP"), and the United States Immigration and Customs Enforcement ("ICE") in their official

capacities pursuant to 28 U.S.C § 1331, alleging a First Amendment violation in connection with

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), the following individuals have been automatically substituted as Defendants in their official capacity: (1) Alejandro Mayorkas became Secretary of Homeland Security on February 2, 2021, and is substituted for former Acting Secretary of Homeland Security, Chad Wolf; (2) Troy Miller became Acting Commissioner of the U.S. Customs and Border Protection on January 20, 2021, and is substituted for former Acting Commissioner of the U.S. Customs and Border Protection, Mark Morgan; and (3) Tae Johnson became Acting Director of U.S. Immigration and Customs Enforcement on January 13, 2021, and is substituted for former Acting Director of U.S. Immigration and Customs Enforcement, Matthew Albence. *See* Fed. R. Civ. P. 25(d); *Althnaibat v. Wolf*, No. 19-CV-3245 (NSR), 2020 WL 4883890, at *5 n.1 (S.D.N.Y. Aug. 18, 2020). The Clerk of Court is respectfully directed to correct the caption on the docket accordingly.

the CBP's questioning of Plaintiffs in secondary inspection upon their return to the United States at various ports of entry. (*See generally* Complaint ("Compl."), Dkt. 1.) Plaintiffs seek a declaratory judgment that their referral to secondary inspection and subsequent questioning violated the First Amendment, and an injunction requiring Defendants to expunge any records they obtained during the questioning and to inform Plaintiffs whether such records have been disclosed to other agencies, governments, or individuals. (*See id.*) Defendants move to dismiss the Complaint. (Dkt. 29.) For the reasons stated below, the Court denies the motion.

## BACKGROUND[2]

### I.    Relevant Facts

In 2018, migrants traveling by caravan from Central America to the United States began attracting widespread attention. (Compl., Dkt. 1, ¶¶ 21–22.) A caravan of approximately 1,500 migrants, mostly women and children from Honduras, began traveling from Tapachula, Mexico toward the United States-Mexico border in March 2018. (*Id.* ¶ 23.) Another caravan of approximately 7,000 migrants, including 2,300 children, began traveling from Honduras toward the United States-Mexico border in October 2018. (*Id.* ¶ 25.) Both caravans garnered significant public attention and local, national, and international press coverage. (*Id.* ¶¶ 24, 26.) Much of the media coverage was critical of and/or negatively portrayed Defendants' handling of the situation, especially as it related to migrant children.[3]

---

[2] The Court assumes the truth of all non-conclusory allegations in the Complaint. *See Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 429 (2d Cir. 2012).

[3] *See, e.g.*, Niraj Chokshi, *Reuters Photojournalist Talks About Photo of Children Fleeing Tear Gas at Border in Mexico*, N.Y. TIMES (Nov. 26, 2018), https://www.nytimes.com/2018/11/26/world/americas/tear-gas-migrant-children-photo.html (last visited Mar. 23, 2021); *Opinion: The Trump administration traumatizes children in the name of scaring migrants away*, WASH. POST (Apr. 29, 2018), https://www.washingtonpost.com/opinions/the-trump-administration-

Plaintiffs are five United States citizens who work as freelance photojournalists, and covered migrant conditions near the United States-Mexico border in late 2018 and early 2019. (Compl., Dkt. 1, ¶¶ 2, 12–16.)  According to reports by media outlet NBC 7 San Diego, DHS had targeted activists, lawyers, and journalists in their intelligence-collection efforts regarding the October 2018 migrant caravan.  (*Id.* ¶ 27.)  An internal DHS email, dated December 1, 2018, stated:

> As the caravan issue continues to be front and center, we are increasing our intelligence collection efforts.  All agents are asked to question available sources of information to include Confidential Informants (C/Is) and Sources of Information (SOIs) regarding the migrants, the caravan and it[]s leaders, and any criminal or cartel related actions concerning migrants or the caravan.  All information and intelligence needs to be documented as per standing operating procedures.  However, in addition, please forward any information directly to [the] CIO[4] . . . and Acting Group Supervisor [], and CC your Group Supervisor. . . . This information is being collected locally through the Incident Command Center, our SIG[5] agents and IRS,[6] and being routed through Headquarters.

---

traumatizes-children-in-the-name-of-scaring-migrants-away/2018/04/29/fe779b50-4a5a-11e8-827e-190efaf1f1ee_story.html (last visited Mar. 23, 2021).

[4] "CIO" refers to the Chief Intelligence Officer.  *See Leaked Email Reveals How Federal Agents Used Confidential Sources and Informants to Gather Information about Migrant Caravan*, NBC SAN DIEGO (Mar. 8, 2019), https://www.nbcsandiego.com/news/local/blumenthal-grave-concerns-over-border-surveillance-documents/954/ (last visited Mar. 23, 2021).

[5] The Court assumes "SIG" stands for Smuggling Interdiction Group, a Border Patrol group "whose mission is to disrupt and prevent alien and narcotic smuggling operations."  *See Est. of Martin v. United States*, No. 13-CV-1386 (LAB) (BGS), 2015 WL 5568049, at *3 (S.D. Cal. Sept. 22, 2015), *aff'd sub nom. Est. of Martin by Martin v. United States*, 686 F. App'x 419 (9th Cir. 2017).

[6] The Court assumes "IRS" refers to the Intelligence Records System.  *See TECS System: CBP Primary and Secondary Processing (TECS) National SAR Initiative*, U.S. DEP'T OF HOMELAND SEC. (Aug. 5, 2011), at 2, available at https://www.dhs.gov/xlibrary/assets/privacy/privacy-pia-cbp-tecs-sar-update.pdf (last visited Mar. 24, 2021) ("Border Patrol agents create Field Intelligence Reports (FIRs), when they are using the Intelligence Records System (IRS) operated by U.S. Immigration and Customs Enforcement (ICE), also to document noteworthy incidents or observed activities." (footnotes omitted)).

(*Id.* at 8.)

In addition, according to NBC 7 San Diego, DHS maintained a secret database "list[ing] people who[m] officials think should be targeted for screening at the border," including journalists who documented the October 2018 caravan, and lawyers and activists who had communicated with migrants in the caravan.  (*Id.* ¶ 29 (citation omitted).)  NBC 7 San Diego published screenshots of a DHS document profiling 59 individuals across eight pages, and titled "San Diego Sector Foreign Operations Branch, Migrant Caravan FY-2019, Suspected Organizers, Coordinators, Instigators, and Media" (the "DHS database").[7]  (*Id.* ¶¶ 30–31.)  A logo on the title page depicts the American and Mexican flags and a banner reading "ILU-OASISS-OMEGA."  (*Id.* ¶ 31.)  Plaintiffs believe that "ILU" refers to the International Liaison Unit, which facilitates information-sharing and cooperation between the CBP and the Government of Mexico, and that "OASISS" refers to the Operation Against Smugglers Initiative on Safety and Security, a partnership between the CBP and Government of Mexico that facilitates the prosecution of Mexican human smugglers in Mexican courts using information obtained via CBP interviews of individuals in U.S. custody.  (*Id.* ¶ 31.)

---

[7] The Court is aware of three other First Amendment challenges brought by individuals profiled in the DHS database and sent to secondary inspection while attempting to cross the border. *See Dousa v. U.S. Dep't of Homeland Sec.*, No. 19-CV-1255 (LAB) (KSC), 2020 WL 434314 (S.D. Cal. Jan. 28, 2020); *Adlerstein v. U.S. Customs & Border Prot.*, No. 19-CV-500 (TUC) (CKJ), 2020 WL 5846600, at *4 (D. Ariz. Oct. 1, 2020); *Phillips v. U.S. Customs & Border Protect. Agency*, No. 19-CV-6338 (SVW) (JEM) (C.D. Cal. July 23, 2019).  As discussed *infra*, motions to dismiss have been denied in *Dousa* and *Adlerstein*.  The defendants in *Phillips* did not move to dismiss, though their motion for summary judgment is currently pending.  *See* Motion for Summary Judgment, *Phillips*, No. 19-CV-6338 (SVW) (JEM) (C.D. Cal. Feb. 26, 2021), ECF No. 82.

Each of the 59 profiles included a headshot of the individual, along with information regarding the individual's "DOB," "COC," "Role," "Alert Placed," and "Disposition."[8]  (*Id.* at 10–13.)  According to Plaintiffs, those categories refer to the individuals' date of birth; country of commencement; "role" they purportedly played vis-à-vis the caravan; whether there was an alert placed on their record; and the "disposition" associated with the individuals.  (*Id.* ¶ 32; *see id.* at 10–13.)  As to the "role" category, 23 of the 59 profiled individuals were labeled as "Organizer," "Instigator," "Coordinator," or "Associate"; ten were labeled as "Media," "Media/Photographer," or "Journalist"; three were labeled as "Administrator on Caravan Support Network Facebook page"; one was labeled as "Lawyer"; one was labeled as "Suspected Antifa/Organizer"; and 21 were labeled "Unknown" or "N/A."  (*See id.* at 10–13; *id.* ¶ 33.)  Furthermore, 43 of the 59 profiled individuals were identified as having alerts placed on their record.  (*See id.* at 10–13.)  Some profiled individuals also had an "X" placed across their headshot, indicating that they had been "arrested, interviewed, or had their visa or [Secure Electronic Network for Travelers Rapid Inspection ("SENTRI")] pass revoked."  (*Id.* ¶ 32.)

Plaintiffs were all featured in the profiles, though Abramson's identity was redacted in the screenshots published by NBC 7 San Diego.  (*See id.* at 10–13; *id.* ¶¶ 34–35.)  The profiles of Plaintiffs Drehsler, Guan, Nakamura, and Cahana labeled each as "Media/Photographer," and indicated that an alert had been placed on each of their records.[9]  (*See id.* at 14; *id.* ¶ 35.)  Drehsler,

---

[8] In addition to the DHS database, NBC 7 San Diego reported that DHS also created a dossier on each featured individual.  (Compl., Dkt. 1, ¶ 37.)  NBC 7 San Diego obtained a list of such dossier files, and reported that two of the files "were labeled with the names of journalists but [that] no further details were available," and that "those journalists were also listed as targets for secondary screenings."  (*Id.* (alteration omitted).)

[9] Of the 10 individuals labeled as "Media," "Media/Photographer," or "Journalist," nine profiles indicated that an alert had been placed on their record.  (*See* Compl., Dkt. 1, at 10–13.)

Guan, and Nakamura each had a green "X" placed across their headshot.  (*See id.* at 14; *id.* ¶ 35.) Drehsler's profile indicated that she was "[i]nterviewed on 12/30/2018"; Nakamura's profile indicated that an "[i]nterview [was] conducted on 12/29/2018"; Guan's profile indicated that he was "[i]nterviewed"; and Cahana's profile stated "Pending Encounter."  (*Id.* at 14; *see also id.* ¶ 36.)

In December 2018 and January 2019, Plaintiffs each attempted to enter the United States at a port of entry.  (*Id.* ¶ 38.)  When Plaintiffs tried to cross the border, they were each referred to secondary inspection by the CBP, and questioned about their work in Mexico.  (*Id.* ¶ 38.)  In Plaintiffs' view, each was selected for secondary inspection "because of their journalism work and activities in Mexico."  (*Id.* ¶ 38.)  The Court recounts specific allegations regarding each Plaintiff as follows:

A.     **Plaintiffs Bing Guan and Go Nakamura**

Plaintiff Guan is a New York-based freelance photojournalist whose photographs have been featured in *The Sunday Times Magazine*, *The Intercept*, and *The Phnom Penh Post*.  (*Id.* ¶¶ 12, 39.)  Plaintiff Nakamara is a New York-based freelance photojournalist whose photographs have been featured in *The Guardian*, *The New York Times*, and *Reuters*.  (*Id.* ¶¶ 13, 62.)  To sustain their careers as freelance photographers, Guan and Nakamura frequently travel internationally to cover newsworthy stories.  (*Id.* ¶¶ 60, 82.)

In November 2018, Guan and Nakamara worked in Mexico, documenting the migrant caravan that had originated in Honduras.  (*Id.* ¶¶ 41, 64.)  Nakamura was on assignment with *Reuters* for part of his trip, and Guan eventually sold his photographs from the trip to *The Intercept*. (*Id.* ¶¶ 41, 64.)  Both Guan and Nakamura returned to the United States following their trips, and both traveled back to Mexico around December 24 and 25, 2018, respectively, to continue their coverage of migrants and border conditions in Tijuana, a border city.  (*Id.* ¶¶ 42, 65.)  On or about

December 27, 2018, Guan and Nakamura were each approached by Mexican authorities on the southern side of the border, questioned about the purpose of their visits, and asked for photo identification. (*Id.* ¶¶ 43, 66.) Both Guan and Nakamura provided their passports, which the Mexican authorities photographed. (*Id.* ¶¶ 43, 66.)

On the morning of December 29, 2018, Guan and Nakamura left their hotel in Mexico to drive to San Diego. (*Id.* ¶¶ 44, 67.) They arrived at the San Ysidro port of entry to cross the border back into the United States, where CBP officers scanned their passports, and informed them that they had to undergo secondary inspection. (*Id.* ¶¶ 44, 67.) After waiting for 60 to 90 minutes, they were led by plainclothes officers into a nearby building. (*Id.* ¶¶ 44, 67.)

One of the plainclothes officers escorted Guan to a windowless room and questioned him for approximately one hour. (*Id.* ¶ 45.) The officer asked Guan questions about: his current address, length of residency, birth location, contact information, whether he "knew smugglers, activists, or journalists who assisted migrants in crossing the border," how he supported himself as a photojournalist, and "whether he knew any 'coyotes' or activists who were pro-migrant or anti-migrant." (*Id.* ¶¶ 46–49.) During the questioning, the officer stated, "I know you've been around the migrant caravan." (*Id.* ¶ 47.) The officer also produced a book featuring color photographs[10] of individuals, and asked Guan "to identify any 'instigators' he recognized" in the book. (*Id.* ¶ 50.) The officer requested to see the photographs that Guan had taken while covering the border, and Guan agreed, "feeling he had no choice and was not at liberty to leave." (*Id.* ¶ 51.) Guan scrolled through some of the pictures he had taken on his camera, and the officer took cell phone pictures of the photographs on the camera's digital display. (*Id.*) Shortly after this

---

[10] The photographs were taken from sources such as identification documents and social media profiles. (Compl., Dkt. 1, ¶ 50.)

questioning, Guan was released from secondary inspection and permitted to enter the United States. (*Id.* ¶ 52.)

Meanwhile, another officer took Nakamura into a separate waiting room, and questioned him for approximately 40 to 45 minutes. (*Id.* ¶¶ 68–89.) The officer asked Nakamura about: the purpose of his trip, for whom he was working, where he was from, where he lived, how he had become a photojournalist, and "whether he had interacted with caravan organizers or activists who may have assisted people in crossing the border." (*Id.* ¶¶ 70–71.) The officer also produced a book featuring color headshots of individuals and asked Nakamura "to identify anyone he recognized" in the book. (*Id.* ¶ 72.) The officer requested to see the photographs Nakamura had taken while covering the border, and Nakamura agreed, "feeling he had no choice and was not at liberty to leave." (*Id.* ¶ 73.) Nakamura showed the officer some photos on his public Instagram page depicting migrants on their way to the border, and near the border wall. (*Id.*) After waiting ten more minutes, Nakamura was released from secondary inspection and permitted to enter the United States. (*Id.* ¶ 74.)

In July 2019, Nakamura stopped in Mexico City on his way back to New York City from Peru. (*Id.* ¶ 75.) At passport control in the Mexico City airport, Mexican authorities stopped Nakamura, sent him to a separate room, and asked him to sign a document indicating that an "alerta migratoria," or "migratory alert," had been placed on his passport. (*Id.* ¶ 75.) On or about August 26, 2019, Guan again traveled to Tijuana. (*Id.* ¶ 53.) At passport control, Mexican authorities informed Guan that a migratory alert had been placed on his passport. (*Id.* ¶ 53.)

## B.    **Plaintiff Mark Abramson**

Plaintiff Abramson is a New York-based freelance photojournalist whose photographs have been featured in, *inter alia*, *The New York Times*, *The Washington Post*, *The Wall Street Journal*, and *Time*. (*Id.* ¶¶ 14, 84.)

8

For approximately three weeks in November 2018, Plaintiff Abramson worked in Mexico, covering the migrant caravan that had originated in Honduras. (*Id.* ¶ 86.) He returned to the United States thereafter, but traveled back to Mexico on or about December 24, 2018 to continue his coverage of migrants and border conditions in Tijuana, in part on a freelance basis and in part on assignment for *The New York Times*. (*Id.* ¶ 87.) On or about December 27, 2018, Abramson was approached by Mexican authorities on the southern side of the border, questioned about the purpose of his visit, and asked for photo identification. (*Id.* ¶ 88.) Abramson provided his passport, which the Mexican authorities photographed. (*Id.* ¶ 88.)

Around 2:00 a.m. on or about January 5, 2019, Abramson arrived at the San Ysidro port of entry to cross the border back into the United States, where CBP officers scanned his passport, and sent him to secondary inspection. (*Id.* ¶ 89.) In secondary inspection, two uniformed officers patted Abramson down and emptied his pockets. (*Id.* ¶ 90.) They searched his "bag, which contained notebooks that included confidential source material; the names and contact information of people he encountered while working; personal reflections; and receipts to be submitted to his editor for reimbursement." (*Id.* ¶ 90.) During the search, the officers asked Abramson about the kinds of photographs he takes, as well as "questions about the contents of his belongings, such as 'What is in the book?'" (*Id.* ¶ 91.) Approximately 20 to 30 minutes following the search, Abramson was led to another room and patted down again. (*Id.* ¶ 92.) An officer who introduced himself as "Agent Castro" questioned Abramson for 30 to 40 minutes about the purpose of his work and his employers, to which "Abramson responded that he was a photojournalist covering migrant camp conditions for *The New York Times*"; "what he saw while following the caravan[;] who was leading the group of migrants[;] [] whether these leaders were for or against the U.S.

government"; and whether Abramson "knew of any groups assisting the migrant caravan." (*Id.* ¶¶ 92–95.)

After being questioned by Agent Castro, Abramson was released from secondary inspection and permitted to enter the United States. (*Id.* ¶ 95.)

### C.    Plaintiff Kitra Cahana

Plaintiff Cahana is a Texas-based freelance photojournalist whose photographs have been featured in *National Geographic* and *The New York Times*. (*Id.* ¶¶ 15, 104.)

For several weeks between November 2018 and January 2019, Cahana worked in Mexico, covering migrant issues in Tijuana both on a freelance basis and on assignment for *Huffington Post*, *The New York Times*, and *Die Zeit*. (*Id.* ¶ 106.) On or about December 27, 2018, Cahana was approached by Mexican authorities on the southern side of the border, questioned about the purpose of her visits, and asked for photo identification. (*Id.* ¶ 107.) Cahana provided her passport, which the Mexican authorities photographed. (*Id.* ¶ 107.)

In early January 2019, Cahana flew from Tijuana to Montreal, Canada. (*Id.* ¶ 108.) On or about January 17, 2019, Cahana intended to return to Mexico, flying from Montreal to Tapachula (near the Mexico-Guatemala border) via Detroit and Mexico City. (*Id.* ¶ 109.) Cahana planned to take photographs covering the migrant caravans and conditions at the United States-Mexico border on a freelance basis, though several publications like *The New York Times* and *The Intercept* had expressed interest in her planned coverage. (*Id.* ¶ 109.) Due to her stopover in Detroit, Cahana had to go through the U.S. Customs preclearance checkpoint at the Montreal airport. (*Id.* ¶ 109.) She scanned her passport at a machine in the preclearance area, which "printed out a ticket with a picture of [her] face with a large 'X' on it. This had never happened to [her] previously." (*Id.* ¶ 109.) Cahana was sent to a booth, where a CBP officer asked her about the purpose of her trip

to Mexico and what she intended to photograph, and then referred her to secondary inspection. (*Id.* ¶ 110.)

In secondary inspection, another CBP officer questioned Cahana for ten minutes, asking her "whether she had an assignment in Mexico, about her plans to photograph the migrant caravan, how she obtained assignments and which press outlets she had worked for in the past, and about the financial compensation and tax implications of freelancing." (*Id.* ¶ 111.) Cahana was subsequently permitted to enter the United States, and flew to Mexico City by way of Detroit. (*Id.* ¶ 112.)

Once Cahana arrived at the Mexico City airport around 8:00 p.m., a Mexican customs officer asked her "where she was headed." (*Id.* ¶ 113.) Cahana answered that she was en route to Tapachula, and was "immediately escorted [] to a waiting area." (*Id.* ¶ 113.) In the waiting area, Mexican officers confiscated Cahana's cell phone and asked her to complete forms containing questions relating to her occupation and plans in Mexico. (*Id.* ¶ 114.) Cahana, who could speak beginner Spanish, repeatedly asked the officers in Spanish why she was being held, and whether it was because she was a journalist. (*Id.*) An officer responded in Spanish, to the best of Cahana's knowledge, "No, it's not us, it's Interpol." (*Id.*) When Cahana followed up, asking "whether it was the Americans," the officer answered, to the best of Cahana's knowledge, "yes." (*Id.*)

Around 1:30 a.m., a Mexican officer asked Cahana to sign a form written in Spanish. (*Id.* ¶ 115.) Cahana did not understand the form, and refused to sign. (*Id.*) She was taken to another area by a different officer, who "tried to pressure her to sign the form." (*Id.*) Again, Cahana refused. (*Id.*) Cahana was taken to yet another area, where an AeroMexico[11] representative told

---

[11] AeroMexico is a prominent Latin American airline based in Mexico. *Aeromexico Corporate*, AEROMEXICO, https://aeromexico.com/en-ca/about-us/aeromexico-corporate (last visited Feb. 21, 2021).

her "that she would be placed on a plane to Detroit in the morning." (*Id.* ¶ 116.) Cahana again asked an officer in Spanish "whether she was being held because she was a journalist," to which the officer responded, to the best of Cahana's knowledge, "that it was because of the Americans, not the Mexicans." (*Id.*)

Around 8:00 a.m., Mexican officers escorted Cahana to the terminal, returned her cell phone, and placed her on a 9:10 a.m. flight to Detroit. (*Id.* ¶ 117.) Once Cahana arrived at the Detroit airport, she scanned her passport at a machine in the customs area, which again "printed out a ticket with a picture of [her] face with a large 'X' on it," and she was again sent to secondary inspection. (*Id.* ¶ 118.) Cahana was taken to a private room, where two plainclothes officers questioned her while seeming to consult a computer. (*Id.* ¶ 119.) They asked her why she had been denied entry to Mexico, what happened there, and whether she had prior encounters with Mexican authorities. (*Id.*) Cahana answered that Mexican police in Tijuana had previously asked to see her identification, and photographed her passport. (*Id.*) In response, one of the officers asked Cahana "to confirm whether the incident had taken place on the U.S.-Mexico border and around 'the day after Christmas,'" suggesting to Cahana "that the officers knew more about her and her journalism work in Mexico in December 2018 than [] Cahana had revealed during questioning." (*Id.*) Following this questioning, Cahana was released from secondary inspection and allowed into the United States. (*Id.* ¶ 120.) Cahana was thus prevented from traveling to Mexico on that occasion to take photographs of the migrant caravans and conditions at the United States-Mexico border.

On or about January 26, 2019, Cahana again attempted to enter Mexico to take freelance photographs, this time by land from Guatemala. (*Id.* ¶ 121.) At the border, a Mexican officer

scanned her passport, told her that an alert was associated with it, and denied her entry into Mexico. (*Id.*)

### D.      Plaintiff Ariana Drehsler

Plaintiff Drehsler is a California-based freelance photojournalist whose work has been published in *The Guardian*, *The New York Times*, *The Associated Press*, *Agence France-Presse*, *The Wall Street Journal*, and *Bloomberg*.  (*Id.* ¶¶ 16, 129.)  In April 2017, Drehsler worked in Mexico covering migrant issues on assignment for *Buzzfeed*.  (*Id.* ¶ 131.)

In November and December 2018, Drehsler covered one of the migrant caravans near the United States-Mexico border on assignment for *United Press International*.  (*Id.* ¶ 132.)  On or about December 30, 2018, at around 12:15 a.m., Drehsler sought entry into the United States at the San Ysidro port of entry, where a CBP officer referred her to secondary inspection.  (*Id.* ¶ 133.) Border officers[12] searched her belongings, and another officer questioned her for 10 to 15 minutes. (*Id.* ¶ 134.)  Eventually, Drehsler was escorted to a separate room by two plainclothes officers. (*Id.*)  When she asked the officers why she had been referred to secondary inspection, the officers answered that it was because her passport had been flagged.  (*Id.* ¶ 135.)  The officers instructed Drehsler to write down her home address and editor's phone number, and "asked her about the nature of her work and her background in photography, including what training is required for freelance photography," and "what she had seen in Tijuana, including at any migrant shelters." (*Id.* ¶¶ 136–37.)  One of the officers stated, "You're on the ground; you're there, we're not."  (*Id.* ¶ 137.)  The officers informed Drehsler that "she should budget an additional hour to pass through secondary inspection" if she intended to cross the border at San Ysidro in the future.  (*Id.* ¶ 138.)

---

[12] Plaintiffs uses the term "border officers" to refer to CBP and other federal officers assigned to the United States-Mexico border.  (*See, e.g.*, Compl., Dkt. 1, ¶¶ 1–2, 5–7, 38, 40, 63, 85, 98, 105, 124, 130, 134, 142, 153.)

Drehsler was thereafter released from secondary inspection and permitted to enter the United States.  (*Id.* ¶ 139.)

On or about January 2, 2019, at around 11:00 p.m., Drehsler again sought entry into the United States at the San Ysidro port of entry.  (*Id.* ¶ 140.)  She was again sent to secondary inspection by the CBP officer who scanned her passport.  (*Id.*)  After 15 minutes, the same two plainclothes officers who had questioned Drehsler a few days prior escorted her into a room.  (*Id.* ¶ 141.)  A third officer entered, told Drehsler that she had seen her website, and "complimented [] Drehsler's photography, saying she had done 'great work.'"  (*Id.* ¶ 141.)  The officers questioned Drehsler for 15 to 20 minutes, asking whether she could identify activists working near the United States-Mexico border if they showed her photographs (though they did not end up showing her photographs); what she had seen in Mexico relating to the migrant caravan and people around the caravan; what she thought of the latest caravan; whether she was familiar with its leadership to the extent it had any; whether she thought it was difficult for people to cross the border; whether those considering traveling to the United States-Mexico border had heard about how difficult it was to seek asylum; and whether she rented or owned her home in the United States.  (*Id.* ¶¶ 142–43, 145.)  Drehsler asked the officers whether "she should expect to be stopped [for secondary inspection] again," to which an "officer[] responded that she should."  (*Id.* ¶ 144.)  Drehsler was then released from secondary inspection and permitted to enter the United States.  (*Id.* ¶ 145.)

On or about January 4, 2019, at around 9:00 p.m., Drehsler again sought entry into the United States at the San Ysidro port of entry.  (*Id.* ¶ 146.)  Once again, she was referred to secondary inspection.  (*Id.*)  While Drehsler waited to be taken into secondary inspection, "a uniformed officer asked [] [her] whether she wanted to show the officers her photographs from that day.  [] Drehsler did not show the officer any photographs."  (*Id.*)  After waiting for around

45 minutes, two uniformed officers escorted Drehsler into a room, where they inspected her belongings. (*Id.* ¶ 147.) The officers questioned her about a Mexican migrant shelter she had been covering, "whether she had seen 'anything suspicious' at the shelter, and what the general mood in the shelter had been," given that "she was 'on the ground'" there. (*Id.* ¶ 148.) The officers also questioned Drehsler about her prior experience as a journalist in Syria, "the subjects of her photography [there], the people with whom she had associated, and whether she was affiliated with any organizations or groups." (*Id.* ¶ 149.) Drehsler was then released from secondary inspection and permitted to enter the United States. (*Id.* ¶ 150.)

*     *     *

Plaintiffs allege that Defendants violated the First Amendment by: (1) questioning Plaintiffs about their journalism, sources of information, and journalistic observations without any valid immigration or customs purpose; (2) questioning Plaintiffs about their journalism, sources of information, and journalistic observations in a way that compelled them to disclose constitutionally protected news-gathering and associational information without meeting the standard necessary to compel such disclosure; (3) questioning Plaintiffs in a way that substantially burdened their constitutional rights to engage in newsworthy activity and to associate with their sources, thus burdening their freedom of speech, including their rights to publish their work as photojournalists; and (4) subjecting Plaintiffs to secondary inspection, detention, and questioning because of their work and activities as journalists covering conditions at the United States-Mexico border. (*Id.* ¶¶ 159–62.) Plaintiffs request (1) a declaration that Defendants violated the First Amendment; and (2) an injunction requiring Defendants to (a) expunge all records retained during the questioning of Plaintiffs at the border, and (b) inform Plaintiffs whether those records have been shared with other individuals, agencies, and governments, and if so, to whom. (*Id.* at 35.)

## II.     Procedural History

Plaintiffs commenced this action on November 20, 2019. (*See generally id.*) On February 21, 2020, Defendants filed a pre-motion conference request in connection with their anticipated motion to dismiss for lack of standing and failure to state a claim. (Dkt. 18.) On February 28, 2020, Plaintiffs responded (Dkt. 19), and the Court granted Defendants leave to file their motion (2/28/2020 Docket Order). Briefing in connection with Defendants' motion to dismiss was completed on August 14, 2020. (*See* Dkts. 29–34.) Defendants move to dismiss the Complaint pursuant to both Federal Rule of Civil Procedure ("Rule") 12(b)(1) on the basis that the Court lacks subject matter jurisdiction, and Rule 12(b)(6) on the basis that Plaintiffs fail to state a claim.

## LEGAL STANDARD

## I.     Federal Rule of Civil Procedure 12(b)(1)

Rule 12(b)(1) provides for the dismissal of a claim over which the Court lacks subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The party asserting subject matter jurisdiction bears the burden to prove the Court's jurisdiction by a preponderance of the evidence. *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citing *Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir. 1996)). To survive a motion to dismiss for lack of Article III standing, a plaintiff must allege facts that, when accepted as true, "affirmatively and plausibly suggest that it has standing to sue." *Reyes v. Sofia Fabulous Pizza Corp.*, No. 13-CV-7549 (LAK) (JCF), 2014 WL 12768922, at *2 (S.D.N.Y. Apr. 7, 2014), *report and recommendation adopted*, 2014 WL 1744254 (S.D.N.Y. Apr. 24, 2014). "Where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003) (quoting *LeBlanc v. Cleveland*, 198 F.3d 353, 356 (2d Cir. 1999)).

## II.   Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal citation omitted). Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (internal citation omitted). In addressing a motion to dismiss, the court should "draw all reasonable inferences in [the plaintiffs'] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks and citations omitted). "The Court's function on a motion to dismiss is 'not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient.'" *Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410, 418–19 (S.D.N.Y. 2019) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)).

## DISCUSSION

"When a defendant moves to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, and also moves to dismiss on other grounds such as Rule 12(b)(6) for failure to state a claim upon which relief can be granted, the Court must consider the Rule 12(b)(1) motion first." *Bobrowsky v. Yonkers Courthouse*, 777 F. Supp. 2d 692, 703 (S.D.N.Y. 2011) (citing, *inter alia*,

*Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990)).  The Court, therefore, first addresses whether Plaintiffs have standing to bring this action.

## I.      Standing

"Article III [of the Constitution] limits federal judicial power to 'Cases' and 'Controversies,' and standing to sue 'limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong.'"  *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 92 (2d Cir. 2019) (first quoting U.S. Const. art. III, § 2; and then quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)), *cert. denied sub nom. Bowes v. Melito*, 140 S. Ct. 677 (2019).  The purpose of the standing inquiry is to ensure that "the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant *his* [*or her*] invocation of federal-court jurisdiction."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (emphasis in original) (internal quotation marks omitted) (quoting *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975)); *see also Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) ("[T]he standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome[.]" (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000))).  "If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim."  *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, LLC*, 433 F.3d 181, 198 (2d Cir. 2005).

"To establish standing 'a plaintiff is constitutionally required to have suffered (1) a concrete, particularized, and actual or imminent injury-in-fact (2) that is traceable to [the] defendant's conduct and (3) likely to be redressed by a favorable decision.'"  *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (quoting *Woods v. Empire Health Choice, Inc.*, 574 F.3d 92, 96 (2d Cir. 2009)); *see also Spokeo*, 136 S. Ct. at 1547 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  "The plaintiff, as the party invoking federal jurisdiction,

bears the burden of establishing these elements." *Spokeo*, 136 S. Ct. at 1547. "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561 (collecting cases). "Where, as here, standing is challenged at the pleadings stage, a court must 'accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.'" *Black Lives Matter v. Town of Clarkstown*, 354 F. Supp. 3d 313, 322 (S.D.N.Y. 2018) (quoting *United States v. Vazquez*, 145 F.3d 74, 81 (2d Cir. 1998)). At this stage, "standing allegations need not be crafted with precise detail, nor must the plaintiff prove his allegations of injury."[13] *Baur v. Veneman*, 352 F.3d 625, 631 (2d Cir. 2003) (citing *Lujan*, 504 U.S. at 561). "To survive the motion to dismiss, the pleadings must only 'allege facts that affirmatively and plausibly suggest that [Plaintiffs have] standing to sue.'" *Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 437 (S.D.N.Y. 2016) (quoting *Amidax*, 671 F.3d at 145).

---

[13] Defendants claim that, unlike the plausibility standard required to overcome a Rule 12(b)(6) motion, Plaintiffs must "demonstrate that they *actually* have standing to sue" to defeat a Rule 12(b)(1) motion. (Defendants' Memorandum of Law in Support of Motion to Dismiss ("Defs.' Br."), Dkt. 30, at 25 (emphasis in original).) This is plainly incorrect; the plausibility standard applies here regardless of whether the Court is evaluating Plaintiffs' allegations for sufficiency of stating a claim, or sufficiency of establishing standing. Though the elements of standing are "an indispensable part of the plaintiff[s'] case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at [each] successive stage[] of the litigation." *Lujan*, 504 U.S. at 561 (collecting cases). At the summary-judgment stage, for instance, the plaintiff "can no longer rest on [] 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken to be true." *Id.* (quoting Fed. R. Civ. P. 56(e)). At "the final stage," those facts establishing standing "must be 'supported adequately by the evidence adduced at trial.'" *Id.* (quoting *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 115 n.31 (1979)). And here, at the motion-to-dismiss stage, "general factual allegations of injury resulting from the defendant[s'] conduct may suffice." *Id.*

Furthermore, "[b]ecause 'the standing inquiry requires careful judicial examination of whether the *particular plaintiff* is entitled to an adjudication of the *particular claims* asserted,' standing must be assessed as to each plaintiff and each 'plaintiff must demonstrate standing separately for each form of relief sought.'" *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 556 (S.D.N.Y. 2018) (emphases in original) (ellipsis omitted) (first quoting *Allen v. Wright*, 468 U.S. 737, 752 (1984); and then quoting *Friends of the Earth*, 528 U.S. at 185), *aff'd*, 928 F.3d 226 (2d Cir. 2019). Though Plaintiffs bring a single claim alleging a First Amendment violation, they seek two forms of relief: declaratory judgment and injunctive relief in the form of expungement and disclosure of whether Defendants have disseminated the records at issue with others. (*See* Compl., Dkt. 1, at 34–35.) The Court finds that Plaintiffs lack standing to pursue declaratory judgment, but have sufficiently established their standing to seek expungement and disclosure.

## A.   Declaratory Judgment

In their Complaint, Plaintiffs request a declaratory judgment pursuant to the Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201, that border officers' conduct violated Plaintiffs' First Amendment rights. (*See id.* at 35 (requesting the Court to "[d]eclare that Defendants' border officers'" actions violated the First Amendment); *id.* ¶ 10 (stating that the "Court has authority to issue declaratory . . . relief pursuant to [the DJA,] 28 U.S.C. §§ 2201–02").) The Court finds that Plaintiffs fail to establish that they have standing to pursue the prospective relief permitted by the DJA.

The DJA authorizes a federal court, "[i]n a case of actual controversy within its jurisdiction," to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Declaratory

relief pursuant to the DJA "is intended to operate prospectively."[14] *Storms v. United States*, No. 13-CV-811 (MKB), 2015 WL 1196592, at *21 (E.D.N.Y. Mar. 16, 2015) (internal quotation marks and citation omitted). Such relief is appropriate where, for example, "a party [] wishes to engage in [future] conduct that may infringe [on] another's [] rights[,] [and] seek[s] a declaration that those rights are invalid without first exposing itself to liability." *Velvet Underground v. Andy Warhol Found. for the Visual Arts, Inc.*, 890 F. Supp. 2d 398, 403–04 (S.D.N.Y. 2012) (citing 28 U.S.C. § 2201(a)). When "only past acts are involved," declaratory relief is unavailable. *Storms*, 2015 WL 1196592, at *21; *see also Mariah Re Ltd. v. Am. Fam. Mut. Ins. Co.*, 52 F. Supp. 3d 601, 623 (S.D.N.Y. 2014) ("There is no basis for declaratory relief where only past acts are involved." (internal quotation marks and citation omitted)), *aff'd sub nom. Maria Re Ltd. ex rel. Varga v. Am. Fam. Mut. Ins. Co.*, 607 F. App'x 123 (2d Cir. 2015); *KM Enterprises, Inc. v. McDonald*, No. 11-CV-5098 (ADS) (ETB), 2012 WL 4472010, at *19 (E.D.N.Y. Sept. 25, 2012) ("The main barrier in a declaratory judgment action is that it cannot be used solely to adjudicate a defendant's past conduct." (internal quotation marks, citation, and alteration omitted)), *aff'd*, 518 F. App'x 12 (2d Cir. 2013).

"To establish standing to obtain prospective relief" like declaratory judgment, "a plaintiff must show a likelihood that he will be injured in the future." *Carver v. City of New York*, 621 F.3d 221, 228 (2d Cir. 2010) (internal quotation marks omitted). Plaintiffs neither request prospective relief nor establish that they have standing for such a request. They seek only a declaration that

---

[14] The purpose of the DJA is to "avoid accrual of avoidable damages to one not certain of his rights and to afford him an early adjudication without waiting until his adversary should see fit to begin suit, after damage has accrued." *Nat'l Union Fire Ins. Co. v. Int'l Wire Grp., Inc.*, No. 02-CV-10338 (SAS), 2003 WL 21277114, at *4 (S.D.N.Y. June 2, 2003) (quoting *Luckenbach Steamship Co. v. United States*, 312 F.2d 545, 548 (2d Cir. 1963)); *see also In re Combustible Equip. Assoc.*, 838 F.2d 35, 37 (2d Cir. 1988) ("The purpose of the [DJA] is to enable parties to adjudicate disputes before either side suffers great damages.").

Defendants' *past* conduct was unlawful; they do not request a declaration that any such conduct in the *future* would violate the First Amendment.  (*See* Compl., Dkt. 1, at 35 ("Plaintiffs respectfully request that this Court . . . [d]eclare that Defendants' border officers' questioning of [] Plaintiffs about their journalism work and activities violated the First Amendment[.]"); Plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss ("Pls.' Br."), Dkt. 31, at 4 ("Plaintiffs seek a declaratory judgment that such questioning and compelled disclosure of information violated the First Amendment.").)  The insufficiency of Plaintiffs' declaratory judgment claim for standing purposes is borne out by a comparison to the relief requested in *Amadei v. Nielsen*, 348 F. Supp. 3d 145 (E.D.N.Y. 2018).  There, the plaintiffs sought a declaration that "the rule or policy pursuant to which CBP conducted the illegal search and seizure of Plaintiffs . . . is unconstitutional, arbitrary and capricious, an abuse of discretion, contrary to law, and in excess of statutory authority, and is therefore invalid under the Administrative Procedure Act."  348 F.3d at 153 (internal quotation marks omitted).  The Honorable Nicholas G. Garaufis found that the *Amadei* plaintiffs had sufficiently alleged injury-in-fact because their declaratory judgment claim was based on a CBP policy that the plaintiffs alleged was likely to be enforced against them in the future.  *Id.* at 158 (finding that "[w]hile [p]laintiffs allege that they have only been subjected to one prior search, they have proffered numerous statements from [d]efendants admitting that this search was part of a 'routine' practice conducted pursuant to a formal 'policy[,]'" thereby satisfying plaintiffs' burden to plausibly allege that "they face a sufficient likelihood of experiencing another search").  Here, by contrast, Plaintiffs allege only that Defendants' past detention and questioning of them violated their First Amendment rights, but not that this conduct was done pursuant to an ongoing policy that is likely to be enforced against them again in the future.  Rather, despite stating that they fear they will be subjected to similar treatment in the future

(*see* Compl., Dkt. 1, ¶¶ 60, 82, 102, 127, 156), Plaintiffs do not allege that Defendants are *actually* likely to engage in such conduct in the future.[15]

Moreover, "[t]he fact that a lawsuit has been filed that will necessarily settle the issues for which declaratory judgment is sought suggests that the declaratory judgment will serve no useful purpose." *Fleisher v. Phoenix Life Ins. Co.*, 858 F. Supp. 2d 290, 302 (S.D.N.Y. 2012) (quoting *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 301, 311 (S.D.N.Y. 2010)); *see also Amusement Indus.*, 693 F. Supp. 2d at 312 ("[Where] there is a better or more effective remedy than a declaratory judgment action[—]specifically, the underlying litigation itself[—] [] there appears to be no purpose to the request for declaratory relief."). Thus, although Plaintiffs are not entitled to a declaratory judgment that Defendants' past conduct was unlawful, they may be, as explained below, entitled to a determination by a factfinder that the conduct was unlawful, which may in turn warrant expungement.

### B.    Expungement

The Court finds that Plaintiffs have sufficiently alleged "facts that affirmatively and plausibly suggest" that they satisfy the three elements of standing as to their claim for expungement. *See Boelter*, 192 F. Supp. 3d at 437 (quoting *Amidax*, 671 F.3d at 145).

---

[15] The Court notes that in *Dousa* and *Adlerstein*, the plaintiffs sought prospective relief in the form of an injunction prohibiting such questioning in the future, rather than a declaration, and in both, the court found that they did sufficiently allege the likelihood of recurrence. *See Dousa*, 2020 WL 434314, at *5 ("All told, the duration and extent of past surveillance means that it's not a stretch to think the surveillance continues today. Dousa therefore faces 'a real and immediate threat of repeated injury.'"); *Adlerstein*, 2020 WL 5846600, at *10 ("[T]he allegations and inferences in the Complaint regarding past conduct and injuries present a credible threat of future harm. Plaintiffs have alleged they are realistically threatened by a repetition of the violation, or have shown a credible threat of future injury." (internal quotation marks and citation omitted)). However, in those cases, there is no indication, as there is here, that the plaintiffs were spared the same treatment during subsequent crossings.

23

1.      Injury-in-Fact

"To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo*, 136 S. Ct. at 1548 (internal quotation marks omitted).  For an injury to be "concrete," it must be "real," *i.e.*, not "abstract," but need not be "tangible." *Id.*  "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Id.* at 1548–49 (quoting *Lujan*, 504 U.S. at 560 n.1).  The parties rightly do not dispute that Plaintiffs' alleged injuries are particularized, as each Plaintiff was subjected to the secondary inspections and questioning at issue in this case.  Instead, the parties' disagreement as to whether Plaintiffs have standing centers around whether Plaintiffs have sufficiently alleged a concrete, justiciable injury-in-fact.

Plaintiffs allege that they suffered an injury to their First Amendment rights when the CBP targeted them for secondary screening based on their roles as journalists covering conditions at the United States-Mexico border, and questioned them about their journalism work without any valid immigration or customs purpose.  (Compl., Dkt. 1, ¶¶ 159–62.)  Furthermore, Plaintiffs allege that they continue to be impacted by the effects of the secondary questioning; they are all freelance photojournalists who frequently travel internationally for work, and whose ability to continuing travelling internationally is important to sustaining their careers.  (*Id.* ¶¶ 39, 60, 62, 82, 102, 104, 127, 156.)  As a result of their experiences in secondary inspection in December 2018 and January 2019, Plaintiffs fear that they will be referred to secondary inspection again in the future and questioned again about their journalistic activities and sources.  (*Id.* ¶¶ 60, 82, 102, 127, 156.)  Plaintiffs also fear that their ability to work and travel freely as freelance photojournalists remains imperiled because Defendants collected information about their journalistic activities, continue to

24

retain records, and potentially shared those records with other law enforcement agencies and/or foreign governments. (*Id.* ¶¶ 61, 83, 103, 128, 157.)

Defendants argue that none of Plaintiff's allegations constitute a cognizable injury-in-fact to their First Amendment rights for standing purposes. (Defendants' Memorandum of Law in Support of Motion to Dismiss ("Defs.' Br."), Dkt. 30, at 25.) In support of this argument, Defendants submit a declaration by the Acting Assistant Director of Field Operations in the CBP's Office of Field Operations, Michael B. Firing, as well as CBP records of Plaintiffs' border crossing histories from November 1, 2017 through February 3, 2020, which, *inter alia*, document the secondary inspections at issue in this case.[16] (Declaration of Michael B. Firing ("Firing Decl."), Dkt. 30-1; Firing Decl. Exs. 1–10, Dkt. 34.) According to Defendants, the CBP records reveal that Plaintiffs were not subjected to any First Amendment violations during their questioning because (1) Plaintiffs voluntarily complied with their questioning without compulsion; (2) Plaintiffs were asked mainly about the nature of their work, travels, activities, and plans in the United States; (3) to the extent Plaintiffs were questioned about the migrant caravans, the questioning focused on their observations about the conditions of the migrants, shelters, and those potentially assisting the illegal border crossings; and (4) Plaintiffs were neither asked about nor revealed their journalistic sources. (Defs.' Br., Dkt. 30, at 26.) Defendants also argue that the records of Plaintiffs' border crossing histories undermine Plaintiffs' claims of fearing future interactions with the CBP because each has crossed the border multiple times since the incidents at issue without being referred to secondary inspection, "render[ing] any notion of [a] 'chilling effect' or fear of future injury entirely spurious." (*Id.* at 29.)

---

[16] As previously noted, "[i]n resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings." *Makarova*, 201 F.3d at 113.

Plaintiffs respond that Defendants' targeting of Plaintiffs for secondary inspection and questioning would reasonably chill them and other journalists from covering issues at the United States-Mexico border or publishing or speaking in a way critical to the U.S. government because they fear being detained and questioned about their journalism at the border in the future.  (Pls.' Br., Dkt. 31, at 25.)  Plaintiffs further argue that the documents submitted by Defendants, namely, Assistant Director Firing's Declaration and the CBP records, in fact, confirm Plaintiffs' allegations "that border officers improperly collected and retained information from Plaintiffs that pertains to their First Amendment protected-newsgathering activities and associations and has nothing to do with a valid immigration or customs purpose."[17]  (*Id.* (citations omitted.)

The Court finds that Plaintiffs have failed to sufficiently plead the actual chilling of their First Amendment rights so as to constitute an injury for standing purposes.  Apart from the conclusory statement that the CBP officers' past conduct "would reasonably chill Plaintiffs and other journalists from traveling to Mexico to report on U.S.-Mexico border issues" (*see* Compl., Dkt. 1, ¶ 6), Plaintiffs do not allege that they were *actually* chilled from pursuing any journalistic activities.  While Plaintiffs allege that they *fear* they will be referred to secondary inspection and asked questions about their journalism and sources while crossing the border in the future (*see* Compl., Dkt. 1, ¶¶ 60, 82, 102, 127, 156), fear alone is insufficient.  For fear to suffice as a concrete and immediate harm "constitut[ing] a present injury to [P]laintiff[s'] First Amendment rights," Plaintiffs "must 'proffer some objective evidence to substantiate their claim that the challenged conduct has deterred them from engaging in protected activity.'"  *Nitke v. Ashcroft*, 253 F. Supp.

---

[17] Plaintiffs also point out that the CBP records documenting the questioning of Plaintiffs in secondary inspection might "memorialize the individual border officers' impressions of their inspections of Plaintiffs, [but] only reflect the information they chose to record," and say nothing "about Plaintiffs' experiences of their interrogations."  (Pls.' Br., Dkt. 31, at 29.)

2d 587, 596 (S.D.N.Y. 2003) (alterations omitted) (quoting *Bordell v. General Electric Co.*, 922

F.2d 1057, 1061 (2d Cir. 1991)); *see also Laird v. Tatum*, 408 U.S. 1, 13–14 (1972) ("Allegations

of a *subjective* 'chill' are not an adequate substitute for a claim of specific present *objective* harm

or a threat of specific future harm[.]" (emphases added)).  Plaintiffs do not allege that their fear of

future secondary inspections has deterred them from engaging in First Amendment activities; in

fact, they expressly state that they "intend[] to continue traveling internationally to document

issues of national and global importance."[18]  (*See* Compl., Dkt. 1, ¶¶ 60, 82, 102, 127, 156.)  Thus,

Plaintiffs have failed to plead an injury based on the actual chilling of their First Amendment

---

[18] The Court bases this finding solely on the insufficiency of the pleadings, and not on the CBP records of Plaintiffs' border crossings following the incidents in question, which Defendants argue "belie any supposed fear of future interaction with [the] CBP[.]" (Defs.' Br., Dkt. 30, at 28.) These records document that, since the secondary inspections at issue, Guan has crossed back into the United States from abroad at least two times; Nakamura at least eight times; Abramson at least once; Cahana at least six times; and Drehsler at least 31 times. (Defs.' Br., Dkt. 30, at 34 (citing Firing Decl. Exs. 1, 3, 5, 7, 9, Dkt. 34, at ECF 3, 12, 24, 33–34, 46–47).) However, had Plaintiffs alleged that they were actually deterred from covering migrant conditions at the United States-Mexico border after being subjected to secondary inspections, these records would not necessarily contradict those claims, except perhaps as to Plaintiff Drehsler.  First, many of Plaintiffs' subsequent border crossings involved entry from Europe, Asia, or Canada, as opposed to Latin America, and appear unrelated to their coverage of migrant conditions at the United States-Mexico border.  (*See* Firing Decl. Ex. 1, Dkt. 34, at ECF 3 (Guan entering the United States once via San Ysidro, and four times by air from London, Hong Kong, or Vienna); *id.* Ex. 3, Dkt. 34, at ECF 12 (Nakamura entering the United States once by air from Mexico City, four times from Mexico at the Brownsville gateway bridge, and three times from Asia); *id.* Ex. 5, Dkt. 34, at ECF 24 (Abramson entering the United States once by air from Moscow); *id.* Ex. 7, Dkt. 34, at ECF 33–34 (Cahana entering the United States once via San Ysidro, once by air from El Salvador, and three times from Canada or Turkey).  *But see id.* Ex. 8, Dkt. 34, at ECF 46–47 (Drehsler entering the United States 31 times from Mexico).)  And second, subsequent border crossings from Latin America notwithstanding, Plaintiffs could still argue that they were deterred from engaging in the full measure of journalistic activities they otherwise would have pursued but for the secondary inspections at issue.  In any event, had Plaintiffs alleged that they were actually deterred from further journalistic involvement covering migrant conditions at the border, whether that was in fact so would be a factual dispute inappropriate for the pleadings stage.  *Cf. Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001) ("Where a party can show no change in his behavior, he has quite plainly shown no chilling of his First Amendment right to free speech." (citing *Singer v. Fulton County*, 63 F.3d 110, 120 (2d Cir. 1995))).

rights.[19] *Cf. N.Y.C.L.U. v. N.Y.C. Transit Auth.*, 675 F. Supp. 2d 411, 427 (S.D.N.Y. 2009) (finding an alleged chilling effect to constitute an injury for standing purposes where the "[p]laintiff has established that it wishes to exercise its purported First Amendment right . . . , that its attempts to do so have been frustrated in the past, and that its attempts will continue to be frustrated in the future absent judicial relief"), *aff'd*, 652 F.3d 247 (2d Cir. 2011), *opinion amended and superseded*, 684 F.3d 286 (2d Cir. 2012), and *aff'd*, 684 F.3d 286 (2d Cir. 2012).

Though Plaintiffs have failed to adequately allege a chilling effect on their First Amendment rights, the Court nevertheless finds that Plaintiffs have sufficiently pleaded an injury-in-fact.  Importantly, "[c]hilled speech is not the *sine qua non* of a First Amendment claim.  A plaintiff has standing if he can show *either* that his speech has been adversely affected by the government [action] or that he has suffered some other concrete harm," including "non-speech related harms." *Dorsett v. City of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013) (per curiam) (emphasis in original); *see Gill v. Pidlypchak*, 389 F.3d 379, 383 (2d Cir. 2004) ("[S]tanding is no issue whenever the plaintiff has clearly alleged a concrete harm independent of First Amendment chilling.  It is only a problem where no harm independent of the First Amendment is alleged.  For there, the only injury is the chilling itself."); *see also Knight First Amendment Inst.*, 302 F. Supp. 3d at 557 (acknowledging limits on plaintiffs' ability to communicate as "cognizable injuries-in-fact . . . regardless of whether they are harms cognizable under the First Amendment").  "[N]on-speech related harms" that the Second Circuit has recognized as "sufficient to give a plaintiff standing" include losing a government contract, the revocation of a building permit, the refusal to

---

[19] By contrast, in *Dousa*, the court found that a pastor who was also profiled in the DHS database had standing to seek injunctive relief after being referred to secondary inspection and questioned about her work involving the migrant caravans because she alleged "that she has withdrawn from many of her normal religious activities as a result of th[e] [CBP] surveillance." *See Dousa*, 2020 WL 434314, at *5.

enforce zoning laws, and—as relevant here—"additional scrutiny at border crossing." *Dorsett*, 732 F.3d at 160 (citing, *inter alia*, *Tabbaa*, 509 F.3d at 102).

In *Tabbaa*, plaintiffs who had attended an Islamic conference in Canada were detained by CBP officers in secondary inspection at the Buffalo port of entry for four to six hours, questioned, and fingerprinted.  509 F.3d at 94.  The plaintiffs "were questioned about, *inter alia*, their past travels, their relationship to other vehicle occupants, what occurred at the [] [c]onference, and why they had attended the conference." *Id.*  After confirming the government's broad authority under the Fourth Amendment to conduct "routine" searches and questioning of individuals at the border,[20] the Second Circuit nonetheless concluded that the defendants' conduct constituted "a significant penalty, or disability" on the plaintiffs' First Amendment associational rights, even though the searches were considered routine for Fourth Amendment purposes.[21] *Id.* at 99, 102.

In reaching this conclusion, the Second Circuit explained:

> Government action can constitute a direct and substantial interference with associational rights even if there is no prior restraint and no clear chilling of future expressive activity.  For example, when government action substantially penalizes members of a group for exercising their First Amendment rights, that penalty in itself can constitute a substantial burden, even if the government did not prevent the group from associating and regardless of any future chilling effect.

*Id*. at 101.  "[T]he Constitution's protection is not limited to direct interference with fundamental rights. . . .  'Freedom[s] [under the First Amendment] are protected not only against heavy-handed

---

[20] The Second Circuit explained that while "the precise line between what is routine and what is not routine . . . has not been clearly delineated[,] . . . it has been held that '[r]outine searches include those searches of outer clothing, luggage, a purse, wallet, pockets, or shoes which, unlike strip searches, do not substantially infringe on a traveler's privacy rights.'" *Tabbaa*, 509 F.3d at 98 (quoting *United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006)).

[21] Notably, the Second Circuit came to this conclusion while analyzing the merits of the plaintiffs' First Amendment claims, as the defendants did not dispute that the plaintiffs had standing.  *See Tabbaa*, 509 F.3d at 96 n.2.

frontal attack, but also from being stifled by more subtle governmental interference.'" *Healy v. James*, 408 U.S. 169, 183 (1972) (quoting *Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960)).

Here, the Court similarly concludes that Plaintiffs have plausibly alleged that their associational and expressive rights were injured by the secondary inspections to which they were subjected at the United States-Mexico border in December 2018 and January 2019. When crossing the border into the United States, individuals are generally subjected to primary inspection, where CBP officers will inspect their travel documentation, attempt to verify their identity and citizenship, and ask "questions regarding their travel." (Firing Decl., Dkt. 30-1, ¶ 10.) Individuals may be referred to secondary inspection with or without suspicion, where they may be questioned regarding

> their admissibility; the purpose and intent of their travel; their occupation; the identity of any traveling companions; the identity of any persons and places to be visited in the United States; the contents of their baggage and vehicles; the expected length of their visit; the identity of all persons and places visited abroad; the nature of any affiliations with educational or professional institutions; the value of any cash and other monetary instruments in a traveler's possession; and the identity of a traveler's next destination, among other things.

(Firing Decl., Dkt. 30-1, ¶ 11.)

Plaintiffs allege that they were each singled out for additional scrutiny—during which they were asked questions beyond the regular scope of secondary inspections—while crossing the border, solely and specifically because of their involvement covering conditions at the border as photojournalists. Guan, Nakamura, Abramson, and Drehsler were all stopped for secondary inspection when crossing into the United States from Mexico at the San Ysidro port of entry. On December 29, 2018, Guan and Nakamura were sent to secondary inspection, made to wait for 60 to 90 minutes, and then questioned in separate rooms for between 40 to 60 minutes about, *inter alia*, their work as photojournalists, knowledge of the migrant caravans, and whether they could identify photos of certain individuals. (Compl., Dkt. 1, ¶¶ 44–45, 67–69; *see id.* ¶¶ 46–49, 70–

71.)  On December 30, 2018, Drehsler was sent to secondary inspection, where officers searched her belongings and questioned her for 10 to 15 minutes.  (*Id.* ¶¶ 133–34.)  She was then escorted into a separate room, and questioned about, *inter alia*, what she had seen in Tijuana, including at migrant shelters.  (*Id.* ¶¶ 136–37.)  She was told that, if she planned to cross the border at San Ysidro in the future, she should "budget an additional hour to pass through secondary inspection." (*Id.* ¶ 138.)  Thereafter, Drehsler was stopped two additional times while crossing the border at San Ysidro, once on January 2, 2019, and again on January 4, 2019.  (*Id.* ¶¶ 140, 146.)  On January 2, 2019, she was sent to secondary inspection, made to wait for 15 minutes, and questioned for 15 to 20 minutes about, *inter alia*, whether she could identify photographs of activists working near the border, what she had seen around the caravans in Mexico, and what she thought of the caravan. (*Id.* ¶¶ 141–45.)  She was again told that she should expect to be stopped for secondary inspection again in the future.  (*Id.* ¶ 144.)  On January 4, 2019, Drehsler was sent to secondary inspection, made to wait for 45 minutes, then taken to a separate room, where officers inspected her belongings and questioned her about, *inter alia*, her journalism work, what she had seen at a migrant shelter in Mexico, and her prior experience as a journalist in Syria.  (*Id.* ¶¶ 146–49.)  On January 5, 2019, Abramson was taken to secondary inspection, patted down, had his bag (which included confidential source materials and personal reflections) searched, and questioned about the contents of his belongings, such as his book of source materials, and his work as a photojournalist.  (*Id.* ¶¶ 89–91.)  About 20 to 30 minutes after the first search in secondary inspection, Abramson was patted down again, and questioned for an additional 30 to 40 minutes about his work as a photojournalist and his knowledge of the migrant caravans.  (*Id.* ¶¶ 92–95.)

Cahana was stopped for secondary inspection when she was passing through the United States on her way from Canada to Mexico, and again when she returned to the United States after

being denied entry into Mexico. On January 17, 2019, at the U.S. Customs preclearance checkpoint in the Montreal airport, Cahana was referred to secondary inspection, and questioned for ten minutes about her plans in Mexico. (*Id.* ¶¶ 109, 111.) Once Cahana arrived at the airport in Mexico City, Mexican authorities confiscated her cell phone, pressured her to sign Spanish forms that she did not understand, detained her for over 12 hours, denied her entry into Mexico, and placed her on a flight back to the United States. (*Id.* ¶¶ 113–114, 117.) Cahana was told twice that she was being held "because of the Americans." (*Id.* ¶ 116; *see also id.* ¶ 114.) Once Cahana arrived back in the United States, she was again taken to secondary inspection. (*Id.* ¶ 118.) About a week later, Cahana again attempted to enter Mexico, this time by land from Guatemala, but was again denied entry due to an alert associated with her passport. (*Id.* ¶ 121.)

Based on the foregoing allegations, the Court finds that Plaintiffs have sufficiently pleaded an injury-in-fact in the form of the scrutiny they experienced during secondary inspection. *Cf. Tabbaa,* 509 F.3d at 102.

The CBP's retention of records from the searches itself also constitutes an independent harm. Defendants do not dispute or deny that they retain records documenting Plaintiffs' questioning during secondary inspections, and indeed, attach them as exhibits to the instant motion. (*See* Firing Decl., Exs. 1–10, Dkt. 34.) Plaintiffs allege that, as a result of the retained documents, they fear "their ability to travel freely and work as freelance journalists is imperiled." (*See* Compl., Dkt. 1, ¶¶ 61, 83, 103, 128, 157.) While this allegation fails to explain how Plaintiffs anticipate the retention of records impeding their ability to travel in the future, the retention of the information itself constitutes an injury regardless of its effect on Plaintiffs. *See Amidax,* 671 F.3d at 147 ("To establish an injury in fact—and thus, a personal stake in this litigation—[plaintiff] need only establish that its information was obtained by the government." (citation omitted)); *see*

32

also *A.C.L.U. v. Clapper*, 959 F. Supp. 2d 724, 738 (S.D.N.Y. 2013) (finding standing satisfied where "there [wa]s no dispute the Government collected telephony metadata related to the [plaintiff's] telephone calls"), *aff'd in part, vacated on other grounds, remanded*, 785 F.3d 787 (2d Cir. 2015); *Janfeshan v. U.S. Customs & Border Prot.*, No. 16-CV-6915 (ARR) (LB), 2017 WL 3972461, at *7 (E.D.N.Y. Aug. 21, 2017) (noting that the plaintiff "has adequately alleged an injury in fact based on the ongoing effects of the previous search," *i.e.*, the retention of records).

Thus, the Court finds that Plaintiffs have plausibly alleged injuries-in-fact based on the enhanced scrutiny they faced while crossing the border and Defendants' continued retention of records documenting the secondary inspections.

### 2.   Causation

"[A]t the pleading stage of the litigation, the plaintiffs' burden of alleging that their injury is 'fairly traceable' to the challenged act is relatively modest." *Rothstein v. UBS AG*, 708 F.3d 82, 92 (2d Cir. 2013) (alterations and internal quotation marks omitted) (quoting *Bennett v. Spear*, 520 U.S. 154, 171 (1997)).  Moreover, "[a] showing of causation does not require that the plaintiff[s] show that defendant[s'] actions were the only cause of an injury, so long as the plaintiff[s'] injury would not have occurred 'but for' the defendant[s'] action." *M&T Mortg. Corp. v. White*, No. 04-CV-4775 (NGG) (VVP), 2006 WL 47467, at *5 (E.D.N.Y. Jan. 9, 2006) (quoting *Duke Power Co. v. Carolina Env'l Study Grp., Inc.*, 438 U.S. 59, 81 (1978)).

Defendants do not appear to dispute that Plaintiffs satisfy the causation element of standing.  (*See generally* Defs.' Br., Dkt. 30; Defs.' Reply, Dkt. 33.)  Nor should they.  Plaintiffs' alleged injuries, *i.e.*, the additional scrutiny they faced while crossing the border and the CBP's continued retention of records documenting that scrutiny, are a direct result of the actions taken by officers in Defendants' agencies.  Plaintiffs satisfy the causation element of standing.

3.    Redressability

For standing purposes, redressability refers to a "non-speculative likelihood that the injury can be remedied by the requested relief." *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106–07 (2d Cir. 2008) (citing *Lujan*, 504 U.S. at 560–61).  Plaintiffs' injuries are redressable if their requested relief can compensate them for their losses or "'eliminate any effects' caused by [the] defendant[s'] challenged conduct." *Janfeshan*, 2017 WL 3972461, at *6 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 105–06 (1998)).

Here, Plaintiffs request redress in the form of expungement.   "The judicial remedy of expungement of government records about an individual is one [] remedy . . . to vindicate substantial rights[.]"  *Walker v. United States*, 116 F.R.D. 149, 150 (S.D.N.Y. 1987) (internal quotation marks and citation omitted); *see also Fazaga v. Fed. Bureau of Investigation*, 965 F.3d 1015, 1053 (9th Cir. 2020) ("[F]ederal courts can order expungement of records, criminal and otherwise, to vindicate constitutional rights." (collecting cases)).  Expungement serves to redress Plaintiffs' injuries by eliminating the ongoing effects of the alleged constitutional violation.  *See Janfeshan*, 2017 WL 3972461, at *7 ("[Plaintiff's] injury is redressable because he seeks relief to remedy the continuing effects of CBP's search of his phone, specifically, the destruction of any copies of his information[.]"); *cf. Abidor v. Napolitano*, 990 F. Supp. 2d 260, 275 (E.D.N.Y. 2013) (concluding that the plaintiff lacked standing, despite bringing a claim for expungement, because "under the [CBP] regulations[,] he [wa]s [already] entitled to have the materials destroyed" and "the fact that [plaintiff] seeks expungement does not provide a basis to challenge a regulation which provides him with that remedy" (citation omitted)).  Because Plaintiffs have plausibly alleged that they suffered injuries-in-fact fairly traceable to Defendants' conduct and likely redressable via their requested remedy of expungement, the Court concludes that Plaintiffs have standing to bring their First Amendment claim.

34

*       *       *

Defendants' motion to dismiss for lack of standing pursuant Rule 12(b)(1) is denied.

## II.     First Amendment Violation[22]

Having determined that Plaintiffs have standing to bring their claim, the Court proceeds to evaluate, pursuant to Rule 12(b)(6), whether Plaintiffs have sufficiently stated a claim for a First Amendment violation.  Drawing reasonable inferences in Plaintiffs' favor, the Court finds that Plaintiffs have plausibly alleged the deprivation of their First Amendment rights through being targeted for additional scrutiny while crossing the border based on their membership in the media and their journalistic coverage of migrant conditions at the United States-Mexico border.

### A.     First Amendment vs. Fourth Amendment

As an initial matter, the Court rejects Defendant's conception of Plaintiffs' claims as more properly arising under the Fourth Amendment rather than the First Amendment.  Defendants argue that "constitutional claims concerning the lawfulness of searches at the border should be considered under, and in light of, Fourth Amendment jurisprudence" (Defs. Br., Dkt. 30, at 9), and that Plaintiffs impermissibly attempt to "bootstrap what is in reality a Fourth Amendment claim into a First Amendment violation" (*id.* at 2).[23]  (*See also* Defs.' Reply, Dkt. 33, at 8–12.)  In

---

[22] In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the Court considers only the well-pleaded allegations in the Complaint.  *Kiobel v. Royal Dutch Petrol. Co.*, 621 F.3d 111, 123 (2d Cir. 2010); *see also Goel v. Bunge, Ltd.*, 820 F.3d 554, 558–59 (2d Cir. 2016).

[23] Defendants point to Plaintiffs' characterization of the secondary inspections as not "routine," a term of art in Fourth Amendment jurisprudence, as evidence that Plaintiffs truly seek to bring a Fourth Amendment claim.  While the Fourth Amendment does distinguish between "routine" searches (like searches of outer clothing and luggage) that do not infringe on individuals' privacy rights and "non-routine" searches (like strip, body cavity, or involuntary x-ray searches) that may be performed only with reasonable suspicion of criminality, *see Tabbaa*, 509 F.3d at 97–98 (citing *Irving*, 452 F.3d at 123; *Montoya de Hernandez*, 473 U.S. 531, 541 n.4 (1985)), Plaintiffs' semantic use of the term "not routine" to distinguish the scrutiny they underwent, which involved questions about their journalism, from the standard admissibility-related questions to

35

Defendants' view, the Government's paramount interest in securing its borders means there is little Plaintiffs may do to second-guess decisions by CBP officers at the border. (Defs.' Br., Dkt. 30, at 9.)

To the extent Defendants suggest that government conduct at the border is cabined *only* by the Fourth Amendment—which itself is limited to individuals seeking to enter the country—such a suggestion is nonsensical.  True, "the expectation of privacy [is] less at the border than in the interior," *Montoya de Hernandez*, 473 U.S. at 538, and searches at the border "have been considered to be 'reasonable' [under the Fourth Amendment] by the single fact that the person or item in question had entered into our country from outside," *United States v. Ramsey*, 431 U.S. 606, 619 (1977).[24]  And true, the Government's interest in national security is often compelling enough to satisfy strict scrutiny and overcome claims of constitutional violations.  *See, e.g.*, *Tabbaa*, 509 F.3d at 105.  But the border search doctrine under the Fourth Amendment is not so expansive as to entirely overshadow the Bill of Rights simply because the challenged Government conduct occurs at the border.  *See, e.g.*, *United States v. FNU LNU*, 653 F.3d 144, 149–50 (2d Cir. 2011) (whether border questioning is "routine" under the Fourth Amendment is irrelevant to whether the interrogation triggered "*Miranda*'s prophylactic requirement under the Fifth Amendment" (collecting cases)).

---

which most other travelers are subjected, has no legal significance, and does not convert their claims into ones under the Fourth Amendment (*see, e.g.*, Pls.' Br., Dkt. 31, at 12; *see also id.* at 7–8 (noting that border officers' actions may implicate the First Amendment even though "the searches were routine under the Fourth Amendment" (citing *Tabbaa*, 509 F.3d at 102 n.4)).

[24] Accordingly, the Government has "broad plenary power[] [under the border search doctrine] to conduct [] 'routine' searches at the border even without 'reasonable suspicion that the prospective entrant has committed a crime," *see United States v. Levy*, 803 F.3d 120, 122 (2d Cir. 2015) (quoting *Tabbaa*, 509 F.3d at 97–98), while more invasive, non-routine searches require a showing of individualized suspicion, *see Irving*, 452 F.3d at 124.

And contrary to Defendants' suggestion that only the Fourth Amendment protects individuals seeking to enter the country, the Second Circuit has explicitly addressed First Amendment claims arising out of secondary inspection at the border separately from Fourth Amendment claims arising out of the same searches.[25]  *See Tabbaa*, 509 F.3d at 101–07 (independently evaluating whether border search violated the First Amendment after concluding such searches did not violate the Fourth Amendment); *see also House v. Napolitano*, No. 11-CV-10852 (DJC), 2012 WL 1038816, at *13 (D. Mass. Mar. 28, 2012) ("That the initial search and seizure occurred at the border does not strip [plaintiff] of his First Amendment rights[.]").  As the Second Circuit explained in *Tabbaa*, "distinguishing between incidental and substantial burdens under the First Amendment requires a different analysis, applying different legal standards, than distinguishing what is and is not routine in the Fourth Amendment border context."  509 F.3d at 102 n.4.  This approach makes sense.  That the Government conducts a search, thereby implicating

---

[25] In support of their framing of the relevant issue here as one arising out of the Fourth Amendment rather than the First Amendment, Defendants cite to cases involving Fourth Amendment challenges to the border search doctrine where courts refused to create an expressive-materials exception to the general rule that the government may search items being brought into the country without a warrant.  (Defs. Br., Dkt. 30, at 11 (citing *Abidor v. Napolitano*, 990 F. Supp. 2d 260, 278 (E.D.N.Y. 2013); *United States v. Ickes*, 393 F.3d 501, 506 (4th Cir. 2005); *United States v. Arnold*, 533 F.3d 1003, 1010 (9th Cir. 2008)).)  Those cases are inapposite, as they stand only for the proposition that the First Amendment does not limit the Government's general authority to inspect contraband even if that contraband may contain expressive material.  *See Ickes*, 393 F.3d at 505–07; *Arnold*, 533 F.3d at 1006–10.  Neither *Arnold* nor *Ickes* makes the broad proclamation Defendants suggest that the First Amendment does not apply *at all* at the border.  Furthermore, following *Arnold* and *Ickes*, both the Fourth and Ninth Circuits have clarified that the border search doctrine is restricted to searches made for border-related purposes.  *See United States v. Cano*, 934 F.3d 1002, 1019 (9th Cir. 2019) (concluding that "the border search exception is restricted in scope to searches for contraband"); *United States v. Aigbekaen*, 943 F.3d 713, 724 (4th Cir. 2019) ("If the border search exception is to retain any distinction from the Government's generalized interest in law enforcement and combatting crime, it cannot be invoked to sanction invasive and nonroutine warrantless searches of all suspected domestic criminals, nor the suspected instrumentalities of their domestic crimes." (internal quotation marks and citation omitted)).

Fourth Amendment rights, does not mean that the same search may not also implicate First Amendment rights; it goes without saying that a single government action may violate multiple constitutional rights.  Or, as Plaintiffs argue here, a single government action may violate one constitutional right while not violating another.

In sum, Plaintiffs do not, as Defendants suggest, seek a journalists' exception to the relaxed Fourth Amendment standards surrounding border searches.  Their allegations do not touch on Fourth Amendment concepts like reasonable expectation of privacy.  Rather, they allege that Defendants' actions *via* the border searches impermissibly infringe on Plaintiffs' First Amendment rights to freedom of speech, freedom of the press, and freedom of association.  Based on these allegations, it is appropriate and correct to consider their claims as alleging a violation of the First Amendment.

### B.      Stating a First Amendment Claim

"[I]mplicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends."  *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984).   In evaluating whether government conduct violated an individual's First Amendment rights, courts consider "whether and to what extent defendants' actions burdened that right," and whether the conduct at issue passes muster under the appropriate level of scrutiny.  *See Tabbaa*, 509 F.3d at 101–03.  Plaintiffs argue that Defendants infringed on their First Amendment rights by (1) targeting them for additional scrutiny at the United States-Mexico border based on their membership in the media and association with their sources (Pls.' Br., Dkt. 31, at 13–18); (2) compelling them to disclose constitutionally protected information about their news-gathering and associational activities (*id.* at 19–25); and (3) chilling them from engaging in activities protected by the First Amendment (*id.* at 25–27).  As discussed *supra*, Plaintiffs fail to allege a chilling effect

38

from Defendants' questioning.  However, the Court finds that Plaintiffs plausibly allege that they were subjected to higher scrutiny at the border, and targeted for this additional scrutiny based on their First Amendment activities, *i.e.*, their membership in the media and the focus and content of their journalism.

Defendants do not dispute that Plaintiffs were exercising their First Amendment rights when reporting on migrant conditions at the border and associating with other members of the media, as well as their sources.  (*See generally* Defs.' Br., Dkt. 30.)  They argue, however, that Plaintiffs fail to sufficiently allege that they were targeted based on their journalism, and that the CBP questioning at issue constituted, at best, an incidental burden on Plaintiffs' First Amendment rights.  The Court disagrees.

Defendants are correct that "[m]ere incidental burdens on the right to associate do not violate the First Amendment; rather, 'to be cognizable, the interference with plaintiffs' associational rights must be direct and substantial or significant.'"  *Tabbaa*, 509 F.3d at 101 (alterations omitted) (quoting *Fighting Finest, Inc. v. Bratton*, 95 F.3d 224, 228 (2d Cir. 1996)). And, as discussed *supra*, Plaintiffs have failed to allege a chilling of their future expressive activity as a result of Defendants' conduct.  However, "when government action substantially penalizes members of a group for exercising their First Amendment rights, that penalty in itself can constitute a substantial burden, even if the government did not prevent the group from associating and regardless of any future chilling effect."  *Tabbaa*, 509 F.3d at 101 (citing *Healy*, 408 U.S. at 181–84).  The Court finds that Plaintiffs have plausibly alleged that they were targeted for additional scrutiny based on their exercise of their First Amendment rights through their journalism and association with their sources and other members of the media, and that this additional scrutiny constituted a substantial burden.

>  1.  Plaintiffs plausibly allege that they were targeted for secondary inspection based on their journalism work

"The First Amendment generally empowers a journalist with no 'special privilege' merely for the exercise of his craft." *United States v. Carpenter*, 791 F.2d 1024, 1034 (2d Cir. 1986) (citation omitted), *aff'd*, 484 U.S. 19 (1987). However, like all individuals, journalists should not be targeted and penalized on the basis of their associations or content of their expression. *See, e.g.*, *Pen Am. Ctr., Inc. v. Trump*, 448 F. Supp. 3d 309, 326–27 (S.D.N.Y. 2020), *stay granted, motion to certify appeal granted*, 2020 WL 5836419 (S.D.N.Y. Oct. 1, 2020). When the Government subjects a specific group to a burden such as extensive processing, "the prospect of being singled out for such extensive processing could reasonably deter others from associating" in the future, thereby "implicat[ing] the protections of the First Amendment." *Tabbaa*, 509 F.3d at 102 (citing *Lyng*, 485 U.S. at 367; *Fighting Finest, Inc.*, 95 F.3d at 228).

Plaintiffs allege that, around the time the migrant caravan started traveling from Honduras to the United States in October 2018, the DHS was maintaining a secret database of individuals whom officials believed should be targeted for screening at the border. (Compl., Dkt. 1, ¶ 29.) According to Plaintiffs, the DHS database in which Plaintiffs were all profiled was linked to an information-sharing initiative between the CBP and the Government of Mexico. (*Id.* ¶ 31.) The database labeled Plaintiffs as "Media/Photographer," and indicated that each had an alert placed on their records. (*See id.* at 14; *id.* ¶ 35.) Plaintiffs Drehsler, Guan, and Nakamura had a green "X" placed across their headshot, indicating that they had been "arrested, interviewed, or had their visa or SENTRI [] pass revoked." (*See id.* at 14; *id.* ¶ 32.) NBC 7 San Diego reported that the DHS also maintained a dossier on each individual featured in the database, including, presumably Plaintiffs. (*Id.* ¶ 37.) Guan, Nakamura, Abramson, and Cahana were all approached by Mexican authorities on the Mexico side of the border at some point in December 2018, and had their

40

passports photographed.  (*Id.* ¶¶ 43, 66, 88, 107.)  Plaintiffs further allege that, when they attempted to cross the border into the United States in December 2018 and January 2019, each was selected for secondary inspection and questioned about their journalistic work and activities in Mexico.  (*Id.* ¶ 38.)  Drawing all reasonable inferences in Plaintiffs' favor, it can be readily inferred that they were selected for additional scrutiny based on their reporting on migrant conditions at the border.

Defendants argue that there is "no plausible factual basis" for Plaintiffs' allegations that they were targeted based on their journalism because (1) the secondary inspections occurred after Mexican authorities had placed alerts on their passports, and (2) the DHS database was not limited to members of the media, but also to individuals such as "suspected organizers, coordinators, or instigators" associated with the caravans.[26]  (Defs.' Br., Dkt. 30, at 13.)  Furthermore, Defendants argue, the Government's paramount mission in securing the border justifies any decision to select Plaintiffs for questioning, and such a decision was based on Plaintiffs' knowledge of information related to the migrant caravans, rather than due to Plaintiffs' professional status as journalists.[27]  (*Id.* at 13–14.)

---

[26] Defendants seem to also suggest that the database was innocuous in that it included only routine information about which CBP officers typically ask of individuals at the border, such as their name, date of birth, and occupation.  (Defs.' Br., Dkt. 30, at 13.)  However, along with this routinely collected information, the DHS was interested in the status (or "disposition") of the individuals in the database, such as whether they had been interviewed or were still "pending encounter."  (*See* Compl., Dkt. 1, ¶ 36.)

[27] In a footnote, Defendants quote a letter written by the CBP's Executive Director of its Office of Field Operations, Randy J. Howe, stating: "A number of journalists and photographers were identified by Mexican Federal Police as possibly assisting migrants in crossing the border illegally and/or as having some level of participation in the violent incursion events[.]"  (Defs.' Br., Dkt. 30, at 14 n.8 (quoting Letter from Randy J. Howe, Executive Director, Office of Field Operations, U.S. Customs and Border Protection to Mana Azarmi, Center for Democracy & Technology (May 9, 2019)).)  Defendants do not, however, provide any reason to think that

These arguments do not overcome the plausibility of Plaintiffs' claims that their inclusion in the DHS database suggests that they were targeted based on their coverage of migrant conditions at the border. *See Dousa*, 2020 WL 434314, at *10 ("The Government's decision to place [plaintiff in the DHS database,] for example, seems to be quite clearly linked to her work on the border."). First, the fact that Mexican authorities stopped Guan, Nakamura, Cahana, and Abramson prior to their detention in secondary inspection does not contradict Plaintiff's claims of being targeted by Defendants' agencies, as they allege that the database containing the alerts on Plaintiffs was jointly associated with and maintained by the CBP and Mexican Government.[28]  (*See* Compl., Dkt. 1, ¶ 31.)  Furthermore, though Mexican authorities informed Drehsler that her passport had been flagged (*id.* ¶ 135), it is unclear whether it had been flagged by the CBP, Mexican Government, or jointly by the two.  Indeed, the Complaint alleges that when Cahana asked the Mexican authorities who detained her in January 2019 whether she was being stopped because of "the Americans," Cahana understood the officer to have answered "yes." (*Id.* ¶ 114.)  In any event, Defendants' contrary argument, in effect, that Plaintiffs were subjected to greater scrutiny only *because* Mexican authorities placed alerts on Plaintiffs' identification—and not because of Defendants' actions or at Defendants' direction—would require the Court to improperly assume the truth of certain facts urged by Defendants at this stage of the proceedings.[29]

---

*Plaintiffs* were identified as possibly having assisted migrants in crossing the border, or had any involvement in unlawful activities.

[28] Furthermore, Defendants' assertion that Mexican authorities placed the alerts on Plaintiffs' profiles is a factual issue that the Court cannot consider in deciding this motion.

[29] If anything, the more plausible inference is that the "Americans," rather than the Mexican government, were responsible for the heightened scrutiny on Plaintiffs, given the Government's interest in Plaintiffs' coverage of the migrant caravans, even if only as a potential source of law-enforcement-related intelligence.

Second, the fact that *other* individuals in the DHS database may have been targeted due to *different* connections to the migrant caravans does not negate the claim that *Plaintiffs* were targeted for their journalistic role in covering the caravans.  For example, border officers could have targeted some individuals for their work as lawyers on migrant issues while simultaneously targeting others for their work as journalists on those issues; the two plainly are not mutually exclusive.  Indeed, that Plaintiffs were questioned about their encounters and observations while working as journalists covering the migrant situation confirms as much and further confirms that Plaintiffs were targeted because of the subject matter of their coverage.

Lastly, the fact that the Government targeted Plaintiffs because they had information about the migrant caravans, a matter within Defendants' purview and responsibility, is of little consequence, given that Plaintiffs possessed that information by virtue of their position in the media and journalistic investigation and efforts.  *Cf. Branzburg v. Hayes*, 408 U.S. 665, 667–68 (1972) (seeking disclosure of source information the journalist had by virtue of his position in the media); *In re McCray, Richardson, Santana, Wise, Salaam Litig.*, 991 F. Supp. 2d 464, 467 (S.D.N.Y. 2013) (seeking disclosure of film and audio outtakes that filmmaker had by virtue of its role in producing a documentary).  And as Defendants suggest, although the Government's interest in that information may be paramount, the weighing of that governmental interest against Plaintiffs' competing First Amendment rights occurs at the scrutiny analysis, not when the Court considers whether Plaintiffs have been targeted in the first place based on the exercise of their First Amendment rights.  *See Tabbaa*, 509 F.3d at 101–03 (confirming that "[g]overnment action can constitute a direct and substantial interference with associational rights even if there is no prior restraint and no clear chilling of future expressive activity," but affirming grant of summary judgment in government's favor where evidence failed to showed that compelling government

43

interest in protecting against terrorism "could not have been 'achieved through means significantly less restrictive of [plaintiffs'] associational freedom'" (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984))).

2.  Plaintiffs plausibly allege that the questioning constituted a substantial burden

Like the defendants in *Tabbaa*, Defendants argue that their conduct constitutes only an incidental burden on Plaintiffs' speech and associational rights because they did not "order[] [Plaintiffs] to make specific statements they did not wish to make or to refrain from associating with other specific people or categories of people." (Defs.' Br., Dkt. 30, at 12); *see also Tabbaa*, 509 F.3d at 101 ("Defendants assert that their actions only incidentally interfered with plaintiffs' associational rights, if at all, because [] CBP did not order plaintiffs to refrain from associating with others . . . , nor did it prevent plaintiffs from doing so[.]"). As the Second Circuit did in *Tabbaa*, the Court rejects this argument. Government action that imposes a penalty on individuals' exercise of their First Amendment rights may constitute a "substantial burden" on those rights "even if the government did not prevent the group from associating and regardless of any future chilling effect." *See Tabbaa*, 509 F.3d at 101 (citing *Healy*, 408 U.S. at 181–84).

As discussed *supra*, individuals entering the country at a port of entry are generally subjected to questioning by CBP officers about, *inter alia*, their admissibility, and goods they are bringing into the country. *See, e.g.*, *id.* at 100 (citing 19 U.S.C. § 1582; 19 U.S.C. § 1433(e); 8 U.S.C. § 1225(b)). Here, however, Plaintiffs were singled out for heightened scrutiny and compelled to answer questions unrelated to their admissibility into the country.[30] When Plaintiffs

---

[30] Defendants argue that, while the First Amendment protects against the forced disclosure of identities of associates and compelled speech in general, this right is not unique to journalists, and that a finding that Plaintiffs were compelled here would invalidate all CBP questioning of individuals at the border. (*See* Defs.' Br., Dkt. 30, at 15–17.) This argument lacks merit, as the crux of Plaintiffs' argument is premised on having been subjected to an *enhanced* scope of questioning from which most other travelers are exempt—that is, they were questioned about, *inter*

attempted to enter the United States during the incidents in question, they were stopped for secondary inspection, and taken to a separate room for questioning. (Compl., Dkt. 1, ¶¶ 44–45, 67–69, 92–93, 110–11, 118–19, 133–38, 140–43.) The lengths of the questioning varied, with Abramson briefly questioned during a patdown and search of his belongings and then questioned for 30 to 40 minutes, and Guan questioned for approximately one hour.[31] (*Id.* ¶¶ 45, 90–91, 95.) There is no indication, however, that Plaintiffs were told in advance how long they would be questioned for, although Drehsler was instructed to budget an additional hour when traveling through San Ysidro in the future. (*See id.* ¶ 138.) Cahana, furthermore, was detained for over 12 hours at the airport in Mexico City (*id.* ¶¶ 113, 117), and ultimately denied entry into Mexico and returned to the United States, after which she was subjected to further questioning (*id.* ¶¶ 117, 119). Each time Cahana's passport was scanned, the machine printed a ticket with an "X" over her headshot. (*Id.* ¶¶ 109, 118.) It is yet unclear how coordinated, if at all, the efforts were between the CBP and Mexican authorities in placing an alert on Cahana's passport and denying her entry into Mexico, but Cahana was told at the airport that "the Americans" were involved, and CBP officers were aware of the prior incident during which Cahana was stopped by Mexican authorities near the border. (*See id.* ¶¶ 114, 116, 119.)

---

*alia*, their observations in Mexico, their background in journalism, and whether they knew any "coyotes," or pro- or anti-migrant activists. General questions about a traveler's admissibility and contents of their luggage is one thing; detailed questions about a journalist's work and sources is far different in terms of the perceived coerciveness of the questioning, the confidentiality of the information sought, and the relatedness of the questioning (or lack thereof) to the Government's national security interest.

[31] Guan, Nakamura, Cahana, and Drehsler were all questioned by plainclothes officers (Compl., Dkt. 1, ¶¶ 45, 6869, 119, 134–38), which Plaintiffs argue "indicat[ed] a special operation" (Pls.' Br., Dkt. 11, at 24).

45

Case 1:19-cv-06570-PKC-RER   Document 38   Filed 03/30/21   Page 46 of 52 PageID #: 574

Plaintiffs further allege that, during their questioning by border authorities, they were asked about the subject of their journalism and people with whom they associate in ways that were irrelevant to determining whether they legally could enter the country. Plaintiffs were questioned about, for example, whether they have associated with certain individuals connected to the migrant caravans,[32] and about people with whom they associated in the press. (*See, e.g.*, *id.* ¶¶ 47 (Guan was asked whether he "knew smugglers, activists, or journalists who assisted migrants in crossing the border"), 49 (Guan was asked "whether he knew any 'coyotes' or activists who were pro-migrant or anti-migrant"), 71 (Nakamura was asked "whether he had interacted with caravan organizers or activists who may have assisted people in crossing the border"), 94 (Abramson was asked "whether he knew of any groups assisting the migrant caravan"), 111 (Cahana was asked about "which press outlets she had worked for in the past"), 136 (Drehsler was asked to provide "her editor's phone number"), 143 (Drehsler was asked "whether she was familiar with [the caravan's] leadership to the extent it had leaders"), 149 (Drehsler was asked about "the people with whom she had associated [in Syria], and whether she was affiliated with any organizations or groups").) Guan and Nakamura were asked whether they recognized, *i.e.*, whether they have had past associations with, individuals in a book of photographs. (*See* Compl., Dkt. 1, ¶¶ 50 (Guan was asked "to identify any 'instigators' he recognized in th[e] book of photographs"), 72 (Nakamura was asked "to identify anyone he recognized in th[e] set of pictures"); *see also id.* ¶ 142 (Drehsler was asked whether she could "identify any activists working near the U.S.-Mexico

---

[32] The Court notes that the possibility that Plaintiffs have encountered or associated with individuals involved in unlawful activities does not extinguish their right to free association. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 908 (1982) ("The right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected."); *see also Dinler v. City of New York*, No. 04-CV-7921 (RJS) (JCF), 2012 WL 4513352, at *22 (S.D.N.Y. Sept. 30, 2012).

border" if shown photographs, though she was ultimately not shown any photographs).) Guan, Nakamura, and Drehsler and were asked to show officers photos they had taken while covering the border. (Compl., Dkt. 1, ¶¶ 51 (Guan felt like he had no choice but to show officers pictures that he had taken at the border, and officers photographed the pictures on the digital display of Guan's camera), 73 (Nakamura felt like he had no choice but to show officers pictures he had taken at the border, and showed the officer photos from his public Instagram page); *see also id.* ¶ 146 (Drehsler was asked "whether she wanted to show the officers her photographs from that day," which she refused to do).) Abramson, Cahana, and Drehsler were asked about the observations they made while conducting their journalism work and/or what they planned to cover in the future. (*See id.* ¶¶ 94 (Abramson was asked "what he saw while following the caravan, who was leading the group of migrants, and whether these leaders were for or against the U.S. government"), 110 (Cahana was asked what she planned to photograph in Mexico), 137 (Drehsler was asked "to describe what she had seen in Tijuana, including at any migrant shelters"), 143 (Drehsler was asked "what she had seen in Mexico related to the migrant caravan," and whether "word had reached people who were thinking of traveling to the U.S.-Mexico border on how difficult it was to seek asylum"), 148 (Drehsler was asked "about a Mexican migrant shelter she had been covering," whether she had seen "anything suspicious" there, and about the general mood in the shelter), 149 (Drehsler was asked "about the subjects of her photography" in Syria); *see also id.* ¶¶ 90–91 (officers asking Abramson about the book containing notes about his confidential source material).) Plaintiffs allege that such information about their journalism and people pictured in their photos constituted their journalistic work product, and that they exercise journalistic judgment about which photographs to publish. (*Id.* ¶¶ 55, 77, 97, 123, 152.)

Based on the conditions and context of their questioning in secondary inspection, Plaintiffs argue that they felt compelled to comply with the questioning and/or requests to show the officers their photographs, even though the questions related to Plaintiffs' journalism and were irrelevant to the CBP's regular questioning of individuals regarding their admissibility. (*See id.* ¶¶ 51, 73; Pls.' Br., Dkt. 31, at 21–25.) This questioning, Plaintiffs contend, violated their "reporter's privilege." (Pls.' Br., Dkt. 31, at 19.) Defendants counter that the questions were non-invasive and that Plaintiffs were not compelled to answer them, as they were not subjected to any law, rule, subpoena, or court order requiring disclosure, or forced or threatened to divulge. (Defs.' Br., Dkt. 30, at 14–17.) Defendants note that Plaintiffs fail to allege being told that answering the questions was a precondition to entry. (*Id.* at 15.) Defendants further point to Plaintiffs' refusal to comply with certain CBP requests, like Drehsler's refusal to show officers her photographs, as support for their argument that any questions Plaintiffs *did* answer were voluntary. (*Id.* at 16 (citing Compl., Dkt. 1, ¶ 146).) The Court finds Defendants' arguments unconvincing, if not disingenuous.

Though Plaintiffs have not demonstrated compulsion in the form usually implicated by the journalist's privilege,[33] they have plausibly alleged a burden on their First Amendment rights, to

---

[33] The parties analyze the compulsion issue in the context of the "reporter's privilege" or "journalist's qualified privilege." (*See* Defs.' Br., Dkt. 30, at 18–21; Pls.' Br., Dkt. 31, at 19–21.) However, because the Court is not convinced that this doctrine applies here, the Court does not use that framework in resolving this motion. First, it is unclear whether the reporter's privilege "is derived from the First Amendment rather than a federal common law of privileges," so has questionable relevance to Plaintiffs' First Amendment claim. *See United States v. Treacy*, 639 F.3d 32, 43 (2d Cir. 2011); *see also Gonzales v. Nat'l Broad. Co.*, 194 F.3d 29, 35 n.6 (2d Cir. 1999) ("[W]e need not decide whether the privilege is founded in the Constitution."). Second, even if the privilege were mandated by the First Amendment, it exists to "limit[] the circumstances in which litigants may obtain access to press files through *court-ordered discovery*." *Chevron Corp. v. Berlinger*, 629 F.3d 297, 306–07 (2d Cir. 2011) (emphasis added) (citations omitted). Plaintiffs cite to no case in which the reporter's privilege shields production of information outside a court-supervised process. *See, e.g.*, *Gonzales*, 194 F.3d at 36 (affirming district court's grant of motion to compel provision of nonconfidential press materials); *United States v. Cutler*, 6 F.3d 67, 75 (2d Cir. 1993) (affirming in part and reversing in part denial of motion to quash subpoenas);

which they were subjected on the basis of their journalism.  Drawing all reasonable inferences

from Plaintiffs' allegations—that they were made to wait, taken to a separate and often small and

windowless room, and questioned alone by plainclothes officers—the Court finds that Plaintiffs

reasonably may have felt compelled to answer the officers' questions as a precondition of entering

into the country.[34, 35]

---

*United States v. Burke*, 700 F.2d 70, 76–78 (2d Cir. 1983) (affirming grant of motion to quash subpoena based on reporter's privilege); *In re Petroleum Prod. Antitrust Litig.*, 680 F.2d 5, 6 (2d Cir. 1982) (reversing civil contempt sanctions imposed for refusal to comply with subpoena duces tecum requesting names of confidential sources); *Zerilli v. Smith*, 656 F.2d 705, 710–15 (D.C. Cir. 1981) (affirming denial of motion to compel reporter's disclosure of identity of confidential source); *see also Gibson v. Fla. Legislative Investigation Comm.*, 372 U.S. 539, 557–58 (1963) (concluding that a legislative subpoena of the membership list of a branch of the National Association for the Advancement of Colored People violated the organization's First Amendment freedom of association); *Bursey v. United States*, 466 F.2d 1059, 1081–88 (9th Cir. 1972) (holding that First Amendment insulated newspaper staff from being compelled to answer questions about identities of other individuals who worked for the newspaper, or who were members of the Black Panther Party).  Indeed, the limitation of this privilege to the judicial process is consistent with the Second Circuit's rationale for such a privilege, like shielding the press from the "burden . . . [of] heavy costs of subpoena compliance," preventing witnesses from being "sucked into litigation," and avoiding the "symbolic harm of making journalists appear to be an investigative arm of the judicial system, the government, or private parties."  *Chevron Corp.*, 629 F.3d at 307 (quoting *Gonzales*, 194 F.3d at 35).  Furthermore, even if the reporter's privilege applied broadly beyond the evidentiary context, the Court does not construe Plaintiffs as having asserted it.  *See Granite Partners v. Bear, Stearns & Co.*, 184 F.R.D. 49, 52 (S.D.N.Y. 1999) ("The party seeking to assert a claim of privilege has the burden of demonstrating both that the privilege exists and that it has not been waived." (collecting cases)); *see also von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 144 (2d Cir. 1987) (noting the requirements for journalist to raise the privilege under state law); *cf. In re Petroleum Prod. Antitrust Litig.*, 680 F.2d at 6 (finding journalist's privilege asserted where plaintiffs claimed that they were subject to sanctions for their refusal to comply with requests for information).

[34] Of course, discovery may uncover evidence regarding the nature of the questioning during the secondary inspections that makes it unlikely that Plaintiffs felt any sort of pressure or compulsion during the questioning.  That is not, however, a determination the Court can make at this stage in the litigation.

[35] The Court notes that in *Dousa*, the court denied the plaintiff's motion for preliminary injunction on the basis of her First Amendment retaliation claim, finding that her "alleged harm amounts to a single, isolated incident of questioning at the border and a generalized practice of monitoring her border-related activities" and that she was unlikely "to show that she suffered adverse government action that would chill a person of ordinary firmness from engaging in

While, as Defendants note, the questions posed to Plaintiffs could have been related to an ongoing DHS investigation regarding the migrant caravans, they nonetheless exceeded the scope of questioning typically experienced by travelers in secondary inspection, as they did not relate to the admissibility of Plaintiffs or their belongings.   These conditions—causing Plaintiffs to feel compelled to answer questions regarding their associates and sources while covering politically fraught issues at the border—constitute an impairment on Plaintiffs' expressive and associational rights because "the prospect of being singled out for such extensive processing could reasonably deter others from associating" or engaging in such expressive activities in the future. [36, 37]   *See Tabbaa*, 509 F.3d at 102 (citing *Lyng*, 485 U.S. at 367); *cf. House*, 2012 WL 1038816, at *12 (finding "allegations [] sufficient to support a reasonable inference that the [border] agents' interferences with [the plaintiff]'s associational rights were direct and substantial" where the questioning did not "concern[] border control, customs, trade, immigration, or terrorism," and the plaintiff "allege[d] he was questioned solely because of his association with [an organization]").

---

protected activity." *Dousa*, 2020 WL 434314, at *10.   The court nonetheless denied the defendants' motion to dismiss that claim, and allowed the case to proceed to discovery. *See id.* at *11–12.   In *Adlerstein*, the court found, as the Court does here, that the plaintiffs "have adequately alleged [that] [d]efendants' actions would chill a person of ordinary firmness from continuing to engage in the protected activity." *See Adlerstein*, 2020 WL 5846600, at *12.

[36] That the Court previously found that Plaintiffs failed to allege a chilling effect is of no moment here, as the question of whether those in Plaintiffs' positions might be impeded from exercising their associational and expressive rights in the future is separate from whether Plaintiffs allege an actual chilling to themselves. *See Tabbaa*, 509 F.3d at 102 ("It did not matter that the plaintiffs in *Healy* [*v. James*] had not demonstrated a chilling effect on their desire or ability to associate in the future . . . ; rather, there was a substantial burden because of the significant 'disabilities imposed' by the defendant's actions." (quoting *Healy*, 408 U.S. at 183)).

[37] To be clear, the Court is not opining on the permissibility, or "routineness," of these searches under the Fourth Amendment because, as discussed *supra*, a search may be considered both "routine" under the Fourth Amendment, and still impose a burden on an individual's associational rights under the First Amendment. *See Tabbaa*, 509 F.3d at 97–102.

3.    <u>Plaintiffs plausibly allege that such questioning was not narrowly tailored to a compelling governmental interest</u>

Though Plaintiffs plausibly allege that Defendants subjected them to a cognizable burden based on their membership in the media, Defendants' "infringement on [Plaintiffs'] associational rights [would] not [be] unconstitutional so long as it 'serve[s] compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms.'"[38]   *Tabbaa*, 509 F.3d at 102 (quoting *Roberts*, 468 U.S. at 623). Defendants argue that any alleged infringement was narrowly tailored

> to advancing the compelling government interest of protecting the territorial integrity of the United States[,] [as the] CBP had specific concerns . . . about the sharp rise of migrant entrants into the United States and the associated possible violence and violations of federal laws; it thus took appropriate measures to assess the intentions and knowledge of those believed to be involved with or have information about the migrant caravans, in an effort to detect and mitigate potential threats to the Nation.

(Defs.' Br., Dkt. 30, at 17.)   Plaintiffs, on the other hand, argue that a rationale as broad as "ensur[ing] the protection of the Nation's borders" cannot constitute a valid governmental interest and that regardless, Defendants' conduct is not narrowly tailored to such an interest because they "cannot demonstrate that there were no alternative sources for the information" about which they asked Plaintiffs.  (Pls.' Br., Dkt. 31, at 20–21 (emphasis omitted) (citing Defs.' Br., Dkt. 30, at 18).)

The Court focuses on Plaintiffs' second contention, which though based on an incorrect standard, does defeat Defendants' motion.   Plaintiffs are incorrect that Defendants must

---

[38] Though this is the standard under which the court in *Tabbaa* analyzed the burden on the plaintiffs' associational rights, the Honorable Chester J. Straub, "[t]he author of [*Tabbaa*], speaking for himself, d[id] note [] that because the infringement on association [] occurred as part of a border search, a less rigorous form of scrutiny could potentially be warranted."  *Tabbaa*, 509 F.3d at 102 n.5.

demonstrate that Plaintiffs were the only source of the information they sought; "rather, the government must show only that its interest 'cannot be achieved through means *significantly less restrictive* of associational freedoms.'" *Tabbaa*, 509 F.3d at 105 (emphasis in original) (quoting *Roberts*, 468 U.S. at 623). At this stage of the proceedings, the Court cannot make this determination; indeed, Defendants have not sought to make or allege such a showing as part of its motion. *Cf. Tabbaa*, 509 F.3d at 103 (finding operation "carefully circumscribed" and narrowly tailored to compelling governmental interest of protecting the country from terrorism where the operation "applied only to those conferences about which the government had specific intelligence regarding the possible congregation of suspected terrorists, it was limited to routine screening measures, [and] was confined to those individuals . . . whom CBP could establish had attended the conferences in question").

Accordingly, at this stage, the Court concludes that Plaintiffs have plausibly alleged the infringement of their First Amendment rights by Defendants.

**CONCLUSION**

For the reasons stated above, Defendants' motion to dismiss (Dkt. 29) is denied. As discussed *supra* note 1, the Clerk of Court is respectfully directed to correct the caption of the case on the docket.

SO ORDERED.

*/s/ Pamela K. Chen*

Pamela K. Chen
United States District Judge

Dated: March 30, 2021
Brooklyn, New York