# Exhibit D

OFFICE OF INSPECTOR GENERAL

# CBP Targeted Americans Associated with the 2018–2019 Migrant Caravan

Homeland Security

September 20, 2021

OIG-21-62



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

September 20, 2021

MEMORANDUM FOR:    Troy A. Miller
                   Acting Commissioner
                   U.S. Customs and Border Protection

FROM:              Joseph V. Cuffari, Ph.D.        JOSEPH V    Digitally signed by
                   Inspector General               CUFFARI     JOSEPH V CUFFARI
                                                                Date: 2021.09.20
                                                                13:34:20 -04'00'

SUBJECT:           *CBP Targeted Americans Associated with the 2018-2019 Migrant Caravan*

Attached for your information is our final report, *CBP Targeted Americans Associated with the 2018-2019 Migrant Caravan.* We incorporated the formal comments from U.S. Customs and Border Protection in the final report.

The report contains six recommendations identifying action U.S. Customs and Border Protection (CBP) can take to enhance CBP's overall effectiveness. Your office concurred with all six of the recommendations. Based on information provided in your response to the draft report, we consider recommendations 1 through 6 resolved and open. Once your office has fully implemented the recommendations, please submit a formal closeout letter to us within 30 days so that we may close the recommendations. The memorandum should be accompanied by evidence of completion of agreed-upon corrective actions and of the disposition of any monetary amounts. Please send your response or closure request to OIGISPFollowup@oig.dhs.gov.

Consistent with our responsibility under the *Inspector General Act*, we will provide copies of our report to congressional committees with oversight and appropriation responsibility over the Department of Homeland Security. We will post the report on our website for public dissemination.

Please call me with any questions, or your staff may contact Thomas Kait, Deputy Inspector General for Inspections and Evaluations, at (202) 981-6000.

Attachment



# DHS OIG Highlights

### CBP Targeted Americans Associated with the 2018–2019 Migrant Caravan

**September 20, 2021**

## Why We Did This Review

In early 2019, a number of journalists, attorneys, and migrant caravan supporters raised concerns in the media and in litigation that CBP took improper actions against them as a form of harassment due to their work on the migrant caravan. We conducted this review to evaluate these allegations.

## What We Recommend

We made six recommendations to improve CBP's controls on placing and removing lookouts and sharing U.S. citizens' sensitive information with foreign countries.

**For Further Information:**
Contact our Office of Public Affairs at (202) 981-6000, or email us at DHS-OIG.OfficePublicAffairs@oig.dhs.gov

## What We Found

U.S. Customs and Border Protection (CBP) officials placed lookouts on U.S. travelers suspected of potential criminal activity. However, many CBP officials were unaware of CBP's policy related to placing lookouts. Therefore, CBP may have inadvertently placed lookouts on U.S. citizens suspected of organizing or being associated with the migrant caravan, which did not fully comply with policy. Additionally, CBP officials did not remove lookouts promptly. As a result, CBP subjected some individuals to repeated and unnecessary secondary inspections.

In addition, in December 2018, a CBP official asked Mexico to deny entry to caravan associates, including 14 U.S. citizens. Unlike CBP's legitimate reasons for placing lookouts on these individuals, CBP had no genuine basis for asking Mexico to deny entry to these U.S. citizens. On several other occasions throughout Operation Secure Line, other CBP officials also improperly shared the sensitive information of U.S. citizens with Mexico. Some of these CBP officials may have asked Mexico to deny entry to these individuals, but we could not determine whether they did, because CBP officials were not forthcoming about the disclosures, did not follow CBP policies on sharing information with foreign entities, and did not retain communication records.

## CBP Response

CBP concurred with our six recommendations, which are resolved and open.



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

## Table of Contents

Background .......................................................................................... 2

Results of Review ............................................................................... 4

    CBP Generally Had Legitimate Reasons for Placing Caravan-Related
    Lookouts on U.S. Citizens, but Some Lookouts Did Not Fully Comply
    with CBP Policy ........................................................................... 5

    CBP Inappropriately Asked Mexico to Deny Entry to at Least 14 U.S.
    Citizens Affiliated with the Migrant Caravan ........................................ 16

Recommendations ................................................................................. 30

## Appendixes

    Appendix A: Objective, Scope, and Methodology ................................. 34
    Appendix B: CBP Comments to the Draft Report................................. 36
    Appendix C: CBP's Foreign Disclosures to Mexico: Tracking
                 Compliance with DHS and CBP Policies .......................... 40
    Appendix D: Major Contributors to This Report................................... 42
    Appendix E: Report Distribution ......................................................... 43

## Abbreviations

| | |
|---|---|
| CBP | U.S. Customs and Border Protection |
| C.F.R. | Code of Federal Regulations |
| EOC | Emergency Operations Center |
| FOB | Foreign Operations Branch |
| NTC | National Targeting Center |
| SPII | Sensitive Personally Identifiable Information |
| TTRT | Tactical Terrorism Response Team |
| U.S.C. | United States Code |



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

## Background

Starting in October 2018, thousands of migrants gathered and traveled from Central America through Mexico to seek entry to the United States.  This came to be known as the "migrant caravan."  U.S. Customs and Border Protection (CBP) was concerned that the estimated 7,000 to 10,000 members of the migrant caravan could overwhelm CBP's resources and hinder its ability to process the legitimate flow of trade and travel.  Additionally, because of reports that the migrant caravan entered Mexico by force, CBP was concerned about the potential for mass illegal border crossings and violence against law enforcement when the migrant caravan reached the U.S. border.

To coordinate its response to the migrant caravan, CBP implemented "Operation Secure Line" from October 2018 through February 2019.  As part of this operation, in October 2018, CBP stood up an Emergency Operations Center (EOC) in San Diego, CA.  The EOC's mission included maintaining control of the border, preventing mass illegal border crossings, safeguarding legitimate trade and travel, and protecting CBP personnel.

The EOC was comprised of several sections, including Planning, Operations, Logistics, and Intelligence.  The EOC's Intelligence Section gathered information about the number and travel patterns of migrants moving toward the border and researched social media and news articles to identify potential migrant caravan organizers.  The EOC heightened its efforts following "incursions" on November 25, 2018, and January 1, 2019, when members of the migrant caravan stormed the border in an attempt to enter the United States from Tijuana, and threw rocks at CBP personnel.[1]  CBP closed the San Ysidro Port of Entry outside of San Diego on November 25, 2018, and dispersed tear gas on both occasions.

CBP officials, particularly those assigned to the EOC Intelligence Section, also gathered information by placing "lookouts" on individuals they suspected of being affiliated with the migrant caravan and others who might have information about those individuals.  Lookouts are electronic alerts placed in CBP's computer system that can result in a variety of different actions.  Most of the caravan-related lookouts resulted in lengthier, enhanced inspections for those individuals when they crossed the U.S. border.  When individuals with caravan-related lookouts attempted to enter the United States at ports of entry,

---

[1] Dara Lind, *How a march at the US-Mexico border descended into tear gas and chaos*, Vox (Nov. 26, 2018), https://www.vox.com/policy-and-politics/2018/11/26/18112474/tear-gas-border-patrol-caravan-rocks; Alan Yates, *U.S. Agents Fire Tear Gas Across Mexican Border*, New York Times (Jan. 1, 2019), https://www.nytimes.com/2019/01/01/world/americas/migrants-border-tear-gas.html.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

CBP officials referred them to secondary inspection,[2] where officers interviewed them about their knowledge of and contacts with the migrant caravan. Some interviews were relatively short, but others lasted several hours.

The EOC also collaborated with Federal, state, local, and Mexican agencies. When exchanging information with Mexico,[3] the EOC worked with CBP's San Diego Foreign Operations Branch (FOB), which is responsible for liaising with local Mexican officials. Often, information sharing happened at a command post that Mexico and CBP established in November 2018 to share caravan-related information. Mexican officials and CBP FOB officials staffed the command post around the clock, exchanged intelligence relating to migrant caravan movements and organizers, and coordinated U.S. and Mexican law enforcement and immigration operations.

In early 2019, a number of U.S. and foreign journalists, attorneys, and migrant caravan supporters raised concerns in the media that CBP was taking improper action against them as a form of harassment due to their work on the migrant caravan, or to intimidate them from continuing to perform caravan-related work.[4] Some individuals claimed CBP subjected them to repeated, unnecessary, and/or excessive secondary inspections when they attempted to reenter the United States, including one individual who claimed CBP stopped him for secondary inspection six times between December 2018 and February 2019. Other individuals alleged the United States placed alerts on them, which led Mexican officials to deny them entry into Mexico. Finally, other individuals alleged that CBP revoked their membership in Trusted Traveler Programs.[5] Following the media stories, several congressional committees questioned whether CBP inappropriately targeted individuals who engaged in constitutionally protected activities.[6]

The Department of Homeland Security Office of Inspector General (OIG) evaluated these allegations. Specifically, in this report we address the following:

---

[2] A secondary inspection is part of and a continuation of the overall border inspection, and an officer may refer any traveler to secondary inspection for various reasons, at his or her discretion in compliance with law and policy. Secondary inspections can include interviews and searches of individuals, their possessions, and electronic devices.

[3] For convenience, this report uses the term "Mexico" to refer to Mexican government officials.

[4] Some of these individuals have also filed lawsuits alleging that CBP targeted them in violation of the U.S. Constitution and Federal laws.

[5] Trusted Traveler Programs provide expedited processing at ports of entry for preapproved, low-risk travelers. We are currently conducting a separate review of allegations related to CBP's Trusted Traveler Programs.

[6] We have not conducted a legal analysis of the constitutional issues as they were generally outside DHS OIG's purview and the scope of this report.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

- whether CBP had legitimate law enforcement reasons for placing lookouts on and conducting secondary inspections of U.S.[7] journalists, attorneys, and migrant caravan supporters, or whether it did so to harass, intimidate, or retaliate against them; and

- whether CBP improperly requested that Mexico deny entry to American journalists, attorneys, and migrant caravan supporters.

## Results of Review

CBP officials had legitimate reasons for placing lookouts on U.S. journalists, attorneys, and others suspected of organizing or being associated with the migrant caravan (caravan associates).[8]  However, many CBP officials were unaware of CBP's policy related to placing lookouts and therefore may have inadvertently placed lookouts on these U.S. citizens, which did not fully comply with the policy.  Additionally, CBP officials did not remove lookouts promptly once they were no longer necessary.[9]  As a result, CBP subjected some of these individuals to repeated and unnecessary secondary inspections.

In addition, in December 2018, a CBP official asked Mexico to deny entry to caravan associates, including 14 U.S citizens.  Unlike CBP's legitimate reasons for placing lookouts on these individuals, CBP had no genuine basis for asking Mexico to deny entry to these U.S. citizens.  On several other occasions throughout Operation Secure Line, other CBP officials also improperly shared the names and sensitive information of Americans with Mexico.  Some of these CBP officials may have asked Mexico to deny entry to these U.S. citizens, but we could not determine whether they did, because CBP personnel were not forthcoming about the disclosures, did not follow CBP policies on sharing information with foreign entities, and did not retain communication records.

---

[7] Both U.S. citizens and foreign individuals raised concerns in the media, but we focused our review on U.S. citizens.

[8] This report uses the term "caravan associates," even though some individuals, such as journalists, may not have actually been "associated" with the caravan.

[9] This report discusses "removing" lookouts even though CBP officials do not technically remove most lookouts.  Instead, they keep the lookouts active, but modify them so that the lookouts no longer send individuals to secondary inspection.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## CBP Generally Had Legitimate Reasons for Placing Caravan-Related Lookouts on U.S. Citizens, but Some Lookouts Did Not Fully Comply with CBP Policy

We did not find that CBP placed lookouts to retaliate against U.S. citizens for performing lawful work related to the migrant caravan.  To the contrary, witnesses told us, and contemporaneous emails and documents corroborated, CBP placed lookouts to gain information about suspected illegal activity and then generally sought information consistent with that purpose during the resulting interviews.  Although we determined CBP's lookouts on a number of journalists present at an illegal border crossing were unnecessary, we found no evidence that CBP placed these lookouts to harass the journalists.

Even though we found no inappropriate intent behind the lookouts, we did find CBP officials did not understand or always follow CBP policy related to lookouts.  Many CBP officials did not know the proper standard for placing lookouts, and almost half of the caravan-related lookouts may not have complied with the policy.  Additionally, CBP subjected some U.S. citizens to repeated and unnecessary secondary inspections, because CBP did not promptly remove lookouts that were no longer necessary, as required by CBP policy.

### CBP Officials Placed Caravan-Related Lookouts and Generally Conducted the Resulting Inspections for Legitimate Reasons

CBP offers little guidance and few restrictions on using lookouts.  CBP's only written guidance on the appropriate basis for placing lookouts is a TECS[10] Directive that has not been updated since 1990, 13 years before DHS was created.[11]  According to the TECS Directive, lookouts must be placed for "legitimate law enforcement purposes" and only if illegal activity is suspected.

---

[10] TECS is the principal law enforcement and antiterrorism database used by CBP officers at ports of entry to collect, maintain, and screen data and to document border inspections of travelers and merchandise.  TECS is the system in which users place lookouts.  TECS previously stood for Treasury Enforcement Communications System but is no longer an acronym.

[11] *Customs Directive No. 4320-003*, July 1990 (TECS Directive).  CBP is in the process of updating this Directive.  Another policy — *CBP Directive No. 3340-051, Passenger Analytical Unit Procedures for Targeting High-Risk Travelers*, June 2014 — contains a short section on lookouts, but it does not include any additional guidance beyond the TECS Directive.  Previously, CBP's *Inspector's Field Manual* provided more detailed guidance on when CBP officials can place lookouts, but CBP revoked that manual in 2013 and has not replaced it.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Lookouts should never be entered as a "prank" or "joke," or for "retaliatory reasons."

We found no direct evidence in emails or interviews that CBP officials intended to retaliate, harass, or intimidate individuals associated with the migrant caravan by placing lookouts on them. To the contrary, the evidence suggests CBP placed most lookouts to seek information that would help CBP respond to the migrant caravan.

CBP officials in the EOC's Intelligence Section placed most of the caravan-related lookouts and tasked officers from the Tactical Terrorism Response Team (TTRT)[12] with conducting the resulting secondary inspections. Within the San Diego Sector, where the migrant caravan was expected to arrive, the EOC took several steps to help the TTRT officers collect and report back useful information to the EOC. At the outset of the operation, the EOC provided TTRT officers with a list of general topics to explore in their caravan-related interviews, such as information about the traveler's involvement in the migrant caravan, the "mood" of the migrant caravan, whether anyone was inciting violence, and whether the traveler could identify other people from a photo lineup. Additionally, upon placing most lookouts, EOC personnel provided the TTRT with one-page "target profiles," which included information such as the individual's picture, basic biographical data, and recent border crossing history. The EOC also invited TTRT officers to ask for assistance if questions arose in specific interviews, and TTRT officers told us they often contacted the EOC before beginning interviews. Finally, the EOC instructed TTRT officers to create a report documenting the substance of the interviews, which they did for most initial interviews.

To further assess whether CBP placed lookouts for legitimate or retaliatory purposes, we also reviewed the specific circumstances of the lookouts on 51 U.S. citizens, and the secondary inspections that resulted from these lookouts.[13] In particular, we reviewed whether CBP could articulate a legitimate law enforcement purpose for placing each lookout and whether it sought information relevant to that purpose in the resulting interviews. If CBP

---

[12] TTRT officers typically conduct inspections of travelers identified within terrorism screening databases. Before being detailed to the EOC, several CBP officials responsible for the caravan-related lookouts worked closely with the TTRT, and therefore asked the TTRT to conduct the caravan-related interviews.

[13] We identified 46 of the 51 lookouts in CBP documents, and the remaining 5 in media articles. Four of the lookouts that we identified in CBP documents were placed by U.S. Immigration and Customs Enforcement agents rather than CBP officials. We included these four lookouts in our analysis because they were part of CBP's targeting of caravan associates. We are not aware of any other caravan-related lookouts that CBP placed on U.S. citizens. The CBP documents we reviewed do not purport to be complete lists, so there could be others.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

placed lookouts to harass individuals associated with the migrant caravan, CBP would be unable to explain why it placed the lookouts, or that it might have had little concern for the information gathered in the interviews. Alternatively, if the lookouts were placed for legitimate law enforcement reasons, we would expect CBP to be able to explain what those reasons were and to have actually asked the individuals about those topics.

CBP appears to have used the lookouts to seek information about possible illegal activity. CBP placed approximately half of the caravan-related lookouts on individuals suspected of inciting violence at the border, or others who might have information about those individuals. CBP also placed lookouts on several individuals suspected of involvement in marriage fraud, purportedly to assist migrants with their asylum claims. In addition, CBP placed lookouts on individuals suspected of organizing and leading the migrant caravan, as well as others suspected of being associated with individuals or organizations leading the migrant caravan. CBP targeted these individuals on the premise that migrant caravan organizers and leaders could be helping to facilitate illegal entry.[14]

CBP's inspections were generally consistent with the claimed purpose of the lookouts, and officers usually documented and shared the information obtained during these inspections.[15] For example, TTRT officers asked individuals who were suspected of involvement in the January 1, 2019 incursion about their whereabouts on that night, and sought information about the incident from those who were present. Likewise, TTRT officers asked suspected migrant caravan organizers about their activities in support of the migrant caravan. TTRT officers usually emailed EOC officials with reports of their interviews, and the EOC then shared information about most interviews in daily leadership briefs. These actions support that CBP had a legitimate interest and purpose for these inspections.

However, in some instances, CBP's inspections were not consistent with the purported purpose of the lookouts. Lookouts that CBP placed on a particular group of journalists raise the most serious concerns. Although we found no

---

[14] In examining whether CBP documented legitimate reasons for placing the lookouts, we did not judge the soundness of this premise and did not otherwise evaluate the strength of the evidence supporting CBP's lookouts. Even though in the following paragraphs we note some lookouts that appear in hindsight to be based on particularly attenuated connections to suspected illegal activity, we acknowledge the information may have appeared differently to CBP officials making real-time decisions.

[15] Although CBP usually documented the information obtained during its initial inspections of individuals with caravan-related lookouts, CBP often did not have detailed interview records for repeat inspections of the same individuals. Later in this report, we discuss how some of these repeat inspections may have been unnecessary.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

evidence in emails or interviews that the EOC official who placed these lookouts (EOC Official 1) did so to harass the journalists or for any other ulterior reasons, his[16] subsequent actions, or lack thereof, demonstrate he did not need to place the lookouts.

During Operation Secure Line, CBP officials noticed that individuals with cameras were sometimes present when large groups attempted to cross the border illegally.  Because this happened multiple times, and in unusual locations or times, such as the middle of the night, CBP officials suspected the individuals with cameras were media, and might be assisting the illegal border crossings.  In one incident, Mexican police identified five American journalists after CBP officials alerted them that CBP officials observed members of the media helping migrants climb a border fence.  EOC Official 1 then placed lookouts on the five journalists.  The lookouts did not mention the illegal crossing but instructed interviewing officers where to find information about the journalists.

Although EOC Official 1 told us the purpose of these lookouts was to determine whether the journalists had information about the incident, his actions show he actually had no interest in that information.  Over the following weeks, all five journalists came back to the United States, and CBP referred them to secondary inspection.  Interview records reflect that none of the five journalists were asked about the illegal crossing.[17]  In fact, the journalists returned to the United States at various places and times and were therefore interviewed by several different officers.  None of the officers asked about the illegal crossing. Yet, EOC Official 1 apparently never followed up with any of the interviewing officers individually, or with the TTRT as a whole, to ask why they did not seek that information or to request that they do so in the future.

EOC Official 1 placed more caravan-related lookouts than anyone else and was in regular contact with the TTRT throughout Operation Secure Line.  If he wanted to know whether the journalists had information about this incident or other illegal border crossings, he knew how to contact the TTRT.  Additionally, EOC Official 1 removed one of the lookouts after the journalist's third interview, even though according to the interview record, CBP never asked the journalist about the illegal border crossing.  If EOC Official 1 no longer needed

---

[16] Throughout this report, one gender pronoun is used regardless of the individual's actual gender to avoid identification of individuals by gender.

[17] Some of the interview records included general statements about not assisting migrants while reporting on the migrant caravan, but none reflect questions about this specific incident or any other illegal border crossings.  In one of the interview records, the journalist mentions that Mexican police photographed his identification during an encounter near the border, but there is no further discussion about that event.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

information about the illegal border crossing at that point, then he also did not need the information when he placed the lookout 9 days earlier.[18]

We identified other instances of CBP officers not documenting information they obtained during caravan-related inspections or not seeking information related to the purported purpose of the lookout.  But these appear to be inadvertent mistakes; other evidence suggests CBP was not trying to harass or intimidate these same individuals.  For example:

- There are no interview records for a suspected migrant caravan organizer who arrived at a port of entry in Arizona, so we cannot determine whether CBP sought information that was relevant to the purpose of the lookout.  When the individual arrived at the same port of entry 2 days after his initial crossing, officers contacted the official who placed the lookout.  He advised them to release the individual.  Records also show the individual was again released when he arrived at the same port of entry the next day.  If the lookout was intended to harass this U.S citizen, the official who placed the lookout could have advised the port of entry to continue interviewing the individual, but the official advised to release him.

- TTRT officers did not ask a person suspected of marriage fraud about that topic, but the evidence suggests the officers who interviewed this individual may not have been aware of the marriage fraud concern at the time of the interview.[19]  Additionally, on the day after the interview, the EOC official who placed the lookout emailed TTRT officers to request that they ask about possible marriage fraud if the individual crossed again.  This suggests that the EOC official's concern about potential marriage fraud was legitimate and not a pretext for harassing the individual.[20]

- A CBP intelligence official who was not part of the EOC placed a lookout on a journalist after finding a YouTube video of his coverage of the January 1, 2019 border incursion.  In the lookout, the intelligence official wrote the journalist was in "possession of journalistic evidence" of the border incursion and "may be involved with inciting caravan migrants to

---

[18] EOC Official 1 did not tell us that he received any new information that obviated the need for the interview, and our review of EOC Official 1's emails did not find that he received any new information about this journalist.

[19] The lookout did not mention marriage fraud.  A few days before the individual arrived at the port of entry, the EOC emailed information about this person and others to the TTRT but by the time of the interview, the TTRT officers may not have remembered this individual was specifically named in the email they received days earlier.

[20] We also found documentary evidence of the marriage fraud concern.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

attempt illegal entry." In the following weeks, the journalist twice returned to U.S. airports. In both instances, officers at the airports did not call the intelligence official or record any information other than the journalist's occupation and employer. Although the intelligence official received notifications of the encounters, he did not follow up with the officers at the airports. This disconnect is likely due to the inexperience of both the interviewing officers and the intelligence official. CBP officers at airports did not regularly encounter people with caravan-related lookouts, and the evidence suggests they might not have understood the lookout. Additionally, the intelligence official was relatively new to his role, and this was the first time he placed a lookout to request a secondary inspection. When the journalist returned to the United States a third time, the officers contacted the intelligence official and then asked the journalist about the January 1 incident.

## Some Migrant Caravan Lookouts Did Not Fully Comply with CBP Policy

Although we determined that CBP's caravan-related lookouts were not intended to harass or intimidate caravan associates, we also found CBP officials did not always follow CBP policy related to lookouts. First, many officials were unaware of CBP's policy related to placing lookouts and therefore placed lookouts for reasons that may not have been permitted by the policy. Additionally, CBP officials did not monitor or remove lookouts as required by CBP policy.

*CBP Officials May Have Placed Some Lookouts for Unpermitted Reasons*

As outlined earlier, the TECS Directive provides the standard for placing lookouts: lookouts must be placed for "legitimate law enforcement purposes" and should never be entered as a "prank" or "joke," or for "retaliatory reasons." Additionally, CBP may place lookouts "only if illegal activity is suspected. The system will not allow a user to indicate that a 'non-suspect' is on 'lookout.'" This last sentence has two possible interpretations. It could mean officials may place lookouts only on people who are suspects of illegal activity, and not on non-suspects; or it could be a description of how the TECS system works.[21]

---

[21] Lookouts appear to be a type of "TECS record" or "TECS subject record," but the TECS Directive does not define those terms. While the TECS Directive says CBP may place lookouts only when illegal activity is suspected, it allows CBP to create "TECS records" or "TECS subject records" even when there is no suspicion of illegal activity. The TECS Directive states, "TECS records should be created when the subject is deemed to be of enforcement interest … based on previous violations, suspicion of violations or simply a result of a business or occupation in which the Federal law enforcement community has an interest. The nature of the interest is to



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

All CBP's caravan-related lookouts were related in some way to suspected criminal activity. However, nearly half of the caravan-related lookouts (25 out of 51) were on people for whom there was no evidence of direct involvement in illegal activity. Instead, those lookouts were based solely on the individuals' associations with other people who were suspected of illegal activity. For example, CBP officials placed lookouts on 15 U.S. citizens who either previously crossed the border with, or were connected on social media to, a person whom CBP suspected of planning violence at the border. CBP had no information to suggest these 15 individuals might be involved in planning violence or were present at one of the incursions. In other cases, CBP officials placed lookouts on U.S. citizens with attenuated connections to people or organizations believed to be leading the migrant caravan. In one instance, a CBP official placed lookouts on two attorneys who previously crossed the border with someone who was believed to be an administrator of a caravan-related online chat group on WhatsApp.[22] In another example, after a suspected migrant caravan organizer was seen riding in a vehicle, the EOC placed lookouts not only on the owner of that vehicle but also on someone who crossed the border with the vehicle owner one time, 9 months earlier, well before the migrant caravan started traveling towards the United States.

We have no reason to doubt that the CBP officials who placed these lookouts believed the lookout subjects might have useful information about potential criminal activity. However, as explained earlier, the TECS Directive might not allow CBP officials to place lookouts on non-suspects who might have useful information about other individuals' criminal activity. CBP officials were not aware of this ambiguity, as many of them told us they were not aware of any policies related to the proper bases for placing lookouts or had not received any training on the issue. Consequently, the officials did not have consistent understandings about when they could place lookouts. Some CBP officials stated that lookouts require a connection to illegal activity. But other CBP officials, including a senior San Diego Sector official and a senior official responsible for TECS, contradicted the TECS Directive, stating CBP can place lookouts for virtually any reason, including when there is no suspicion of illegal activity. And although the TECS Directive might prohibit placing lookouts on non-suspects, no CBP official noted this possibility.

---

be reflected in the Status Code, i.e., whether the subject is a suspect or non-suspect." TECS subject records should be created on "subjects who are currently or potentially of investigative interest," including "investigative targets, violators, suspects, corporations, businesses and associates."

[22] WhatsApp is a social messaging platform that facilitates the exchange of encrypted messages and calls.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

If the TECS Directive is interpreted to prohibit placing lookouts on non-suspects, then nearly half of the caravan-related lookouts may have violated the TECS Directive.  If the alternative interpretation is correct, that the TECS Directive permits lookouts on non-suspects, then the caravan-related lookouts did not violate the Directive.  However, regardless of which interpretation is correct, the Directive's ambiguous language and CBP's absence of training and guidance leave officials without a clear understanding of the proper bases for placing lookouts.

*CBP Subjected U.S. Citizens to Unnecessary Secondary Inspections by Not Promptly Removing Lookouts*

CBP officials are responsible for updating their lookouts as new information is developed, including removing lookouts that are no longer needed.  According to the TECS Directive, "inaccurate, irrelevant or out-of-date records" create a risk that the "agency will make an adverse determination about an individual." Consequently, officials who create and maintain lookouts (lookout owners) are responsible for "[m]aking appropriate modifications to existing records whenever new information is developed or original information becomes obsolete."  A high-level EOC official confirmed that CBP officials should reevaluate lookouts after every inspection, to determine whether to keep them active.

Yet, CBP officials did not remove many caravan-related lookouts once they were no longer necessary.  Although it might be appropriate to maintain lookouts in certain situations,[23] TTRT and EOC officials acknowledged CBP should have removed many caravan-related lookouts after it first interviewed the U.S. citizens.

Two TTRT officers who conducted caravan-related interviews did not believe there was a need to interview many of those individuals multiple times.  One officer said that TTRT did not obtain any valuable information during the follow-up interviews, and that EOC officials should have removed lookouts on "reporters and photographers" after their first referral to secondary inspection. Another officer stated he called EOC officials on multiple occasions to ask them to remove lookouts, but they did not do so.

EOC Official 1, who was primarily responsible for placing caravan-related lookouts at the EOC, also told us that many U.S. citizens did not need to be interviewed multiple times.  Accordingly, EOC Official 1 claimed he went into

---

[23] For example, CBP officials told us that officials typically maintain lookouts on suspected smugglers or for other strategic reasons.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

TECS and removed caravan-related lookouts after individuals were interviewed, but review of TECS data revealed that EOC Official 1 did not remove any of his lookouts on U.S. citizens following their first border crossings.  When presented with this information, he maintained that he tried to remove many lookouts and speculated that a technical glitch may have prevented that from happening,[24] but we confirmed that no such glitch occurred.  Instead, the evidence demonstrates that EOC Official 1 did not try to remove 18 of his 20 lookouts that resulted in secondary inspections.[25]

In fact, EOC Official 1 did not reevaluate or remove his lookouts when he finished his EOC detail at the end of January 2019.  Instead, he and his supervisor transferred at least 31 caravan-related lookouts to other EOC personnel without giving any notice or instruction.  One official who inherited several of those lookouts stated he did not even learn he was assigned to those lookouts until CBP officers contacted him as they were about to interview the individuals.  He recalled that one of the first times this happened, he reached out to EOC Official 1, who originally placed the lookout.  EOC Official 1 told him the lookout was no longer necessary, even though he had transferred it to him just days earlier.  Still, after this discovery, the EOC did not systematically review the remaining lookouts.  Instead, the lookouts remained in place for 2 more weeks, until a media story calling attention to the lookouts spurred the EOC to review and remove 18 caravan-related lookouts it determined were no longer necessary.[26]

In total, 39 U.S. citizens with caravan-related lookouts attempted to enter the United States at least once and were referred to secondary inspection.[27]  Although TTRT officers and EOC Official 1 told us many of those individuals did not need to be re-interviewed, only 5 of those 39 lookouts were removed after the first referral.  Of the 34 U.S citizens whose lookouts remained active

---

[24] EOC Official 1 asserted that while his supervisor instructed him to keep certain lookouts active, many of his lookouts should have been removed.  In addition to the technical glitch, he speculated that he might not have promptly removed some of his lookouts because TTRT officers took a long time to write reports of their interviews.

[25] EOC Official 1 eventually removed two caravan-related lookouts after the individuals on those lookouts were referred to secondary inspection multiple times.  As previously discussed, he removed a lookout on a U.S. journalist who was interviewed three times.  In another instance, an individual crossed twice within a week.  The TTRT officer assigned to conduct the second interview contacted EOC Official 1 to ask if another interview was necessary.  EOC Official 1 told him it was not and then removed the lookout.

[26] EOC personnel who inherited the transferred lookouts claimed the head of the EOC Intelligence Section instructed them to keep the caravan-related lookouts active while CBP's response to the migrant caravan was ongoing.  The head of the EOC Intelligence Section denied providing this instruction.

[27] The remaining 12 U.S. citizens with lookouts were not inspected by CBP, because they did not attempt to enter the United States during this time.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

after their first referral, 18 reentered the United States at least once, and all 18 were referred to secondary inspection again. Figure 1 depicts inspections of U.S. citizens with caravan-related lookouts.

**Figure 1. Initial and Repeat Inspections of U.S. Citizens with Caravan-Related Lookouts**



*Source:* DHS OIG analysis of CBP-provided data

Some U.S. citizens were referred to secondary inspection multiple times, even though the EOC officials who placed the lookouts showed no interest in what was discussed during several of the follow-up interviews. For example:

- One individual was referred to secondary inspection six times in 1 month. An EOC official (EOC Official 2) placed this lookout to obtain a phone number and information about a different person, yet there is no evidence the TTRT officers asked the individual about that other person in any of the six inspections.[28] During the second inspection, the individual was handcuffed to a bench, possibly for several hours, until

---

[28] The report from the first interview notes the individual was generally hesitant to provide information about other individuals, but the report does not say whether the TTRT officers asked him about any specific individual. Documentation from the subsequent inspections reflects that TTRT asked him only about himself and not about other individuals.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

the TTRT officers arrived for an interview.[29]  The TTRT officers also manually searched his phone but did not document what information was sought or obtained, leaving in question whether the search served any purpose.[30]  EOC Official 2 apparently never made any effort to learn what was discussed in the follow-up inspections or what was found on the individual's phone.[31]  EOC Official 2 told us he might have lost track of this individual.

- A U.S. citizen associated with an organization supporting the migrant caravan was referred to secondary inspection four times between December 2018 and January 2019.  The records from the second and third interviews indicate that CBP did not obtain any new or different information from what was discussed in the first interview, and TTRT officers did not document the fourth interview.  There is no evidence that EOC Official 1, the lookout owner, followed up with the officers, and he never removed the lookout.  The individual told us that he became nervous and lost sleep in anticipation of secondary inspection.  He eventually decided to stop crossing the border to avoid additional inspections, which prevented him from visiting family and friends, and from providing humanitarian assistance to migrants.

---

[29] CBP's system shows that CBP held this individual in secondary inspection for 6 hours, but it is unclear whether this is accurate.  CBP officers manually enter start and stop times of secondary inspections, and data we reviewed indicate that officers do not always consistently or accurately record these times.  TTRT officers told us this individual was handcuffed because he was interviewed in a security office that required handcuffs as a protocol after an unrelated security incident and not because of anything he said or did.  We did not evaluate the legality of the security office protocol.

[30] In order to search electronic devices, officers must provide, and supervisors need to approve, "a clear and detailed description of the reasons for the Officer's decision to search or to detain" the device.  Memorandum from Executive Director, Operations, Office of Field Operations to Directors, Field Operations and Director, Preclearance, Office of Field Operations, re: *Border Search of Electronic Devices – Field Guidance*, Jan. 12, 2018.  The officer completed the proper form to record this search but did not include the reason for the search.  Therefore, even though the officer's supervisor approved the form, he did not review and confirm the justification for the search.  Additionally, although CBP's policy does not require officers to document what they find on electronic devices, both the officer and his supervisor admitted that the officer should have documented what he found on the phone.  In addition to this search, we found four other instances of CBP searching electronic devices of Americans during caravan-related inspections.  CBP properly documented three of these searches, but in one of the four instances, the officer did not obtain supervisory approval for the search and did not document the search, as required by the CBP policy.

[31] We identified an email showing EOC Official 2 attempting to follow up with TTRT officers after the individual's first interview, to inquire about the information obtained, but we could not determine whether he successfully connected with the TTRT officers.  We found no evidence of similar attempts, following the subsequent five inspections.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Based on our review of all available evidence, we were unable to determine why CBP did not remove unnecessary caravan-related lookouts. We found no direct evidence that CBP kept lookouts active to harass, intimidate, or retaliate against caravan associates. However, EOC Official 1's vague explanation for not removing lookouts, and the EOC's disinterest in the repeat interviews, suggest it may not have been entirely accidental. Regardless of whether the EOC intended to punish or dissuade U.S. citizens from traveling between Mexico and the United States, subjecting them to repeated unnecessary inspections can have that effect, as the individual who was referred to secondary inspection four times explained.

Although the TECS Directive requires CBP officials to modify obsolete lookouts, CBP has few controls to ensure that officials comply with the requirement. The TECS Directive does not provide specific timeframes or procedures for officials to promptly remove unnecessary lookouts, and CBP provides no other formal guidance or training on the issue. CBP should implement new policies, guidance, or training to help officials appropriately update and remove lookouts. CBP should also develop new automated controls in the TECS system to help officials monitor lookouts. At the time of our review, the TECS system had automated rules in place to notify lookout owners and remove some lookouts based on certain criteria, but the system only applied that functionality when a supervisor has not approved a lookout. When supervisors approve lookouts (as they are supposed to do), there were no such automated controls. As a result, frequent border crossers are repeatedly sent to secondary inspection, unless and until the lookout owner goes into TECS to manually remove the lookout. New system features that automatically delete or at least notify lookout owners of their potentially stale lookouts could help officials better comply with the TECS Directive.

## CBP Inappropriately Asked Mexico to Deny Entry to at Least 14 U.S. Citizens Affiliated with the Migrant Caravan

In January and February 2019, Mexican officials denied entry to at least four U.S. citizens associated with the migrant caravan. Some of these individuals claimed Mexican officials told them they could not enter Mexico because another country placed alerts on their passports. We found that, in December 2018, a CBP official asked Mexico to deny entry to 14 U.S. citizens affiliated with the migrant caravan, including one individual who was subsequently denied entry into Mexico. CBP may restrict Americans' rights to travel internationally in certain circumstances, but CBP could not articulate any genuine basis for sending this request and in fact later admitted that the reasons provided to Mexico were not true. CBP officials at various levels who knew of the request, including the official who oversaw CBP's entire regional



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

response to the migrant caravan, denied or minimized their involvement and told us the request was neither typical nor appropriate.

Additionally, this may not have been the only time that CBP asked Mexico to deny entry to U.S. citizens associated with the migrant caravan. We found that on eight other occasions, CBP officials improperly sent Mexico the names and sensitive information of dozens of additional U.S. citizens, and some of those individuals were later denied entry into Mexico.[32] However, because these CBP officials did not comply with CBP policies on sharing information with foreign entities and did not retain communication records, we cannot determine whether the officials asked Mexico to deny entry to those Americans.

**CBP Had No Genuine Basis for Requesting that Mexico Deny Entry to 14 U.S. Citizens Affiliated with the Migrant Caravan**

On December 10, 2018, a CBP official in San Diego's FOB[33] (FOB Official 1) emailed an unencrypted list of 24 migrant caravan "organizers/instigators," including 14 Americans, to a Mexican immigration official. FOB Official 1 identified the individuals by name, date of birth, and nationality, and explicitly requested that Mexico prevent the individuals from entering Mexico and instead return them to the United States.[34]

**Figure 2. CBP Email to Mexican Official**

Hello [First Name],

CBP has identified the following individuals as part of the organizers/instigators of the migrant caravan that's currently in Tijuana. Most of these people are United States citizens, and it's highly likely that they lack the proper documentation to be in Mexico. CBP wishes to interview them all and respectfully requests that [Mexican Immigration] deny them entry into Mexico. If located, please return them to the United States so that CBP can proceed with their interview.

Your attention and assistance are greatly appreciated.

*Source:* CBP email obtained by DHS OIG

---

[32] In response to litigation filed by some of these individuals, CBP denied placing alerts on them.
[33] The FOB is composed of CBP liaison officers who convey and receive information to and from Mexico and other foreign nations on CBP's behalf.
[34] The original email was written in Spanish. This English translation was performed by a professional translation service.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

The right to travel, including the right to international travel, is a part of the "liberty" of which American citizens cannot be deprived without the due process of law under the Fifth Amendment.[35]  In certain circumstances, the Federal government may reasonably regulate American citizens' right to international travel, such as in the interest of national security or foreign policy.[36]  Despite the constitutional implications of restricting international travel, CBP has no policies, procedures, guidance, or training that specifically address asking or advising foreign countries to deny entry to Americans.  CBP officials identified two scenarios that might allow for actions similar to asking another country to deny entry to Americans.  First, under the Joint Security Program, CBP officials are present in foreign airports to partner with the host countries to identify and interdict high-risk travelers.  However, according to the Joint Security Program Director, the program does not "request" or "instruct" other countries to deny entry to certain individuals.  Instead, the program "advises" other countries about high-risk travelers, and it only does so when there is an outstanding warrant or another connection to a crime.  Second, CBP officials told us they might notify Mexico to "be on the lookout" in exigent situations involving criminal suspects trying to flee to Mexico.

Here, FOB Official 1, another CBP official who drafted the email, and a third CBP official who was copied on FOB Official 1's email, could not identify any specific concerns about most of the Americans and others listed in the email.  Nor could they explain how any national security or foreign policy concerns, or exigent situations applied to those U.S. citizens' situations.

Specifically, FOB Official 1 could not offer any reasons to us for asking Mexico to deny entry to the 24 individuals listed in his email.  He could not recall anything about most of the 24 individuals, other than he did not think they were involved in illegal activity.  In fact, FOB Official 1 initially denied that he ever asked Mexico to reject any individuals and insisted he did not remember this email until we showed it to him.  FOB Official 1's concerns about the 24 individuals could not have been particularly serious, because when we interviewed him, he could not recall what the concerns were or why they prompted him to ask Mexico to deny entry to those individuals, even though he said this was the first and only time he ever sent such a request.

Other CBP officials involved with FOB Official 1's email were similarly unable to articulate specific concerns about the 24 individuals.  One of FOB Official 1's colleagues sent him an English version of the email (without the 24 names) about an hour before FOB Official 1 sent the email in Spanish to the Mexican

---

[35] *See, e.g., Kent v. Dulles*, 357 U.S. 116, 125–26 (1958).
[36] *See, e.g., Haig v. Agee*, 453 U.S. 280, 291, 306 (1981); *Zemel v. Rusk*, 381 U.S. 1, 13–16 (1965).



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

official.  This colleague denied any role in preparing the list of individuals, stated he was only familiar with one individual on the list, and admitted he did not know what information CBP hoped to learn in interviews with the individuals.  Another CBP official who FOB Official 1 copied on his email to Mexico stated CBP was trying to prevent disorder at ports of entry.  Yet, he could not articulate how the 24 individuals might be connected to any potential disorder, what information CBP had about the potential disorder, or any specific concerns about the individuals.

Additionally, our interviews of FOB Official 1 and the two other CBP officials indicate the first reason he provided to Mexico to support the request — that the 24 individuals probably did not have proper travel documents — was not genuine.[37]  FOB Official 1 admitted CBP had "no knowledge of whether they did or didn't have documentation" when he sent the request, and one of the other officials told us CBP had "no concern" about whether the individuals violated Mexican immigration law.  The third official could not explain how CBP determined whether the 24 individuals were authorized to travel into Mexico.

FOB Official 1's second reason for asking Mexico to prevent the individuals from entering the country — that CBP "wishe[d] to interview them all" — also does not seem to be supported by the facts.  CBP did not interview one of the Americans after Mexico denied his entry.  Approximately a month after FOB Official 1's email, Mexico notified the FOB that it was denying entry to this American.  Yet, once Mexico returned the American to a U.S. port of entry, CBP released him without an interview.  FOB officials told us no TTRT or FOB officers were available to interview the individual.  If interviewing this individual was important enough to request that Mexico deny him entry, one might expect CBP officials would have been concerned when he was not interviewed at the port of entry.  Yet, nobody expressed concern — either to us, or in any of the contemporaneous emails we reviewed — about missing the opportunity to interview the individual.[38]  Thus, CBP apparently had no need to request that Mexico deny him entry.[39]

Not only were these three CBP officials unable to provide a genuine basis for asking Mexico to deny entry to the 24 individuals, but they and other officials

---

[37] Notably, the email identified several of the 24 individuals as Mexican nationals, but it did not address why those individuals would not have proper documents to enter their home country.
[38] CBP did not interview this individual any time between FOB Official 1's email and when Mexico returned him to the United States.  The CBP officials did not point out any intervening events that rendered his interview unnecessary, and we found no evidence of any such intervening events.
[39] We did not find any instances of Mexico denying entry to the other 13 Americans listed in FOB Official 1's December 10 email.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

did not admit directing or authorizing the request.  Instead, they said the FOB was merely a conduit for passing the request to Mexico on behalf of the EOC. In particular, FOB Official 1 believed EOC Official 2 asked him to send the request to Mexico.  In fact, just 5 days before FOB Official 1 asked the Mexican official to deny entry to 24 individuals, EOC Official 2 sent FOB Official 1 "target profiles" for those same 24 individuals.

Nevertheless, EOC Official 2 and his chain of command did not admit involvement with FOB Official 1's request and told us the request was not proper or normal.  EOC Official 2 disclaimed involvement with the request and told us FOB Official 1 should not have sent it, but he could not explain why he sent the 24 target profiles to FOB Official 1.[40]  Additionally, the day after FOB Official 1 sent the request to Mexico, he forwarded the request to EOC Official 2, who then forwarded it to his supervisor (EOC Official 3).  EOC Official 3 did not recall seeing the request to Mexico and stated he would not normally be involved with such a request, but he could not explain why EOC Official 2 forwarded him the email.

EOC Official 3's supervisor (EOC Official 4), also denied directing, approving, or being involved with the request to Mexico.  He stated he did not recall hearing about the request.  Yet, contemporaneous emails show that just hours after the request, EOC Official 4 was "asking if a list of [Americans] was provided … to [Mexico] to deny them entry into Mexico" and that he spoke to FOB Official 1 about the request.[41]  According to EOC Official 4, CBP only shares personally identifiable information about Americans with Mexico in rare instances (such as if an American is wanted by Mexican law enforcement relating to serious concerns) and that requests to deny entry should be routed through consulates or embassies.  Therefore, EOC Official 4 speculated he probably asked about the request because he was concerned about it.  However, another possible explanation is that EOC Official 4 directed the request and was confirming that someone had carried out his instruction.  In particular, if someone was truly concerned about this request, we would expect him to recall asking about the request, express his concern or disapproval in writing, admonish FOB Official 1 for sending the request, or take corrective action.  We did not find any evidence of such actions.

---

[40] EOC Official 2 and other EOC officials previously placed lookouts on some of the U.S. citizens included in FOB Official 1's request.  Even though they articulated legitimate law enforcement reasons for placing those lookouts and may have been interested in interviewing those individuals, they did not state that asking Mexico to deny entry to those individuals was appropriate or necessary to conduct the interviews.
[41] FOB Official 1 said he did not recall speaking with the EOC Official 4 about the request.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

### CBP Officials May Have Asked Mexico to Deny Entry to Numerous Additional U.S. Citizens Whose Personally Identifiable Information They Inappropriately Disclosed

FOB Official 1 was not the only CBP official who shared the names and information of U.S. citizens with a Mexican official. Three other CBP officials provided caravan associates' names and Sensitive Personally Identifiable Information (SPII)[42] to Mexican officials on at least eight occasions.[43] We cannot confirm whether these officials asked Mexico to deny entry to the individuals, because the officials did not follow CBP policies on sharing information with foreign entities and did not retain communication records.

*Three Additional CBP Officials Disclosed Information about U.S. Citizens to Mexico*

At a January 2019 meeting with Mexican officials, an FOB official (FOB Official 2) shared two documents, including a PowerPoint presentation with pictures, names, dates of birth, countries of citizenship, and other information about dozens of American and foreign nationals.[44] FOB Official 2 said the main focus of the meeting with Mexico was to discuss how to stop the individuals listed on the PowerPoint from inciting violence and instigating mass incursions, and that he tasked Mexican officials with "increasing their enforcement posture."[45] FOB Official 2 did not deny that he asked Mexico to reject the people on the PowerPoint. In fact, he acknowledged that they discussed possibly preventing caravan associates from entering Mexico but stated he could not recall whether CBP specifically asked Mexico to do so. FOB Official 2 also told us that after the January meeting, he sent a copy of the PowerPoint to the Regional Director for a Mexican government immigration agency in a WhatsApp chat message.

---

[42] SPII is information that, if lost, compromised, or disclosed without authorization, could result in substantial harm, embarrassment, inconvenience, or unfairness to an individual. Examples of SPII include driver's license numbers, passport numbers, and social security numbers. Other examples of SPII include citizenship or immigration status, date of birth, and criminal history, when paired with the identity of an individual. *DHS Privacy Office, Handbook for Safeguarding Sensitive PII*, Dec. 2017.

[43] We also found instances of CBP officials sending Mexico information about foreign nationals.

[44] In January 2019, an FOB official developed this PowerPoint, which is titled "Migrant Caravan FY-2019 Suspected Organizers, Coordinators, Instigators, and Media." The official who created the PowerPoint told us he was not knowledgeable about most of the individuals included in the PowerPoint, and he was simply consolidating CBP's information about the migrant caravan from several places into one document to brief the San Diego Sector Border Patrol Chief. In March 2019, media articles published leaked excerpts of the PowerPoint.

[45] Although FOB Official 2 told the Mexican officials that the individuals on the PowerPoint were inciting violence and instigating mass incursions, he acknowledged to us that the PowerPoint was an overly inclusive document and that being on the PowerPoint "doesn't mean you were a bad or a good guy … [it just] means you were associated" with the migrant caravan.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

However, he did not retain the WhatsApp message transmitting the PowerPoint or any other messages with the Mexican official and stated he could not recall what he wrote when he sent the PowerPoint.[46]

Also, in January 2019 another FOB official (FOB Official 3) used his official CBP email account to send unencrypted SPII of six U.S. citizens to a Mexican intelligence official's Yahoo email address.  FOB Official 3 told us he sent the email so the Mexican official could provide information to help prevent a "very serious" threat from occurring.[47]  Yet, FOB Official 3's email does not request any information from the Mexican official, and instead of mentioning a *future* threat, the email says the six individuals may have been involved in a *past* event.  We were unable to clarify this inconsistency or determine the true reason FOB Official 3 sent this email, because he admitted deleting contemporaneous WhatsApp messages with this Mexican official.[48]

There are indications that FOB Official 2 and/or FOB Official 3 might have asked Mexico to deny entry to the individuals whose information they provided to Mexico.

FOB Official 2 admitted urging Mexico to do more to stop the caravan associates when he shared the PowerPoint with them and conceded that he

---

[46] In his initial interview with us, FOB Official 2 repeatedly denied ever providing the names of individuals to Mexico or sending the PowerPoint to Mexican officials.  We later discovered evidence that he shared the PowerPoint with them, including that he retroactively attempted to seek approval from his then-supervisor, 2 months after the fact.  After we confronted FOB Official 2 with this information in a second interview, he admitted sharing the PowerPoint with Mexico.

[47] FOB Official 3 claimed the threat, obtained from the Federal Bureau of Investigation (FBI), was so serious and imminent that he did not have time to consult with anyone else at CBP or to obtain the approval he knew was required to send the information.  FOB Official 3 told us the FBI previously decided to stop investigating this alleged threat.

[48] On the day before he sent the document with six U.S. citizens' SPII to a Mexican official, FOB Official 3 sent that same document from his official CBP email account to his own personal Gmail account.  He could not tell us why he did this.  That same day, FOB Official 3 also sent pictures of several caravan associates' drivers' licenses from his personal Gmail account to his official CBP account.  FOB Official 3 said the Mexican official provided these photographs to him on an external drive, and he used his own personal computer and email account because he had been instructed not to plug external drives into his CBP computer.  Even assuming that is true, FOB Official 3 could not explain why the Mexican official provided these photographs to him in the first place.  Regardless of the reason, these emails violated DHS policy, as DHS employees must use only DHS-issued email accounts to send and receive DHS business-related communications and may not use non-DHS email accounts to create or send DHS records. DHS Directive No. 142-03, *Electronic Mail Usage and Maintenance,* Jan. 2018.  We do not know whether FOB Official 3 sent other work-related emails from his personal account, including emails to the Mexican official, because we did not access FOB Official 3's personal email account.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

might have asked Mexico to reject them.  Additionally, we found Mexico rejected a total of five caravan associates, including four U.S. citizens.  Not only were all five individuals listed on the PowerPoint, but it also appears that Mexico started rejecting these individuals shortly after receiving the PowerPoint.  We do not know exactly when FOB Official 2 sent the PowerPoint to the Mexican official, because he did not retain his WhatsApp messages.  However, 5 days before Mexico first denied entry to one of the individuals, FOB Official 2 sent himself a reminder email to "provide target list to [Government of Mexico]."  Then, after Mexico rejected this individual, FOB Official 3 informed colleagues that the denied individual was on the "target deck" that CBP shared with Mexico.[49]

Additionally, after Mexico denied entry to two caravan associates in late January 2019, FOB Official 3 sent an email to his colleagues, noting of the two rejected individuals, "Ambos de los Alertados de la Lista..." or "Both are Alerts on the List."  FOB Official 3 stated he did not know what "List" the email was referring to, because he copied and pasted this Spanish text from a WhatsApp group message that Mexican officials sent.  However, it seems unlikely that FOB Official 3 would inform colleagues the individuals were on a list if he did not know what that list was.  In the same email, FOB Official 3 seemed pleased about the rejections when he notified colleagues, "[Mexico] started to reject entry of people assisting the Caravan in Tijuana....  Now, we just need to figure out how to [make] them do the same with the Hondos and Guats...."

Finally, another CBP official — operating independently from the FOB — also disclosed Americans' SPII to Mexico, but we found no evidence that he asked Mexico to deny entry to those Americans.  Throughout January and February 2019, a National Targeting Center (NTC)[50] official provided names, photographs, and other SPII of U.S. citizens associated with the migrant caravan on at least five occasions to a Mexican intelligence official.[51]  In early January 2019, the NTC official agreed to an "internal" and "non-binding" agreement between NTC and Mexico's Intelligence National Center, "to share information relating to organizers, inciters, and supporters of the migrant

---

[49] FOB Official 3 told us that he was mistaken when he informed his colleagues and that the target deck was not actually shared with Mexico, but we have no reason to believe his after-the-fact explanation to us is more accurate than the contemporaneous statement he made to his colleagues.

[50] Located in the Washington, D.C. region, the NTC collects and analyzes data to identify high risk travelers and cargo.

[51] In the first email, the NTC official sent the information to Mexico unencrypted and unprotected.  He password-protected the information in the subsequent four emails.  We also identified a sixth instance where the NTC official shared U.S. citizens' SPII with the Mexican intelligence official during the same time period, but those individuals do not appear to be affiliated with the migrant caravan.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Caravans that are currently transiting Mexico en-route to the United States."[52] Following this, the NTC official sent emails either requesting information from Mexico about certain individuals or responding to Mexico's requests for information about certain individuals. The NTC official said he wanted Mexico to provide information about these individuals' border crossings, to give NTC "a better understanding" of their involvement with the migrant caravan. He also said he knew the FOB was also sharing information with Mexico, but he never coordinated with the FOB and did not know what information the FOB shared with Mexico.

*CBP Officials Were Not Authorized to Disclose Information about U.S. Citizens to Mexico*

Federal law allows CBP to share information or documents with foreign customs and law enforcement agencies when an authorized CBP official reasonably believes it is necessary to:

- ensure compliance with any law or regulation that CBP enforces;
- administer or enforce multilateral or bilateral agreements to which the United States is a party; or
- assist in "investigative, judicial and quasi-judicial proceedings" in the United States.[53]

The CBP Disclosure Directive[54] prescribes requirements and restrictions, in accordance with the above statute and regulation, on sharing information with foreign agencies. The Border Patrol and its San Diego Sector have also issued additional guidance,[55] but CBP's Office of Field Operations, which houses the NTC, has not.

---

[52] Although the NTC official forwarded a copy of the agreement to his supervisor, it is unclear if they were authorized to enter into such an agreement on behalf of CBP. In particular, CBP policy requires that "all agreements or arrangements ... providing for the sharing of information with a Foreign Authority shall be coordinated with the Office of International Affairs, Privacy and Diversity office, and the Office of Chief Counsel." *CBP Directive No. 4320-025A, Disclosure of Official Information to Foreign Authorities*, Apr. 2014 (CBP Disclosure Directive), Section 5.14. The NTC official told us that only he and his supervisor were involved with this agreement, and he did not know if the Office of Chief Counsel was consulted.

[53] 19 U.S.C. §§ 1628(a)(1)-(3); 19 C.F.R. §§ 103.33(a)(1)-(3). Disclosure is also permitted in comparable circumstances "undertaken by a foreign customs or law enforcement agency, or in relation to a proceeding in a foreign country." 19 U.S.C. § 1628(a)(4); 19 C.F.R. § 103.33(a)(4).

[54] CBP Directive No. 4320-025A, *Disclosure of Official Information to Foreign Authorities,* April 14, 2014.

[55] Memorandum from Chief of the U.S. Border Patrol to All Chief Patrol Agents and All Division Chiefs, *Record of Information Shared with a Foreign Government Agency*, Oct. 27 2014; Richard A. Barlow, Chief Patrol Agent, U.S. Border Patrol, San Diego Sector, *San Diego Sector, Standard*



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

FOB Official 1, FOB Official 2, FOB Official 3, and the NTC official were not properly authorized to provide information about U.S. citizens to Mexico.  The three FOB officials were assigned to the Border Patrol's San Diego Sector when they made their disclosures.  The San Diego Sector does not allow its officials to provide information about U.S. citizens to foreign entities, unless the FOB Assistant Chief, the Division Chief of Operations, and the Sector Office of Assistant Chief Counsel all provide advance, written approval.[56]  FOB Official 1, FOB Official 2, and FOB Official 3 all made their disclosures without securing the proper approvals.  The fourth official, the NTC official, claimed his supervisor orally authorized him to make each of his five disclosures, but the CBP Disclosure Directive does not allow supervisors to authorize disclosures without seeing those requests.[57]  There is no evidence the NTC official ever provided his supervisor with Mexico's written requests for information for four of his disclosures, and NTC official made his remaining disclosure proactively, without a request from Mexico.

*We Cannot Determine if CBP Officials Asked Mexico to Deny Entry to U.S. Citizens Because the Officials Violated Policies on Sharing Information with Foreign Entities and Did Not Retain Records*

CBP's foreign disclosure policies require CBP officials to take several steps to record disclosures to foreign entities and to ensure the foreign entities maintain and use the information appropriately.[58]  For example, CBP officials must:

- advise foreign entities in writing to, among other things, keep the information confidential and use it only for the purpose for which CBP provided it;[59]
- mark the documents with appropriate sensitivity notations (*e.g.*, "For Official Use Only – Law Enforcement Sensitive") and warnings that the

---

*Operating Procedure, 4320-001, Disclosure of Official Information to Foreign Authorities*, Jan. 2015 (San Diego Disclosure SOP).
[56] San Diego Disclosure SOP, Section 1.6.2.1.
[57] The CBP Disclosure Directive states that "[e]xcept in exigent circumstances, requests by a [foreign entity] shall be made in writing and provided to a CBP official delegated the authority to provide such information."  This requirement helps ensure that CBP only discloses information to foreign entities when a properly delegated official "reasonably believes [it] is necessary," as provided in the relevant statute and regulation. 19 U.S.C. § 1628(a); 19 C.F.R. § 103.33(a).
[58] CBP may only provide information to a foreign entity if CBP obtains assurances that the entity will hold the information in confidence and use it only for the law enforcement purposes for which CBP provides it. 19 U.S.C. § 1628(b)(1); 19 C.F.R. § 103.33(b)(1).
[59] CBP Disclosure Directive, Section 5.2; San Diego Disclosure SOP, Section 1.3.2.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

information is provided by CBP solely for the law enforcement purpose supporting the request;[60] and

- maintain a record of all disclosures, including the request, the information provided, and the supporting law enforcement reason for disclosing the information.[61]

None of the nine disclosures to Mexico we identified fully complied with these requirements.  Additionally, some of the disclosures contained SPII but were not encrypted as required by DHS policy.[62]  Appendix C shows OIG analysis of compliance tracking for each of the nine disclosures.[63]

Because they did not follow CBP's information-sharing policies, FOB Official 1, FOB Official 2, FOB Official 3, and the NTC official could not prove they shared the information for appropriate reasons, or what they told or asked Mexico to do with the information they shared.  For example, FOB Official 1 could not offer any reason for asking Mexico to deny entry to 14 U.S. citizens, and FOB Official 3 offered conflicting reasons for sending information about U.S. citizens to a Mexican official.  Because they did not comply with the CBP Disclosure Directive's requirement to record the law enforcement reason for each disclosure, they cannot demonstrate whether they reasonably believed the disclosures were necessary to support a purpose authorized by the statute and regulation.  Similarly, we would have known that the CBP officials asked Mexico to deny entry to U.S. citizens, if they had recorded that as the reason for disclosing the information to Mexico.  Alternatively, if the officials had recorded a different reason for disclosing the information to Mexico, and

---

[60] CBP Disclosure Directive, Section 5.6; San Diego Disclosure SOP, Section 3.2.

[61] CBP Disclosure Directive, Section 5.11 (Each CBP office "shall maintain a record of all [foreign] disclosures of official information … such record shall include … a record of the request from the Foreign Authority, the information provided or a summary thereof, the recipient of the information, and the supporting law enforcement reason for the disclosure."). Additionally, to comply with the *Privacy Act*, 5 U.S.C. § 552a, when disclosing information maintained in a System of Records, CBP must keep a record either in TECS, by filing the DHS Privacy Act Disclosure Record form, or through other arrangements made with the CBP Privacy and Diversity Office. CBP Disclosure Directive, Section 5.12.  In the San Diego Sector, "a log will be maintained by the FOB documenting all requests" and officials must complete and file the "Record of Information Shared with Foreign Government Agency" form with the CBP Privacy and Diversity Office for each foreign disclosure.  San Diego Disclosure SOP, Sections 3.2, 3.3.4, Attachment 2.

[62] *DHS Sensitive Systems Policy Directive 4300A*, Version 13.1, Section 5.4.6k, July 2017; *See also DHS Privacy Policy Directive 047-01-007*, *Handbook for Safeguarding Sensitive PII*, Dec. 2017.

[63] CBP officials who improperly disclose CBP documents with confidential information are subject to discipline.  19 C.F.R. § 103.34.  DHS OIG is referring information related to the improper foreign disclosures to CBP's Office of Professional Responsibility for whatever action CBP deems appropriate.



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

properly instructed Mexico to use the information only for that purpose, it would have shown that they probably did not ask Mexico to deny entry to U.S. citizens.

We are also unable to determine whether the CBP officials asked Mexico to deny entry to U.S. citizens because they did not retain records. The *Federal Records Act* requires the heads of Federal agencies to create safeguards to prevent the removal or loss of "records."[64] Additionally, Federal employees may not create or send Federal records using unofficial electronic accounts unless they copy their official electronic messaging account in the original creation or transmission of the record, or forward the message to their official account within 20 days.[65]

DHS policy requires its employees to "create, receive, and maintain official records providing adequate and proper documentation in support of DHS activities" and to "ensure all records are properly maintained."[66] DHS policy similarly provides that, "[a]ny communication in which an Agency decision or commitment is made or where an action is committed to, that is not otherwise documented, needs to be captured," in "compliance with Federal records management laws, regulations, and policies."[67] According to CBP's *Records Control Handbook* (Records Handbook) in effect during the relevant period, electronic Federal records "must be maintained and disposed of in accordance with an approved disposition schedules."[68] The Records Handbook further states that "[i]nformation created in or received by the Customs Service in carrying out its mission constitutes a Federal record."[69] Finally, the Records Handbook states "it is the responsibility of the Customs employee to ensure that a copy [of an electronic mail record] is preserved by making it a part of the official files of Customs," and provides guidance on which electronic communications constitute records:

---

[64] 44 U.S.C. § 3105; 36 C.F.R. § 1220.30. "Records" are "all recorded information, regardless of form or characteristics, made or received by a Federal agency under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the United States Government or because of the informational value of data in them." 44 U.S.C. § 3301(a)(1)(A).
[65] 44 U.S.C. § 2911.
[66] DHS Directive 141-01, *Records and Information, Management*, Section V, Aug. 2014.
[67] DHS Policy Directive 141-03, Memorandum from Claire M. Grady, Under Secretary for Management to Component Heads, *Attachment: Documenting Electronic Messages and Verbal Communications*, Feb. 2018.
[68] U.S. Customs Service, *Records Control Handbook, CIS HB 2100-05A*, Part 3.C, Jan. 2001 (Records Handbook). The Records Handbook has since been replaced (in June 2019, after the end of this report's review period) with a new version that offers additional guidance on maintaining electronic records.
[69] Records Handbook, Part 3.D.

---



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

> An electronic mail message can become a record when created by
> the sender or when received and acted on by the recipient, if the
> message contains substantive information that is necessary to
> adequately and properly document the activities and functions of
> Customs.  It should be preserved as an official record.
> ...
> Electronic mail documents are nonrecord when they provide no evidence
> of Customs functions and activities, lack information of value on
> Customs activities, duplicate information documented in existing or
> subsequent records, and therefore are not unique.[70]

All four CBP officials who sent information to Mexican officials about
Americans told us they communicated with their Mexican counterparts using
WhatsApp.  None of the four officials retained all their relevant WhatsApp
messages:

- FOB Official 1 and FOB Official 3 said they deleted caravan-related
  messages, including contemporaneous messages with their Mexican
  counterparts, when their details to the FOB ended or when they
  otherwise thought they no longer needed the messages.
- FOB Official 2 apparently lost all his WhatsApp data, including the
  transmission of the PowerPoint to his Mexican counterpart, when CBP
  updated his government-issued mobile phone.
- The NTC official claimed that before deleting WhatsApp messages, he
  would copy and preserve their content in emails.  Nonetheless, he was
  unable to provide us with all messages related to his information
  sharing, including a request from his Mexican counterpart for
  information about an American.[71]

The CBP officials' failure to retain WhatsApp messages likely violated DHS and
CBP records retention policies, because the messages were information that
CBP created or received in carrying out its mission and contained substantive
information that was necessary to adequately and properly document the
activities and functions of the CBP officials.  For example, the CBP officials who
communicated with Mexico could not answer questions that would have been
apparent in the deleted messages, such as what information was shared
between the Mexican and CBP officials, when that information was shared,

---

[70] Records Handbook, Part 3.L.
[71] Unless the four CBP officials' WhatsApp accounts were their official CBP electronic account,
they likely violated 44 U.S.C. § 2911, because they did not copy or forward all WhatsApp
messages to their official CBP accounts.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

whether any instructions accompanied the shared information, and why the information was requested or shared.

Moreover, the CBP officials' inability to recall key details about their communications with Mexican officials, or in some cases, whether they even shared information about U.S. citizens with Mexican officials, raises questions about whether there were other instances of Mexican and CBP officials' sharing information about American caravan associates.  Complete WhatsApp records would have shown whether CBP officials shared U.S. citizens' SPII with Mexico on other occasions.

The fact that none of these officials retained their WhatsApp messages, and the various ways in which that happened, highlights the challenges of satisfactorily upholding recordkeeping responsibilities when CBP employees use WhatsApp.[72]  This is particularly troubling given the widespread use of WhatsApp during Operation Secure Line.  Numerous CBP officials, across various offices, regularly used WhatsApp to communicate both with individuals and in various WhatsApp groups, some of which contained up to hundreds of U.S. and Mexican officials.  Yet, these officials did not consistently retain their WhatsApp messages or copy or forward them to their official CBP accounts.[73]

Finally, it is not clear whether CBP even allows officials to use WhatsApp for official business.  During Operation Secure Line, CBP had no policies regarding the use of WhatsApp.  Shortly afterwards, in May 2019, CBP's Office of Information Technology sent conflicting and confusing guidance, stating "Although 'WhatsApp' is not approved for operational use at CBP, WhatsApp users should immediately upgrade to the current version of the app … or remove it from any mobile devices."  Warning employees not to use WhatsApp for operational use but inviting them to download a new version on their government-issued devices could cause confusion among employees.

---

[72] CBP's Records Handbook acknowledges that "the ease with which electronically stored records can be erased or changed increases the risk of unauthorized destruction of official documentation and information."  Records Handbook, Part 3.J.  Similarly, the current CBP Records Handbook warns that Electronically Stored Information "can be erased or altered. This increases the risk of unauthorized destruction of federal records."  *CBP Records and Information Management Handbook, HB 2100-05B:  Records and Information Management Handbook,* Part 3.J., June 2019.

[73] Many CBP officials told us they primarily used WhatsApp for non-substantive purposes such as scheduling, or that the information they received from Mexico was unsolicited and not relevant to their work.  However, from interviews and reviewing the contents of three CBP-issued phones, we confirmed that CBP's use of WhatsApp was not confined to those purposes and that CBP officials also used WhatsApp to send and receive substantive messages that may be subject to recordkeeping requirements.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

# Conclusion

CBP's actions in response to the migrant caravan raised public concerns that CBP was inappropriately retaliating against U.S. citizens. Although we did not find CBP took these actions to harass, intimidate, or retaliate against caravan associates, we identified several issues. First, many CBP officials were unaware of CBP's policy related to placing lookouts and may have inadvertently placed some caravan-related lookouts that did not comply with that policy. Second, CBP officials did not remove lookouts that were no longer needed, resulting in some repeated and unnecessary inspections. Finally, CBP officials repeatedly and improperly sent the names and sensitive information of U.S. citizens to Mexican officials and inappropriately asked Mexico to deny entry to at least 14 of those individuals. Mexico subsequently denied entry to at least four U.S. citizens, and CBP cannot fully explain its involvement in these denials because CBP officials did not comply with the CBP policies on sharing information with foreign agencies and did not retain communication records.

# Recommendations

We recommend the Senior Official Performing the Duties of the Commissioner of CBP:

**Recommendation 1:** Update Customs Directive No. 4320-003, July 1990 (TECS Directive) to clarify the appropriate bases for placing lookouts and provide training to all CBP officials who have the authority to place lookouts.

**Recommendation 2:** Develop and implement procedures to ensure CBP officials update and remove lookouts in accordance with the TECS Directive.

**Recommendation 3:** Develop and issue a policy regarding asking, advising, or otherwise communicating with foreign governments about denying entry to U.S. citizens. At a minimum, the policy should specify the appropriate circumstances for such communications, who is authorized to approve such communications, and the procedures to follow when making such communications.

**Recommendation 4:** Conduct a review of all instances in which CBP, as part of its response to the migrant caravan, disclosed U.S. citizens' Sensitive Personally Identifiable Information to Mexican officials, between October 2018 and March 2019, to identify any instances that did not comply with foreign disclosure requirements and take remedial actions. Remedial actions may include rescinding requests to deny entry to U.S. citizens, retroactively instructing foreign authorities to hold CBP information in confidence and use



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

CBP information only for the purpose for which CBP provided it, ensuring disclosures are properly documented in CBP's systems of records, and any other steps necessary to ensure that all foreign disclosures comply with *CBP Directive No. 4320-025A, Disclosure of Official Information to Foreign Authorities*, *DHS Sensitive Systems Policy Directive 4300A, DHS Handbook for Safeguarding Sensitive Personally Identifiable Information*, and all other applicable policies and procedures.

**Recommendation 5:** Provide training to all CBP personnel on the process for sharing information with foreign nations, covering all applicable policies and procedures, including which CBP personnel are authorized to make foreign disclosures.

**Recommendation 6:** Take immediate action to end the use of WhatsApp for operational purposes or to ensure that WhatsApp messages are retained in compliance with legal and policy requirements including records retention schedules.

## Management Comments and OIG Analysis

We have included a copy of CBP's Management Response in its entirety in Appendix B.  We also received technical comments to the draft report and revised the report where appropriate.  CBP concurred with our six recommendations, which are resolved and open.  A summary of CBP's responses to our recommendations and our analysis follows.

**CBP Response to Recommendation 1:** Concur.  CBP will update lookout placement procedures in the TECS Directive.  Additionally, CBP will modify existing training to inform users that lookouts should only be created for law enforcement purposes.  CBP expects to complete these actions by December 31, 2021.

**OIG Analysis:** We consider these actions responsive to the intent of Recommendation 1, which is resolved and open.  We will close this recommendation when CBP completes the identified updates to the TECS Directive and provides documentation showing that it has updated its existing training and provided that training to all CBP officials who have the authority to place lookouts.

**CBP Response to Recommendation 2:** Concur.  CBP will update lookout placement procedures in the TECS Directive.  In addition, CBP will issue a memorandum and muster to remind CBP officers of their responsibilities to



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

remove and update lookouts in accordance with policy.  CBP expects to
complete these actions by December 31, 2021.

**OIG Analysis:** We consider these actions responsive to the intent of
Recommendation 2, which is resolved and open.  We will close this
recommendation when CBP completes the identified updates to the TECS
Directive and provides documentation showing that it has issued the
memorandum and muster to CBP officers with guidance on removing and
updating lookouts in accordance with policy.

**CBP Response to Recommendation 3:** Concur.  CBP will revise Directive No.
4320-025A, "Disclosure of Official Information to Foreign Authorities," dated
April 2014, by adding a provision on sharing U.S. persons' information with
foreign governments.  CBP component offices will collaborate to revise and
issue the policy.  CBP expects to complete these actions by July 29, 2022.

**OIG Analysis:** We consider this action responsive to the intent of
Recommendation 3, which is resolved and open.  We will close this
recommendation when CBP completes the identified updates to Directive No.
4320-025A, "Disclosure of Official Information to Foreign Authorities."

**CBP Response to Recommendation 4:** Concur. CBP will identify and review
disclosures of U.S. citizens' Personally Identifiable Information to Mexican
officials that occurred as part of its response to the migrant caravans between
October 2018 and March 2019, to ensure compliance with foreign disclosure
requirements (specifically established policies and delegations of authority).  To
the extent remedial actions are required, CBP will remediate each non-
compliant disclosure.  CBP expects to complete these actions by March 31,
2022.

**OIG Analysis:** We consider these actions responsive to the intent of
Recommendation 4, which is resolved and open.  We will close this
recommendation when we receive documentation showing that CBP has
completed its review of disclosures of U.S. citizens' Personally Identifiable
Information to Mexico as part of its response to the 2018–2019 migrant
caravan, as well as documentation showing completion of any required
remedial action.

**CBP Response to Recommendation 5:** Concur.  CBP's Privacy and Diversity
Office, in coordination with various CBP components, will identify individuals
and work units that regularly disclose PII to foreign partners, and will provide
virtual training regarding all applicable policies and procedures by March 31,
2022.  The Privacy and Diversity Office, in coordination with the Office of



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Training and Development, will also develop a new course focused on domestic and foreign information sharing in the DHS Performance and Learning Management System.  CBP expects to complete these actions by December 30, 2022.

**OIG Analysis:** We consider these actions responsive to the intent of Recommendation 5, which is resolved and open.  We will close this recommendation when we receive documentation showing that CBP has completed the identified training on processes for sharing information with foreign nations.  In addition, in order to close this recommendation, we request that CBP provide a copy, once completed, of the course developed by the Privacy and Diversity Office, in coordination with the Office of Training and Development.

**CBP Response to Recommendation 6:** Concur.  CBP's Office of Information and Technology will explore the viability of the continued operational use of WhatsApp, which will include looking for a replacement.  Office of Information and Technology is currently piloting a managed messaging platform to replace WhatsApp.  CBP is currently working on an operational pilot.  CBP expects to complete these actions by December 31, 2021.

**OIG Analysis:** We consider these actions responsive to the intent of Recommendation 6, which is resolved and open.  We will close this recommendation when CBP provides documentation showing the results of its pilot to replace WhatsApp and to ensure that messages are retained in compliance with legal and policy requirements including records retention schedules.

 **OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix A
## Objective, Scope, and Methodology

The Department of Homeland Security Office of Inspector General was established by the *Homeland Security Act of 2002* (Pub. L. No. 107−296) by amendment to the *Inspector General Act of 1978*.

The objective of this special review was to determine whether CBP improperly targeted journalists, attorneys, and advocates (caravan associates) because of their affiliation with and perceived support of the migrant caravan. We focused on CBP's rationale for placing, maintaining, and removing active lookouts on caravan associates and whether CBP improperly requested Mexico to deny their entry. Our review primarily examined the actions of CBP's Region IX Emergency Operations Center located in San Diego and the Foreign Operations Branch within the Border Patrol's San Diego Sector, but we also reviewed certain actions taken by CBP's National Targeting Center in the Washington, D.C. area.

We conducted more than 50 interviews of CBP employees, obtained more than 150,000 emails from 6 CBP officials, and imaged the contents of 3 government-issued mobile phones assigned to CBP supervisors in San Diego. During the early stages of our review, we asked CBP to provide "any and all notices or alerts CBP made to any law enforcement or other government agency (domestic or foreign)" about 54 specific U.S. citizens. The National Targeting Center and the Border Patrol's San Diego Sector both responded that they had no such records, even though CBP officials in those units sent Mexico information about all 54 Americans. These omissions — whether intentional or unintentional — materially impeded and delayed our review.

We also reviewed the circumstances surrounding lookouts CBP placed to refer 51 U.S. caravan associates to secondary inspection. The PowerPoint that was leaked to the media in March 2019 included 38 Americans with caravan-related lookouts for referral to secondary inspection, and we identified 13 additional American caravan associates with lookouts for referral to secondary inspection. For each of the 51 Americans, we reviewed data showing when CBP placed, edited, or removed each lookout, documentation showing CBP's purported reason for placing the lookout, and all records relating to secondary inspections that CBP conducted pursuant to those lookouts. We also reviewed more than 20 binational information-sharing agreements between the United States and Mexico. In addition, we reviewed DHS and CBP policies, procedures, and delegation orders relating to sharing information with Mexico, placing and maintaining lookouts, securely transmitting information, storing government records, and conducting border searches.



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

This review was initiated in February 2019 by the former DHS OIG Special
Reviews Group (SRG) and was conducted in accordance with SRG's quality
control standards and the *Quality Standards for Federal Offices of Inspector
General* (Silver Book) issued by the Council of the Inspectors General on
Integrity and Efficiency.  These standards require work to be carried out with
integrity, objectivity, and independence, and provide information that is
factually accurate and reliable.  This report reflects work performed by SRG
pursuant to Section 2 of the *Inspector General Act of 1978*, as amended.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix B
## CBP Comments to the Draft Report



1300 Pennsylvania Avenue, NW
Washington, DC 20229

August 25, 2021

MEMORANDUM FOR:   Joseph V. Cuffari, Ph.D.
                  Inspector General

FROM:             Henry A. Moak, Jr.                    8/25/2021
                  Senior Component Accountable Official   X _____
                  U.S. Customs and Border Protection    Signed by: HENRY A MOAK JR

SUBJECT:          Management Response to Draft Report: "CBP Targeted
                  Americans Associated with the 2018-2019 Migrant Caravan"
                  (Project No. I19-CBP-SIU-08930/19-SRG-003)

Thank you for the opportunity to comment on this draft report. U.S. Customs and Border
Protection (CBP) appreciates the work of the Office of Inspector General (OIG) in
planning and conducting its review and issuing this report.

CBP's core values are vigilance, service, and integrity. In fulfilling our law enforcement
mission, CBP leadership demands the highest standards of honesty, impartiality, and
professionalism, and the agency takes pride in the organizational commitment to promote
accountability.

CBP's coordinated response to the thousands of migrants seeking admission to the United
States through Mexico beginning in October 2018, known as the "migrant caravan," was
essential, due to the potential for mass irregular border crossings and violence against law
enforcement when the migrant caravan reached the U.S. border. CBP is pleased to note
the OIG's recognition that CBP officials had legitimate reasons for placing lookouts on
individuals suspected of organizing, or being associated with, or having information
about the migrant caravan, including some instances, U.S. journalists and attorneys. The
use of lookouts is integral to CBP's mission.

CBP is also pleased to note the draft report's recognition that OIG found no direct
evidence in emails or interviews that CBP officials intended to retaliate, harass, or
intimidate individuals associated with the migrant caravan by placing lookouts on them,
and that OIG's evidence suggests that CBP placed most lookouts to seek information that
would help CBP respond to the migrant caravan. CBP acknowledges the importance of
ensuring that CBP officials receive current guidance and procedures to follow when
placing lookouts and communicating with foreign governments about U.S. citizens.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

The agency remains committed to ensuring that policy and guidance are clear and executed appropriately.

It is also important to note that 19 United States Code § 1628(a)(1)-(4), as implemented at 19 Code of Federal Regulations §103.33(a)(1)-(4) allows CBP to share information or documents with foreign customs and law enforcement agencies when an authorized CBP official reasonably believes it is necessary to:

1. Ensure compliance with any law or regulation that CBP enforces.
2. Administer or enforce multilateral or bilateral agreements to which the United States is a party.
3. Assist in "investigative, judicial and quasi-judicial proceedings" in the United States.
4. Engage in any comparable action undertaken by a foreign customs or law enforcement agency, or in relation to a proceeding in a foreign country.

CBP understands the privacy concerns raised by the OIG regarding the use of WhatsApp and intends to address these concerns while also ensuring information shared with foreign customs and law enforcement agencies complies with applicable law and CBP policy. Specifically, CBP is committed to protecting all Personally Identifiable Information (PII) and Sensitive Personally Identifiable Information (SPII) in its possession, and CBP personnel are regularly reminded of their responsibility to safeguard PII and SPII when fulfilling mission obligations.

The draft report contained six recommendations, with which CBP concurs. Attached find our detailed response to each recommendation. CBP previously submitted technical comments addressing several accuracy, contextual, sensitivity, and other issues under a separate cover for OIG's consideration.

Again, thank you for the opportunity to review and comment on this draft report. Please feel free to contact me if you have any questions. We look forward to working with you again in the future.

Attachment



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Attachment:  Management Response to Recommendations
## Contained in I19-CBP-SIU-08930/19-SRG-003

OIG recommended that the Senior Official Performing the Duties of the Commissioner of CBP:

**Recommendation 1:**  Update Customs Directive No. 4320-003, July 1990 (TECS Directive) to clarify the appropriate basis for placing lookouts and provide training to all CBP officials who have the authority to place lookouts.

**Response:**  Concur.  CBP's Office of Field Operations (OFO) will update the TECS Directive, which includes lookout placement procedures.  Additionally, CBP's existing training will be modified to inform users that lookouts should only be created for law enforcement purposes.  Estimated Completion Date (ECD):  December 31, 2021.

**Recommendation 2:**  Develop and implement procedures to ensure CBP officials update and remove lookouts in accordance with the TECS Directive.

**Response:**  Concur.  CBP OFO will update the TECS Directive, including lookout placement procedures.  In addition, CBP's OFO will issue a memorandum and muster to remind CBP officers of their responsibilities to follow proper TECS guidelines and remove and update lookouts in accordance with CBP policy.  ECD:  December 31, 2021.

**Recommendation 3:**  Develop and issue a policy regarding asking, advising, or otherwise communicating with foreign governments about denying entry to U.S. citizens. At a minimum, the policy should specify the appropriate circumstances for such communications, who is authorized to approve such communications, and the procedures to follow when making such communications.

**Response:** Concur.  CBP's Office of International Affairs (INA) will revise the CBP policy Directive No. 4320-025A, "Disclosure of Official Information to Foreign Authorities," dated April 2014, by adding a provision specifically focused on sharing the information regarding U.S. Persons with foreign governments.  The Directive already includes special handling/requirements for other categories of information, such as Locally Employed Staff and the Violence Against Women Act.  Further, INA will collaborate with CBP's Office of Policy, as well as the Privacy and Diversity Office (PDO) and other CBP component offices, as necessary, to revise and issue the policy. ECD:  July 29, 2022.

**Recommendation 4:**  Conduct a review of all instances in which CBP, as part of its response to the migrant caravan, disclosed U.S. citizens' Sensitive Personally Identifiable Information to Mexican officials, between October 2018 and March 2019, to identify any



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

instances that did not comply with foreign disclosure requirements and take remedial actions. Remedial actions may include rescinding requests to deny entry to U.S. citizens, retroactively instructing foreign authorities to hold CBP information in confidence and use CBP information only for the purpose for which CBP provided it, ensuring disclosures are properly documented in CBP's systems of records, and any other steps necessary to ensure that all foreign disclosures comply with CBP Directive No. 4320-025A, Disclosure of Official Information to Foreign Authorities, DHS Sensitive Systems Policy Directive 4300A, DHS Handbook for Safeguarding Sensitive Personally Identifiable Information, and all other applicable policies and procedures.

**Response:** Concur. CBP's PDO, in coordination with OFO, U.S. Border Patrol (USBP), and Office of Intelligence (OI), will identify and review disclosures to Mexican officials of U.S. citizens' PII that occurred as part of its response to the migrant caravans between October 2018 and March 2019, to ensure compliance with foreign disclosure requirements (specifically established policies and delegations of authority). To the extent remedial actions are required, PDO, in coordination with INA, will remediate each non-compliant disclosure. ECD: March 31, 2022.

**Recommendation 5:** Provide training to all CBP personnel on the process for sharing information with foreign nations, covering all applicable policies and procedures, including which CBP personnel are authorized to make foreign disclosures.

**Response:** Concur. CBP's PDO, in coordination with OFO, USBP, and OI, will identify individuals and work units that regularly disclose PII to foreign partners, and will provide virtual training regarding all applicable policies and procedures by March 31, 2022. PDO, in coordination with the Office of Training and Development, will also develop a new course focused on domestic and foreign information sharing in the DHS Performance and Learning Management System. ECD: December 30, 2022.

**Recommendation 6:** Take immediate action to end the use of WhatsApp for operational purposes or to ensure that WhatsApp messages are retained in compliance with legal and policy requirements including records retention schedules.

**Response:** Concur. CBP's Office of Information Technology (OIT) will explore the viability of the continued operational use of WhatsApp, which will include looking for a replacement. CBP OIT is currently piloting a managed messaging platform to replace the functions and use cases of WhatsApp. The application is an authorized government-managed platform hosted in the CBP's Amazon Web Services Cloud East environment. The CBP Innovation Office, supported by OIT, is currently working on an operational pilot to expand the use of it and to make it an agency-wide offering. ECD: December 31, 2021.



# OFFICE OF INSPECTOR GENERAL
### Department of Homeland Security

## Appendix C
## CBP's Foreign Disclosures to Mexico: Tracking Compliance with DHS and CBP Policies[1]

| ✔ = Compliant  X = Non-compliant | Advise in writing to keep information confidential and use only for the intended purpose.[2] | Mark with sensitivity notations.[3] | Share information only between government email accounts, in person, or by telephone (San Diego Sector only).[4] | Encrypt sensitive information.[5] | Maintain a record of requests, disclosures and supporting law enforcement reason.[6] | Retain disclosures and related Federal records.[7] |
|---|---|---|---|---|---|---|
| **Foreign Disclosure 1:** FOB Official 1 requested Mexico deny entry to 14 U.S. citizens. | X | X | ✔ | X | X | **Unknown[8]** |
| **Foreign Disclosure 2:** FOB Official 2 shared the PowerPoint and another document during a meeting with Mexican officials. | **Unknown[9]** | **Unknown** | ✔ | N/A | X | N/A |
| **Foreign Disclosure 3:** FOB Official 2 sent the PowerPoint to a Mexican Official via WhatsApp. | **Unknown** | **Unknown** | X | ✔ | X | X |
| **Foreign Disclosure 4:** FOB Official 3 emailed six U.S. citizens' SPII to a Mexican official. | X | X | X | X | X | X |
| **Foreign Disclosure 5:** NTC Official emailed one U.S. citizen's SPII to a Mexican official. | X | X | N/A | X | X | X |
| **Foreign Disclosure 6:** NTC Official emailed five U.S. citizens' SPII to a Mexican official. | X | X | N/A | ✔ | X | ✔ |
| **Foreign Disclosure 7:** NTC Official emailed one U.S. citizen's SPII to a Mexican Official. | X | X | N/A | ✔ | X | ✔ |
| **Foreign Disclosure 8:** NTC Official emailed two U.S. citizens' SPII to a Mexican Official. | X | X | N/A | ✔ | X | ✔ |
| **Foreign Disclosure 9:** NTC Official emailed one U.S. citizen's SPII to a Mexican official. | X | X | N/A | ✔ | X | ✔ |

*Source:* DHS OIG analysis of Federal law, DHS and CBP policies, and CBP-provided data

[1] OIG's analysis of the nine disclosures in Appendix C are bound by the limited facts that were available to OIG. Because CBP officials were not always forthcoming about these disclosures, OIG was not able to conclusively find whether the disclosures were made in compliance with DHS' and CBP's record retention policies.
[2] CBP Disclosure Directive, Section 5.2; San Diego Disclosure SOP, Section 1.3.2.
[3] CBP Disclosure Directive, Section 5.6; San Diego Disclosure SOP, Section 3.2.
[4] San Diego Disclosure SOP, Section 3.1.
[5] *DHS Sensitive Systems Policy Directive 4300A*, Version 13.1, Section 5.4.6k, July 2017.
[6] CBP Disclosure Directive, Sections 5.11, 5.12; San Diego Disclosure SOP, Section 3.2.1.



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

7 DHS Directive 141-01, *Records and Information* Management, Section V, Aug. 2014; Policy Directive 141-03, Memorandum from Claire M. Grady, Under Secretary for Management, to Component Heads, *Electronic Records Management Updates for Chat, Text and Instant Messaging*, Feb. 2018; U.S. Customs Service, *Records Control Handbook, CIS HB 2100-05A*, Part 3.C, Jan. 2001.

8 FOB Official 1 said he communicated with the Mexican official using WhatsApp. Because he deleted those messages, we do not know whether they used WhatsApp to communicate about FOB Official 1's request that Mexico deny entry to 14 Americans.

9 We cannot determine whether Disclosures 2 and 3 contained the appropriate written advisements and markings, because documentary evidence of those disclosures does not exist. FOB Official 2 made Disclosure 2 in person, and we cannot conclusively know what those hard copy documents said. For Disclosure 3, FOB Official 2 did not retain his WhatsApp message transmitting the PowerPoint to the Mexican official.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

**Appendix D**
**Major Contributors to This Report**

John Shiffer, Chief Inspector
Matthew Neuburger, Director of the Special Reviews Group
Michael Redmond, Senior Special Agent
Kay Bhagat-Smith, Investigative Counsel
Steven Staats, Lead Inspector
Gregory Flatow, Lead Inspector

 **OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix E
## Report Distribution

### Department of Homeland Security

Secretary
Deputy Secretary
Chief of Staff
Deputy Chiefs of Staff
General Counsel
Executive Secretary
Director, GAO/OIG Liaison Office
Assistant Secretary for Office of Policy
Assistant Secretary for Office of Public Affairs
Assistant Secretary for Office of Legislative Affairs
Commissioner, CBP
CBP Component Liaison

### Office of Management and Budget

Chief, Homeland Security Branch
DHS OIG Budget Examiner

### Congress

Congressional Oversight and Appropriations Committees
Senator Patrick Leahy
Senator Dianne Feinstein
Senator Richard J. Durbin
Senator Sheldon Whitehouse
Senator Amy Klobuchar
Senator Christopher A. Coons
Senator Richard Blumenthal
Senator Mazie K. Hirono
Senator Cory A. Booker

## Additional Information and Copies

To view this and any of our other reports, please visit our website at: www.oig.dhs.gov.

For further information or questions, please contact Office of Inspector General Public Affairs at: DHS-OIG.OfficePublicAffairs@oig.dhs.gov.
Follow us on Twitter at: @dhsoig.



## OIG Hotline

To report fraud, waste, or abuse, visit our website at www.oig.dhs.gov and click on the red "Hotline" tab. If you cannot access our website, call our hotline at (800) 323-8603, fax our hotline at (202) 254-4297, or write to us at:

Department of Homeland Security
Office of Inspector General, Mail Stop 0305
Attention: Hotline
245 Murray Drive, SW
Washington, DC 20528-0305